No.: 22-35050

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

ENRIQUE JEVONS, as managing member of Jevons Properties; LLC, FREYA K. BURGSTALLER, as trustee of the Freya K. Burgstaller Revocable Trust, JAY GLENN and KENDRA GLENN,

Plaintiffs-Appellants

v.

JAY INSLEE, in his official capacity as Governor of the State of Washington and ROBERT FERGUSON, in his official capacity of the Attorney General of the State of Washington,

Defendants-Appellees.

Appeal from the District Court from the Eastern District of Washington

**APPELLANTS' OPENING BRIEF**

STEPHENS & KLINGE LLP
Richard M. Stephens WSBA #21776
10900 NE 4th Street, Suite 2300
Bellevue, WA  98004
(425)-453-6206
stephens@sklegal.pro

## DISCLOSURE STATEMENT

Appellants have no parent corporation or any publicly held corporation that owns 10% or more of their stock.

# Table of Contents

Disclosure Statement…………………………………………….…………………………..i

Table of Contents…………………………………….……….…………...………..ii

Table of Authorities……………………………………….............………vi

Jurisdictional Statement………………………………………………………1

Statement of the Issues Presented for Review…………………….……..2

Concise Statement of the Case…………………………………………….2

A. The pandemic…………………………………………….…………2

B. The Proclamations affecting rental property………………………….3

C. Appellant Owners' situations……………………………………….7

1. Enrique Jevons…………………………………………………....7

2. Freya Burgstaller………………………………………..10

3. Jay and Kendra Glenn………………………………………..11

D. Procedural History…………………………………………………14

Summary of Argument…………………………………………………15

Standard of Review………………………………………………………16

Argument……………………………………………………….........16

ii

I
The District Court erred in granting summary judgment
against Appellant Owners' taking of property claim.........................16

  A. Nothing bars the Court from granting declaratory relief
     that a government regulation takes, or does not take,
     property interests.................................................................18

    1. The parties' dispute over whether a taking has
      occurred is appropriate for declaratory relief..........................19

      a. The Supreme Court has repeatedly recognized that
        decisions declaring whether a taking did or did not
        occur are appropriate and need not be tethered to
        a claim for compensation...................................................21

      b. By confusing different forms of equitable relief, the
        District Court erroneously concluded that declaratory
        relief was not available for a Fifth Amendment taking
        claim simply because injunctive relief is usually not
        available.........................................................................23

    2. The Declaratory Judgment Act specifically allows plaintiffs
      to seek compensation after a declaration of rights is issued........25

  B. The Proclamations effect a taking of property from Owners
     by mandating unwanted continuing occupation of their
     properties without compensation...........................................27

    1. Mandated physical occupation of private property
      is a *per se* taking..............................................................27

    2. The District Court's reliance on inapt parts of the Supreme
      Court decision in *Yee*, overlooked that *Yee* ultimately
      supports Owners' position here.............................................30

3. The Proclamations also take property interests in
Appellant Owners' rental contracts.......................................34

4. The Proclamations take interests in security deposits...............35

II
The District Court erred in granting summary judgment on
Appellant Owners' Contracts Clause claim......................................38

A. *Blaisdell* and *Kavanaugh* are the controlling authorities….....…..38

B. Forcing owners to tolerate the occupancy of their properties
by nonpaying or rule-breaking tenants contrary to their
leases constitutes a substantial impairment of contracts.............41

1. The Proclamations undermine the contractual bargain.............42

2. The Proclamations interfere with the reasonable expectation
that an owner of property may insist on payment of rent as a
condition for occupying the property......................................45

3. Owners are unable to safeguard or reinstate their rights...........49

C. The impairment is not appropriately tailored or conditioned........52

1. Deference on tailoring and conditioning is not appropriate
because the means analysis does not require scientific or
public health expertise.........................................................53

2. Reasonable tailoring or conditioning is absent.........................53

a. The District Court improperly assumed that Owners'
claim is based on being required to use assets for the
benefit of another................................................................54

b. *Blaisdell* teaches that to have satisfied the tailoring and
reasonable condition standards, the Proclamations should

have included provisions for ensuring Owners received
reasonable payment for the occupancy of their properties........55

   c.  The district court decisions the District Court relied upon
are distinguishable or unpersuasive………………….....…..61

   d.  Requiring property owners to house rule-breaking tenants
without rent is not tailored to the emergency……………....…66

Conclusion…………………………………………….....68

Certificate of compliance with type-volume limitations in
Rule 29(d) and Rule 32(g)(1)……………………………………69

Certificate of Service……………………………………70

Addendum Table of Contents…………………………….....71

Constitutional Provisions…………………………………72

Article I, Section of the United States Constitution……………...72

Fifth Amendment to the United States Constitution……………..72

Fourteenth Amendment to the United States
Constitution, Section 1………………………………….....72

Statutes…………………………………………....………73

RCW 59.18.080………………………………………73

RCW 59.18.130………………………………………73

RCW 59.18.630………………………………………73

# Table of Authorities

Page(s)

Cases

*Alabama Association of Realtors v. Department of Health and Human Services,*
___ U.S.___,141 S.Ct. 2485 (2021) .......................................... 3, 43, 49, 63

*Alabama Association of Realtors v. Department of Health and Human Services,*
539 F.Supp.3d 29 (D.C.D.C. 2021) ....................................................... 63

*Allied Structural Steel Co. v. Spannaus,*
438 U.S. 234 (1978) ...................................................................... 52, 66

*Allstate Ins. Co. v. Herron,*
634 F.3d 1101 (9th Cir. 2011) ............................................................. 19

*Animal Legal Defense Fund v. U.S. Food & Drug Administration,*
836 F.3d 987 (9th Cir. 2016) ............................................................... 16

*Apartment Association of Los Angeles County, Inc. v. City of Los Angeles,*
10 F.4th 905 (9th Cir. 2021) ..................................................... 61, 63, 64

*Arkansas Game and Fish Comm'n v. United States,*
568 U.S. 23 (2012) ............................................................................. 30

*Armstrong v. United States,*
364 U.S. 40 (1960) ................................................................. 17, 36, 37

*Baptiste v. Kennealy,*
490 F. Supp. 3d 353 (D. Mass. 2020) ................................. 23, 24, 31, 48

*Bilbrey by Bilbrey v. Brown,*
738 F.2d 1462 (9th Cir. 1984) ............................................................. 19

*Block v. Hirsh,*
256 U.S. 135 (1921) ...................................................................... 56, 57

*Bronson v. Kinzie,*
42 U.S. 311 (1843) ............................................................................. 56

*Cedar Point Nursery v. Hassid,*
___ U.S. ___, 141 S.Ct. 2063 (2021) ........................................ 21, 27, 28

*Cienega Gardens v. United States,*
    331 F.3d 1319 (Fed. Cir. 2003) .......................................................... 34
*Connolly v. Pension Benefit Guar. Corp.,*
    475 U.S. 211 (1986) .................................................................... 54, 60
*County of Butler of Wolf,*
    2020 WL 2769105, *4 (W.D. Pa. May 28, 2020) ........................... 23, 24
*Cwynar v. City and County of San Francisco,*
    90 Cal. App. 4th 637, 109 Cal. Rptr.2d 233 (2001) ............................ 31
*Duke Power Co. v. Carolina Environmental Study Group, Inc.,*
    438 U.S. 59 (1978) .............................................................................. 22
*Eastern Enters. v. Apfel,*
    524 U.S. 498 (1998) ............................................................................ 22
*Edgar A. Levy Leasing Co. v. Siegal,*
    258 U.S. 242 (1922) ............................................................................ 57
*El Papel, LLC v. Inslee,*
    2021 WL 71678 (W.D. Wash. 2021) ............................................. 61, 62
*Elmsford Apartment Assoc., LLC v. Cuomo,*
    469 F. Supp. 3d 148 (S.D. N.Y. 2020) ................................................ 31
*F.C.C. v. Fla. Power Corp.,*
    480 U.S. 245 (1987) ............................................................................ 29
*Farhoud v. Brown,*
    2022 WL 326092 (D. Or. February 3, 2022) ..................... 46, 47, 49, 50
*HAPCO v. City of Philadelphia,*
    482 F. Supp. 3d 337 ...................................................... 24, 48, 61, 62
*Heart of Atlanta Motel, Inc. v. United States,*
    279 U.S. 241 (1964) ..................................... ..................................... 34
*Heights Apartments, LLC v. Walz,*
    30 F.4th 720 (8th Cir. 2022) ..................................................... passim
*Hendler v. United States,*
    952 F.2d 1364 (Fed. Cir. 1991) .......................................................... 29
*Home Bldg. & Loan Ass'n v. Blaisdell,*
    290 U.S. 398 (1934) ................................................................... passim
*Hurley v. Kincaid,*
    285 U.S. 95 (1932) .............................................................................. 20
*In re Chateaugay Corp.,*
    53 F.3d 478 (2nd Cir. 1995) ............................................................... 22
*Kaiser Aetna v United States,*
    444 U.S. 164 (1979) ............................................................................ 29

*Knick v. Township of Scott, Pennsylvania,*
___ U.S. ___, 139 S.Ct. 2162 (2019)................................................ 19, 20
*Lingle v. Chevron,*
*Corp.*, 544 U.S. 528 (2005) ..................................................... 17, 22, 27
*Loretto v. Teleprompter Manhattan CATV Corp.,*
458 U.S. 419 (1982) ..................................................................... 27, 29
*Lynch v. United States,*
292 U.S. 571 (1934) ............................................................................. 51
*Marcus Brown Holding Co. v. Feldman,*
256 U.S. 170 (1921) ............................................................................. 57
*Matzger v. Arcade Bldg. & Realty Co.,*
80 Wash. 401 (1914) ............................................................................ 35
*Melendez v. City of New York,*
16 F.4th 992 (2nd Cir. 2021) .............................................................. 49
*Milavetz, Gallop & Milavetz, P.A. v. United States,*
559 U.S. 229 (2010) ............................................................................ 26
*Monongahela Nav. Co. v. United States,*
148 U.S. 312 (1893) ............................................................................ 17
*Pham v. Corbett,*
187 Wn.App. 816 (2015) ..................................................................... 44
*Phillips v. Washington Legal Foundation,*
524 U.S. 156 (1998) ............................................................................ 35
*Regional Rail Reorganization Act Cases,*
419 U.S. 102 (1974) ............................................................................ 20
*Ruckelshaus v. Monsanto Co.,*
467 U.S. 986 (1984) ...................................................................... 20, 22
*S. Cal. Gas Co. v. City of Santa Ana,*
336 F.3d 885 (9th Cir. 2003) .............................................................. 41
*Schneider v. County of San Diego,*
285 F.3d 784 (9th Cir. 2002) .............................................................. 41
*Skelly Oil Co. v. Phillips Petroleum Co.,*
339 U.S. 667 (1950) ............................................................................ 26
*Spokane School Dist. No. 81 v. Parzybok,*
96 Wn.2d 95 (1981).............................................................................. 35
*State of Nev. Employees Ass'n, Inc. v. Keating,*
903 F.2d 1223 (9th Cir. 1990) ...................................................... 60, 65
*State v. Trask,*
91 Wn.App. 253 (1998) ....................................................................... 35

viii

*Sveen v. Melin,*
　138 S.Ct. 1815 (2018) ...................................................... 39, 40, 42, 53
*United States Trust Co. of New York v. New Jersey,*
　431 U.S. 1, 22 (1977) ...................................................... 40, 52, 53, 67
*University of Hawaii Prof'l Assembly v. Cayetano,*
　183 F.3d 1096 (9th Cir. 1999) ...................................................... 41, 68
*Usery v. Turner Elkhorn Mining Co.,*
　428 U.S. 1 (1976) ...................................................... 54
*W.B. Worthen Co. v. Kavanaugh,*
　295 U.S. 56 (1935) ...................................................... 38, 39, 59
*Yee v. City of Escondido, Cal.,*
　503 U.S. 519 (1992) ...................................................... 31, 32, 33, 34

Statutes

28 U.S.C. § 1291 ...................................................... 1
28 U.S.C. § 1343(a) ...................................................... 18
28 U.S.C. § 2201(a) ...................................................... 18
28 U.S.C. §§ 1331 and 1343 ...................................................... 1
28 U.S.C. §§ 1391(b)(1) and (2) ...................................................... 1
28 U.S.C § 2202 ...................................................... 25
42 U.S.C. § 1983 ...................................................... 1, 18

RCW 58.19.630 ...................................................... 51
RCW 59.18.080 ...................................................... 46
RCW 59.18.130 ...................................................... 46
RCW 59.18.630 ...................................................... passim

Rules

Fed. R. App. P. 29(d) and 32(a)(7)(B) ...................................................... 69
Fed. R. App. P. 32(a)(5) ...................................................... 69
Fed. R. App. P. 32(a)(6) ...................................................... 69
Fed. R. App. P. 32(a)(7)(B)(iii) ...................................................... 69
FRCP 56 ...................................................... 16

Other Authorities

Restatement of Property § 7 (1936) ...................................................... 29

## Jurisdictional Statement

The District Court and this Court have subject matter jurisdiction because the Complaint raises questions under the Takings Clause of the Fifth Amendment, the Due Process Clause of the Fourteenth Amendment as it incorporates the Takings Clause, and the Impairment of Contracts Clause of Article I, Section 10. 2-ER-194-235.

Appellants also sought declaratory relief under the Civil Rights Act, 42 U.S.C. § 1983. Therefore, the District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1343. Venue was proper in the Eastern District of Washington pursuant to 28 U.S.C. §§ 1391(b)(1) and (2): all the property that is the subject of the action is situated in that district.

The basis for the Court of Appeals' jurisdiction is 28 U.S.C. § 1291 and Fed. R. App. Proc. Rule 3, arising from the timely filing of a Notice of Appeal in the District Court. Judgment was entered by the District Court on September 20, 2021 (2-ER-54), a timely motion for reconsideration was filed, then denied on December 15, 2021 (2-ER-48), and the Notice of Appeal was filed on January 12, 2022. 2-ER-271. This appeal is from a final order or judgment that disposes of all parties' claims.

## Statement of the Issues Presented for Review

1. Whether a prohibition on evicting non-paying or rule-breaking tenants for 18 months constitutes a temporary taking of property for which just compensation must be paid under the Fifth Amendment.

2. Whether a prohibition on evicting non-paying or rule-breaking tenants constitutes an impairment of the obligation of contract when there is no provision to ensure the owner receives a fair rental value.

Pertinent statutes and constitutional provisions are provided in the addendum hereto.

## Concise Statement of the Case

### A. The pandemic.

The global COVID-19 pandemic brought on by the Novel Coronavirus has caused catastrophic and unprecedented economic damage across the globe and, with it, significant loss of life and fundamental changes to both world and national economies, as well as regional ones. Certainly, the State of Washington has faced tremendous adversity in

planning, coordinating and, at times, executing effective policies to protect the general public's health, safety and welfare during this time of crisis.

### B. The Proclamations affecting rental property.

In response to the pandemic's outbreak in the State of Washington, on March 18, 2020, Governor Inslee issued a series of proclamations. Under these proclamations, the owners of residential rental properties such as Appellants ("Owners") were the only people who were required by any of the Governor's emergency proclamations to continue to provide a good or service without payment in return.[1]

Proclamation 20-19 was the first proclamation relevant to rental housing (collectively "Proclamations"). 2-ER-69. In relevant part, this first Proclamation suspended provisions of state law that allowed the providers of residential rental housing to evict tenants, but the

---

[1] For example, stores and restaurants lost business opportunities due to the pandemic, but they were not forced to provide goods or food to customers without an ability to charge for the items they sold. *See Alabama Association of Realtors v. Department of Health and Human Services*, ___ U.S.___,141 S.Ct. 2485, 2489 (2021) (referring to the hypothetical problem with mandating free groceries, free computers, free internet service).

Proclamation failed to include any provision to reimburse Owners for the uncompensated use of their properties. 2-ER-69.

Approximately ten weeks later, the Governor issued the third Proclamation related to rental property, Proclamation No. 20-19.2, which prohibited: (a) evictions with narrow exceptions,[2] (b) the imposition of fees for late payment, regardless of the tenant's ability to pay, (c) treating unpaid rent as an enforceable debt or financial obligation, again with a narrow exception,[3] and (c) using security

---

[2] The Proclamations provided lessors could only evict tenants if they (a) provide an affidavit that the eviction is necessary to respond to a significant and immediate risk to the health, safety, or property of others created by the resident; or (b) provide at least 60 days' written notice of intent to (i) personally occupy the premises as a primary residence, or (ii) sell the property. 2-ER-110.

[3] The inability to treat unpaid debt as a financial obligation of the tenant is lifted only if the lessor offers the tenant, and the tenant refused or failed to comply with, a repayment plan that was reasonable based on the individual financial, health, and other circumstances of that resident. 2-ER-111. There was, however, no corresponding obligation of tenants to cooperate by providing information for the formulation of such plan—such as the tenant's financial, health and other circumstances—that a housing provider would otherwise have no knowledge about. Tenants have every incentive not to provide such personal information and a history of not doing so. 2-ER-58, 60. Further, Owners could not take tenants to court to find out this information in a deposition, because no action could be filed. 2-ER-110. Hence, it was impossible for Owners to acquire the very information necessary to enforce the rental obligation.

deposits to cover unpaid rent even when a tenant chooses to leave. 2-ER-110.

These Proclamations were renewed several times over successive time periods. *See* 2-ER-102-48. In April of 2021, the Washington Legislature enacted Engrossed Second Substitute Senate Bill 5160, now codified in Title 59.18 of Wash. Rev. Code. (RCW) (2-ER-159, *et seq.*). Relevant to the appeal here, the law ended the Governor's blanket moratorium on evictions, but required dispute resolution proceedings prior to evictions and only in cases of nonpayment of rent. RCW 59.18.630(1).

The Governor vetoed two sections designed to lessen the disparate impact on Owners which would have enabled them to request payment from public funds to cover nonpayment of rent during the period of the Governor's Proclamations. 2-ER-191-92. In June of 2021, the Governor issued Proclamation 21-09, also known as the "Bridge Proclamation," because it was to be a bridge between SB 5160 and post-SB 5160: https://www.governor.wa.gov/sites/default/files/proclamations/proc_21-09.pdf. Despite the Legislature declaring that the eviction moratorium would end, the Governor twice extended the prohibition on evictions for

unpaid rent through to the end of October 2021, unless two conditions were met:

1. There was an operational rental assistance program in the county where the rental property was located, and

2. The tenant was notified of an opportunity to participate in an operational rental assistance program and an operational eviction resolution pilot program in the county where the property was located.

https://www.governor.wa.gov/sites/default/files/proclamations/proc_21-09.1.pdf;

https://www.governor.wa.gov/sites/default/files/proclamations/21-09.2%20%20-%20COVID-19%20Eviction%20bridge%20transition%20Ext%20%28tmp%29.pdf. As will be seen, however, any relief this measure appeared to provide was illusory and inadequate.

These laws have not only significantly impacted Owners but have also negatively impacted the availability of affordable rental housing. Owners facing untenable financial choices have elected to cease renting properties—either choosing to sell or leave homes empty—due to the

tremendous economic burden they were required to shoulder in the furtherance of the public good. 2-ER-239, 262.

### C. Appellant Owners' situations.

Owners are individuals who provide rental housing to tenants in Yakima, Washington. While they all have been willing to work with tenants who have suffered economic hardship resulting from the pandemic or otherwise, they have tenants who have simply chosen not to pay rent or have created nuisances, knowing they couldn't be evicted.

#### 1. Enrique Jevons.

Enrique Jevons (Jevons) is the managing member and owner of Jevons Properties LLC which owns hundreds of residential rental properties rented to tenants in Yakima, Washington. 2-ER-237. Jevons also manages rental units for other owners. *Id.* At the time the cross motions for summary judgment were briefed, Jevons had 171 tenants who were not current with paying their rent. As of April of 2021, he had lost $ 266,509.98 in unpaid rent. *Id.*

For tenants in multifamily buildings, such as a fourplex, Jevons pays the utilities and then splits the utility charges among the tenants in the building, billing each for their share. *Id.* With the Proclamations,

Jevons has been forced to pay utility expenses for those tenants who stopped paying rent. 2-ER-239.

Before the first Proclamation in March of 2020, when a tenant moved out, Jevons would apply the tenant's security deposit to cover any costs for damage to the unit, for cleaning, or for *unpaid rent or late fees*. 2-ER-237-38. If that security deposit was insufficient to cover these costs, he would turn over any unpaid remainder to a collection agency. *Id.*

That stopped with the Governor's First Proclamation. Now, Jevons can only use the security deposit to cover damages and cleaning, but not unpaid rent or fees. *Id.* at 237. Further, Jevons had not been able to offer tenants repayments plans reasonably based on the individual financial, health, and other circumstances of that tenant as the Proclamations require because Jevons does not know the tenants' financial, health or other circumstances. 2-ER-238. It is undisputed that tenants generally do not provide information about their financial or health circumstances or answer questions in the landlord's attempt to gather that information. *Id.*

Jevons's firm has referred tenants who have not been paying rent to various nonprofit agencies to ask for rental assistance, including Opportunities Industrialization Center, Catholic Charities, and Farm Workers Union. *Id.* But these nonprofits entities typically do not have sufficient funds to bring any tenants current on their rent. *Id.* And Washington State itself, using funds earmarked for the Department of Commerce, would pay only 80% of three months of delinquent rent and, in exchange, the owner of the property must agree to waive all other past due rent. *Id.* Jevons has been unwilling to agree to these untenable terms. 2-ER-239.

Since the issuance of the Proclamations, Jevons has received a much higher than normal number of applications for rental units. *Id.* Because the Proclamations on eviction allow eviction when an owner decides to sell, numerous owners choose to sell their property, which further restricts the supply of rental housing. *Id.* There is extremely high demand in the rental market in Yakima County and demand is outstripping supply. *Id.*

All homes owned by Jevons's firm are subject to state and local property taxes. The firm is still required to pay those taxes even when

the tenant is not paying rent, and often must pay utilities, mortgages, and the cost of maintaining and repairing its rental properties. *Id.*

Jevons has eight tenants whose income is too high for them to qualify for rental assistance from the rental assistance programs operating in Yakima County. Nevertheless, those eight tenants together owe over $48,000 in unpaid rent incurred during the Governor's Proclamations. 2-ER-50.

Jevons is also concerned he will never be able to recover these funds or treat this amount as an enforceable debt. RCW 59.18.630 does not allow unpaid rent during this time period to be treated as an enforceable debt unless the landlord and tenant have been provided with an opportunity to resolve nonpayment of rent through an eviction resolution pilot program—an impossible requirement for some like Jevons because as it turns out the program cannot accept tenants who need no financial assistance. 2-ER- 50.

### 2. Freya Burgstaller.

Appellant Freya K. Burgstaller is the trustee of the Freya K. Burgstaller Revocable Trust, which owns 12 residential rental properties rented to tenants in Yakima, 2-ER-253. Burgstaller came to

Yakima in the 1960s and found a home she wanted to purchase. The seller conditioned the sale of that home by requiring Burgstaller to purchase the sellers' second home. *Id.* Thus, albeit with no predetermined plans to do so, Burgstaller entered the rental property business and has been providing residential units for rent ever since.

In March of 2020, Burgstaller attempted to evict a tenant who had stopped paying rent and created enough noise in her unit that Burgstaller's other neighboring tenant repeatedly complained. *Id.* During the eviction process, it became clear that eviction was banned by the Governor's Proclamation in effect at the time. *Id.* Burgstaller was forced to have a tenant in her property who is not paying rent and who creates noise problems for other tenants. *Id.*

### 3. Jay and Kendra Glenn.

Appellants Jay and Kendra Glenn are the owners of 46 residential rental properties rented to tenants in Yakima. 2-ER-260. Because of the Glenns' concern about homelessness and the difficulty of finding suitable housing in the Yakima area for lower income people, the Glenns decided to go into the rental housing business and provide homes at lower than market rents. *Id.* The Glenns pay all utilities for

11

their rental units themselves. *Id.* All the Glenns' properties are subject to state and local property taxes. *Id.*

At the time of the filing of their motion for summary judgment, the Glenns had 29 rental units where the tenants are delinquent in paying their rent. *Id.* The total amount due from nonpaying tenants was $99,728. *Id.* Like Jevons, the Glenns learned they could not be paid through rental assistance programs without waiving all but three months' rent. 2-ER-261, 270.

As noted by Jevons, the demand for rental housing in Yakima is high. The Glenns have not advertised a property for rent since before March of 2020. 2-ER-262. Nevertheless, the Glenns' property manager receives calls several times a day from people looking for a place to rent. The rental shortage is the worst he has ever seen in Yakima. *Id.*

As of the date of filing their motion for reconsideration, the Glenns had seven rental units where the tenants have moved out with unpaid rent incurred during the Proclamations challenged in this case. 2-ER-53. The unpaid rent from those seven former tenants total $19,619. *Id.* Rental assistance programs will not provide any funding for the unpaid rent for these seven tenants; program providers have all stated that

they will not provide rental assistance for tenants who are no longer tenants in the property. 2-ER-53.

As the Glenn's property manager explained:

> In my six years of experience managing rents, it is my experience that tenants will not provide information about their health or financial circumstances after they have moved into the property, although they will provide information about their employment when they are first applying to rent in the units I manage.
>
> During the effective dates of the Proclamations, I hand deliver bills for rent twice a month and several times a month have knocked on the doors of tenants who owe unpaid rent. I ask how they are doing in regard to their financial and health circumstances and ask how we can help them out. On several occasions, I gave tenants who owed unpaid rent some money because they didn't have money for food.
>
> I have had numerous personal interactions with numerous tenants about unpaid rent. Some tenants who owe months of unpaid rent will tell me that they have money (without disclosing the source of funds) but they will not use it to pay unpaid rent. They claim they are saving it and they are confident that the Governor will protect them because the Governor has stated that they cannot be evicted for nonpayment of rent. Because I don't know the amount, I can't use that limited information to come up with a reasonable repayment plan based on their financial circumstances.

2-ER-56-67.

It has been the standard in the rental industry that tenants who do owe past rent have little incentive to pay once they have moved out of the rental unit. The only way to get former tenants to pay is to send their account to a collection agency. It is simply less likely that people will pay what they owe once they are no longer receiving the benefit of their tenancy.

… We are more than willing to work with people. While we want to be paid for the months of unpaid rent, our first priority is to get tenants back to paying what is the current rent and stop the financial drain to the business. Based on conversations with me, I know our tenants know they cannot be evicted and they have little incentive to pay rent.

2-ER-57-58. Jevons' testimony was similar. 2-ER-60.

### D. Procedural History.

Owners filed this action in the District Court for the Eastern District of Washington and, later, their First Amended Complaint was filed. 2-ER-194. Thereafter, the parties agreed to file cross motions for summary judgment. The District Court held oral argument and subsequently ruled in Respondents' favor on all points. Owners filed a timely motion for reconsideration, which was denied, 2-ER-45, and filed a timely Notice of Appeal on January 12, 2022. 2-ER-271. Respondents filed a motion to dismiss on mootness grounds which was denied by this Court on May 26, 2022.

## Summary of Argument

The Governor's Proclamations—which prohibited evictions of tenants who failed to pay rent or violated the rules of the tenancy—effectively mandated a physical occupation of the Owners' properties. Such mandates resulted in classic *per se* takings, which requires payment of just compensation. Accordingly, Owners seek declaratory relief that a taking occurred, which is an appropriate request given the Supreme Court's repeated recognition that declaratory relief is an appropriate mechanism when a taking is alleged to determine whether a taking has occurred.

As to the merits of the takings claim, the Supreme Court has repeatedly made clear that a forced physical occupation of private property is a *per se* taking, requiring payment of just compensation. The District Court's conclusion otherwise is based on a misreading and misapplication of key precedents.

Additionally, the obligations under Owners' leases have been unconstitutionally impaired. Interference with contractual obligations requires reasonable conditions and tailoring. In situations where one's right to exclude others is at stake, the Supreme Court has made clear

15

what conditioning and tailoring require—an assurance that fair market rent would be made available. That tailoring is missing in the Proclamations at issue herein.

## Standard of Review

The District Court granted the State's motion for summary judgment under FRCP 56 (1-ER-7), and Owners appeal the judgment arising from that decision. The standard of review is *de novo*. *Animal Legal Defense Fund v. U.S. Food & Drug Administration,* 836 F.3d 987, 988 (9th Cir. 2016).

## Argument

## I
## The District Court erred in granting summary judgment against Appellant Owners' taking of property claim.

The District Court concluded that issuing declaratory relief that a taking occurred is not a permissible remedy. 1-ER-26-27. In so holding, the court failed to apprehend that the Supreme Court has repeatedly affirmed the propriety of issuing declaratory relief as to whether a taking occurred and conflated declaratory relief with injunctive relief, considering injunctions are usually not available in a taking of property case.

As to the merits of the claim, the Proclamations required Owners to endure a physical occupation of their property without compensation rendering a *per se* taking under the Fifth Amendment.

The purpose of the Fifth Amendment undergirds the analysis to be applied, which the Supreme Court has explained as being to

> bar Government from forcing some people alone to bear the public burdens which, in all fairness and justice, should be borne by the public as a whole.

*Armstrong v. United States*, 364 U.S. 40, 49 (1960), *quoted in Lingle v. Chevron Corp.*, 544 U.S. 528, 537 (2005).[4]

As addressed below, the *Armstrong* rationale applies here. To the extent that society benefits by allowing tenants to remain in their

---

[4] This purpose has deep roots. In *Monongahela Nav. Co. v. United States*, 148 U.S. 312, 324-25 (1893), the Court explained the compensation principle

> "in no wise detracts from the power of the public to take whatever may be necessary for its uses; while, on the other hand, it prevents the public from loading upon one individual more than his just share of the burdens of government, and says that when he surrenders to the public something more and different from that which is exacted from other members of the public, a full and just equivalent shall be returned to him."

*Id*. at 325 (citation omitted).

leaseholds during the pandemic, the burden of that benefit to society has been disproportionately—*in fact, exclusively*—placed on the private owners of the property. Owners urge the Court to declare that they must be provided just compensation for providing this public benefit at their own expense.

### A. Nothing bars the Court from granting declaratory relief that a government regulation takes, or does not take, property interests.

Owners sought declaratory relief that they had property interests taken when the Proclamations forced uncompensated occupations of their properties by prohibiting property owners from taking any action to remove tenants who failed to pay rent, who broke rules, who overstayed their lease or even to remove squatters who never had any right to possession. Various statutes authorize declaratory relief to resolve disputes: 42 U.S.C. § 1983, 28 U.S.C. § 1343(a) and 28 U.S.C. § 2201(a). As addressed below, the District Court's conclusion that it could not grant declaratory relief was erroneous.

### 1. The parties' dispute over whether a taking has occurred is appropriate for declaratory relief.

Owners' takings claim fits the statutory authorization for declaratory relief. Specifically, declaratory relief is appropriate

> (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.

*Bilbrey by Bilbrey v. Brown*, 738 F.2d 1462, 1470 (9th Cir. 1984). Here, declaratory relief would clarify and settle the legal relations between the parties as to whether compensation is required.

Such a ruling is the only way to ensure that the people who have a constitutional right to be paid are, in fact, paid. Hence, a ruling on the taking claims would "serve a useful purpose in clarifying the legal relations at issue." *Allstate Ins. Co. v. Herron*, 634 F.3d 1101, 1107 (9th Cir. 2011) (suit proper to declare legal implications of insurance policy).

Nonetheless, the District Court concluded that declaratory relief that a taking occurred is not a permissible remedy under the Fifth or Fourteenth Amendments. 1-ER-26 (citing *Knick v. Township of Scott, Pennsylvania,* ___ U.S. ___, 139 S.Ct. 2162, 2175 (2019). But the argument, and the District Court's decision, ignores the distinction

between injunctive and declaratory relief, which are separate types of equitable remedies. The prohibition in *Knick* applies only to injunctive, not declaratory, relief. [5]

Owners agree that they likely could not get injunctive relief prohibiting the continued effect of the Proclamations under the Fifth Amendment for the simple reason that the taking of property alone is not unconstitutional—there is nothing to enjoin. The Fifth Amendment does not prohibit the taking of property; it simply requires (eventual) payment of just compensation. *Hurley v. Kincaid*, 285 U.S. 95, 104 (1932); *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 107, 149 (1974), *cited in Knick,* 139 S.Ct. at 2175. But the existence of an ultimate remedy of compensation does not mean that there is no controversy to be resolved by declaratory relief. A declaration that there

---

[5] Overlooking the limited relief sought here, the District Court relies on *Knick,* 139 S.Ct. 2162, for the proposition that an injunction to stop a taking is inappropriate. "Given the availability of post-taking compensation, *barring the government from acting* will ordinarily not be appropriate." *Knick,* 139 S.Ct. at 2177 (emphasis added). Owners agree. *E.g.*, *Ruckelshaus*, 467 U.S. at 1016 ("Equitable relief is not available *to enjoin* an alleged taking of private property for a public use, duly authorized by law, *when a suit for compensation can be brought* against the sovereign subsequent to the taking") (emphasis added and footnote omitted).

is a taking when a state bars persons from collecting moneys owed to them for the occupancy of their properties would be useful for determining whether the parties need to resolve the just compensation requirement.

    **a. The Supreme Court has repeatedly recognized that decisions declaring whether a taking did or did not occur are appropriate and need not be tethered to a claim for compensation.**

The Supreme Court has repeatedly recognized that declaratory relief is appropriate for takings claims. The most recent Supreme Court example is *Cedar Point Nursery v. Hassid,* ___ U.S. ___, 141 S.Ct. 2063, 2070 (2021). There, the Court considered a declaratory relief claim and ultimately ruled that the state law caused a taking of property. *Id.* Notably, the dissent argued that the Court should not issue declaratory relief because of the existence of a compensation remedy for a potential taking. *Id.* at 2089 (Breyer, J., dissenting). But the majority did not treat the compensation remedy in the Fifth Amendment as a bar to declaratory relief. *Cedar Point Nursery* applies here. The relief sought by Owners is like that in *Cedar Point Nursery* and bears no resemblance to injunctive relief, as erroneously surmised by the District Court.

21

*Cedar Point Nursery* is not an outlier. On numerous occasions, the Supreme Court has recognized that declaratory relief is appropriate for determining whether a compensable taking occurred. *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984) is another example of the Court issuing declaratory relief on the existence of a taking without an accompanying claim for compensation. *Ruckelshaus* involved mandatory disclosures of trade secrets which the plaintiff alleged were a taking by mandating such disclosures. *Id.* at 982. The Court concluded that, for a certain time period under the relevant regulation, a taking would occur. "We further hold that EPA consideration or disclosure of health, safety, and environmental data *will constitute a taking if* Monsanto submitted the data to EPA between October 22, 1972, and September 30, 1978." *Id.* at 1013 (emphasis added); *see also In re Chateaugay Corp.*, 53 F.3d 478, 492 (2ⁿᵈ Cir. 1995) ("[I]n *Duke Power* [*Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 71 n. 15 (1978)], the Court appears to have explicitly endorsed district courts' exercise of jurisdiction over declaratory judgment actions founded on the Takings Clause, even when no prior attempt to secure compensation in the Federal Claims Court has been made."); *Eastern Enters. v. Apfel*, 524

U.S. 498, 521 (1998) ("the Declaratory Judgment Act allows individuals threatened with a taking to seek a declaration of the constitutionality of the disputed governmental action before potentially uncompensable damages are sustained").

In conclusion, the body of law on this issue is unequivocal: a party may seek a determination, and a court may declare, whether there has been a taking to support a subsequent claim for compensation. Such relief should not be conflated with an injunction claim, which is not at issue here.

> **b. By confusing different forms of equitable relief, the District Court erroneously concluded that declaratory relief was not available for a Fifth Amendment taking claim simply because injunctive relief is usually not available.**

In holding that it could not declare whether a taking occurred, the District Court relied, without analysis, on cases that had reached a similar conclusion, *also without analysis,* that declaratory relief was the same as injunctive relief. *See* 1-ER 26-27 (concluding that declaratory relief would be "the functional equivalent of an injunction against enforcement of the moratorium") (citing *Baptiste v. Kennealy*, 490 F. Supp. 3d 353, 391 (D. Mass. 2020); *County of Butler of Wolf*, 2020 WL

2769105, *4 (W.D. Pa. May 28, 2020); *HAPCO v. City of Philadelphia*, 482 F. Supp. 3d 337, 358 & n. 112 (E.D. Pa. 2020)).[6]

These three district court cases upon which the District Court relied ignore the distinctions between declaratory and injunctive relief. While there may have been unique reasons declaratory relief was not granted in those cases (based on the relief sought or the argument and authorities presented), the blanket conclusion that declaratory relief is tantamount to an injunction has no support in the law.

Rather, the two types of equitable relief are very different. Declaratory relief simply declares the legal implications of the circumstances pled, *i.e,* a determination whether the situation amounted to a taking of property. Injunctive relief is very different; such relief would prohibit the State's action—a remedy Owner do *not* seek under the Fifth Amendment.

---

[6] The three authorities the District Court cites provide no explanation for their conclusion. *Baptiste* and *HAPCO*, with no analysis, merely cite *Wolf* for the conclusion that declaratory relief would be the functional equivalent of an injunction. *See Baptiste*, 490 F. Supp.3d at 391 (citing *Wolf,* 2020 WL 2769104, at *4); *and HAPCO*, 482 F. Supp. 3d at 358. But, *Wolf*, also without any analysis, announces that declaratory relief is the functional equivalent of an injunction. *Wolf,* 2020 WL 2769104, at *4.

Ultimately, with its focus on the three district court cases, the District Court here failed to grapple with prior Supreme Court decisions such as *Ruckelshaus* or *Duke Power*. Nevertheless, *Cedar Point Nursery* should put this issue about the ability to grant declaratory relief to rest.

### 2. The Declaratory Judgment Act specifically allows plaintiffs to seek compensation after a declaration of rights is issued.

The declaratory judgment statute, 28 U.S.C § 2202, expressly recognizes that a declaratory judgment may not provide all appropriate relief and that further relief—like an award of compensation in the present case—may be granted *after* the declaration has been granted.

> *Further necessary or proper relief* based on a declaratory judgment or decree may be granted, *after* reasonable notice and hearing, *against any adverse party whose rights have been determined by such judgment.*

28 U.S.C. § 2202 (emphasis added). Owners seek a declaration that a taking occurred and, only if the parties are unable to agree on the

amount of compensation, would they seek an award of compensation in court—further relief as contemplated by the statute.

> The Declaratory Judgment Act allow[s] relief to be given by way of recognizing the plaintiff's right even though *no immediate enforcement of it was asked*.

*Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671-72 (1950) (emphasis added). Likewise, Owners seek recognition of their Fifth Amendment right to compensation even though immediate demand of payment was not sought, but could be sought once the declaration of rights is made.[7]

---

[7] Regarding a due process claim not presented on appeal, the District Court assumed the claim, or perhaps the entire case, is a facial challenge to the Proclamations. 1-ER-40. Nothing in the Complaint so suggests and, on summary judgment, Owners submitted evidence regarding how the Proclamations applied to them and their tenants. 2-ER-49, 52, 55, 59, 236, 252, 259. Courts generally defer to the plaintiff's characterization of its claim. *See, e.g., Milavetz, Gallop & Milavetz, P.A. v. United States,* 559 U.S. 229, 249 (2010). In the event the "facial challenge" statement was intended to apply to the taking claim, that is erroneous.

**B. The Proclamations effect a taking of property from Owners by mandating unwanted continuing occupation of their properties without compensation.**

Following its conclusion that declaratory relief was inappropriate, the District Court concluded that no taking occurred. 1-ER-35. The District Court's conclusion is contrary to established precedent which holds that government-enforced physical occupation of private property is a *per se* taking.

**1. Mandated physical occupation of private property is a *per se* taking.**

Government action may violate the Takings Clause when the action is "the functional equivalent [of] the classic taking in which government directly appropriates private property or ousts the owner from his domain." *Lingle,* 544 U.S. at 539. One such "functional equivalent" is when government action leads to the physical invasion of private property, categorized as an automatic, *per se,* taking. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 433 (1982) (physical invasion by mandated cable box).

The most recent taking by physical invasion decision from the Supreme Court is *Cedar Point Nursery,* 141 S.Ct. 2063. The Court in

*Cedar Point Nursery* reviewed California statutes requiring a property owner to grant temporary, physical access to union organizers on private property for the purpose of soliciting employees to join or form a union. *Cedar Park Nursery*, 141 S.Ct. at 2069. The plaintiff nursery argued the California law mandated a physical occupation of its property, causing a *per se* taking. *Id*. The Supreme Court agrees:

> [t]he right to exclude is "one of the most treasured" rights of property ownership … "one of the most essential sticks in the bundle of rights that are commonly characterized as property" …. [and] the right to exclude is the "sine qua non" of property.

*Cedar Point Nursery,* 141 S.Ct. at 2072-73 (citations omitted); *see also id*. at 2075.

Similarly, the Proclamations forced Owners to accept the continued occupation of tenants without any payment of rent, without compliance with rules concurrent with their occupancies and without any prospect of government reimbursement or other compensation. The Proclamations did nothing to protect Owners from losses they have sustained when tenants are unable—or are able and refuse—to pay their rental obligations. The Owners' injuries are exacerbated by the fact that Owners remain obligated to pay property taxes to the state

and local government and pay for electricity, sewer, water and garbage removal for the nonpaying tenant. 2-ER-239, 254.

The Proclamations have thus eliminated Owners' fundamental constitutional right to exclude nonpaying or rule-breaking tenants from their respective properties. As Justice Thurgood Marshall explained in *Loretto,* "property law has long protected an owner's expectation that he will be relatively undisturbed at least in the possession of his property" and "[t]o require, as well, that the owner permit another to exercise complete dominion literally adds insult to injury." 458 U.S. at 436 (citing *Kaiser Aetna v United States*, 444 U.S. 164, 179–180 (1979) (the right to exclude others, is "one of the most essential sticks in the bundle of rights that are commonly characterized as property"); Restatement of Property § 7 (1936)); *see also F.C.C. v. Fla. Power Corp.*, 480 U.S. 245, 252 (1987) (likening the right to exclude to the right to invite persons of one's choice onto private property); *Hendler v. United States,* 952 F.2d 1364, 1374-75 (Fed. Cir. 1991) ("the ability to exclude freeriders").

This right to be compensated when government requires the owners of private property to endure the physical occupation of their property does not depend upon the *duration* of the occupation.

> [I]f government action would qualify as a taking when permanently continued, temporary actions of the same character may also qualify as a taking.

*Arkansas Game and Fish Comm'n v. United States,* 568 U.S. 23, 26 (2012). And, *Cedar Point* makes clear that the *per se* taking rule for physical invasions applies to temporary invasions and not just permanent invasions at issue in *Loretto*.

In conclusion, the Proclamations require a property to endure the occupation of their property by someone else without compensation. This government-mandated occupation is the functional equivalent of the government itself taking property for a temporary period for housing people, an action needed for the public good during the pandemic.

## 2. The District Court's reliance on inapt parts of the Supreme Court decision in *Yee*, overlooked that *Yee* ultimately supports Owners' position here.

The District Court concludes that an eviction moratorium cannot constitute a government-mandated physical occupation because of the

Supreme Court's decision in *Yee v. City of Escondido, Cal.*, 503 U.S. 519 (1992)—a case challenging controls on rents. 1-ER-29-30. The District Court completely misreads *Yee* which unequivocally states: "Had the city required a [physical] occupation, of course, petitioners would have a right to compensation." *Yee*, 503 U.S. at 532.

Instead, the District Court relied on the statement in *Yee* that landlords did not suffer a city-mandated physical occupation by their tenants because the *Yee* plaintiffs "voluntarily rented their land" to residential tenants; but that reference does not change the recognition by the Supreme Court in *Yee* that enforced physical occupation would be a taking. *Yee,* 505 U.S. at 527, *quoted in* 1-ER-33.[8]

---

[8] In fairness to the District Court, other courts have also relied upon the "voluntarily rented" phrase to conclude a taking by physical occupation can never occur with tenants. *See, e.g., Baptiste,* 490 F. Supp. 3d at 388; *Elmsford Apartment Assoc., LLC v. Cuomo*, 469 F. Supp. 3d 148, 163 (S.D. N.Y. 2020). However, like the District Court here, those courts had not analyzed *Yee* as addressed herein.

Two notable exceptions are the courts in *Heights Apartments, LLC v. Walz*, 30 F.4th 720, 734 (8th Cir. 2022) (addressing Covid-19-related eviction restrictions) and *Cwynar v. City and County of San Francisco*, 90 Cal. App. 4th 637, 109 Cal. Rptr.2d 233 (2001) (challenge to eviction restrictions), noting, *inter alia, Yee* "addressed a narrow issue—a facial challenge to a purely economic rent control law," and "[u]nlike the plaintiffs in *Yee*, Plaintiffs here are not asserting a right to increase rent, but to receive rent from occupants of their property." *Id.* at 656-57.

The District Court fails to recognize the major difference between what was challenged in *Yee* and what is challenged here, making the "voluntary rented" language essentially *dicta.* The owners of mobile home sites in *Yee* mounted a facial challenge to the city ordinance, not to a state statute which imposed some restrictions on eviction; they argued the ordinance should be "viewed against the backdrop" of state law. *Id.* at 523. However, the *Yee* landlords did not sue the state, nor challenge the state law. The Court's focus was on the city ordinance, which did not restrict eviction, but regulated rents. *Id.* at 528. But the District Court's analysis misreads *Yee.*

After recognizing that required physical occupation of property results in a taking, the Court in *Yee* concluded that is not what the city ordinance required. "[W]e do not find that right [to exclude] to have been taken from petitioners on the *mere face of the Escondido ordinance.*") *Id.* (emphasis added). Importantly to the distinction Appellants made below and here, the *Yee* Court observed "*a different case would be presented* were the statute, on its face or as applied, to

compel a landowner over objection to rent his property or to refrain in perpetuity from terminating a tenancy." *Id* (emphasis added).[9]

Nothing in the Escondido ordinance mandated tolerating tenants' continued occupation without payment of rent—unlike the present case. *Id.* at 527. Specifically, the Escondido ordinance allowed the owner to terminate the tenancy when there was "nonpayment of rent" or "violation of law" or rules. *Id.* at 524.

However, the plaintiffs in *Yee* attempted to bolster their physical occupation argument by *claiming* there were *state law* restrictions on eviction. After recognizing that the plaintiffs could only use state law as "a backdrop," the Court concluded that "[o]n the face of the regulatory scheme, neither the city nor the [s]tate compels petitioners, once they have rented their property to tenants, to

---

[9] A tenant's right to possess is both temporary and conditional, and dependent upon the tenant's adherence to the terms of a lease. When the tenant materially breaches the lease, the "voluntariness" referenced in *Yee* disappears. In this context, *Yee* cannot stand for the proposition that the Owners have forfeited their right to exclude tenants whom they previously allowed to occupy their properties. As *Yee* noted, that would be "a different case." *Id*. at 528.

continue doing so." *Id.* at 527-28.[10] That is a critically distinguishing feature between the challenge in *Yee* and the present challenge. The Proclamations required Owners to continue to have someone else occupy their property for a longer period than the owners ever agreed to, not to mention free of charge.

### 3. The Proclamations also take property interests in Appellant Owners' rental contracts.

Owners' rights in their rental contracts have also been taken in that contractual rights constitute property. The Supreme Court's rule that contractual rights are protected from uncompensated taking was summarized by the Federal Circuit: "[T]here is also ample precedent for acknowledging a property interest in contract rights under the Fifth Amendment." *Cienega Gardens v. United States*, 331 F.3d 1319, 1329

---

[10] Considering the concern that rent was limited for longer than the terms of the lease and leaving tenants could sell the opportunity to lease a rent-restricted unit, the Eight Circuit recognized "landlords in *Yee* sought to exclude future or incoming tenants rather than existing tenants." *Heights Apartments, LLC v. Walz*, 30 F.4th 720, 733 (8th Cir. 2022) (also further distinguishing *Yee*). And, it is in connection with the desire to exclude incoming tenants that the *Yee* Court notes that they voluntarily entered this business and cannot be discriminatory in excluding potential tenants. *Yee*, 503 U.S. at 529 (citing *Heart of Atlanta Motel, Inc. v. United States*, 279 U.S. 241, 243-262-62 (1964)).

(Fed. Cir. 2003) (challenge to statute prohibiting contractual right to prepay loans) (multiple citations omitted).

The Fifth Amendment protects property interests recognized under state law. *Phillips v. Washington Legal Foundation*, 524 U.S. 156, 164 (1998). And Washington law is unmistakable that contractual rights are property rights which can be taken by governmental action. *See, e.g., Spokane School Dist. No. 81 v. Parzybok*, 96 Wn.2d 95,104 (1981) (plaintiff "suffered a loss of his property, be it only a contractual right" and is entitled to compensation). Washington recognizes leases are contracts which constitute property. *See, e.g., Matzger v. Arcade Bldg. & Realty Co.*, 80 Wash. 401 (1914); *State v. Trask,* 91 Wn.App. 253 (1998). There is no compelling argument to the contrary.

### 4. The Proclamations take interests in security deposits.

The Proclamations prohibit treating unpaid rent or other changes as an enforceable debt and "[t]his includes … withholding any portion of a security deposit." 2-ER-118. In other words, security deposits cannot be used to reimburse Owners for unpaid rent even though that was one of the purposes for the deposit. If a tenant chooses to leave without paying

all rent that is due, the Proclamations require that Owners return to

the tenant the security deposit without any deduction for unpaid rent.

Enrique Jevons explains:

> Since the Governor's first proclamation in March of 2020, we
> have had tenants leave with rent owing, but we are required by
> the Proclamations not to apply any of their security deposit to
> cover unpaid rent. Since the Proclamations, we use the security
> deposit only for damages and cleaning and are *forced to refund
> to tenants the remainder of the security deposit even though they
> have not paid all the rent due.*

2-ER- 237-38 (emphasis added). The Proclamations take Owners'

property interest in the security deposit.

The Supreme Court has long held that the Takings Clause protects

people from government taking of security interests. The Proclamations

create a situation like that in *Armstrong,* 364 U.S. 40, a case that

involved the destruction of materialmen's liens on property that was

subsequently acquired by the United States. Because the federal

government has sovereign immunity, the Government took the position

that the liens on the property it acquired disappeared. *Id.* The Supreme

Court explains that the inability to enforce a lien resulted in the destruction of a property interest:

> The result of this was a destruction of all petitioners' property rights under their liens, although, as we have pointed out, the liens were valid and had compensable value.

*Armstrong,* 364 U.S. at 46 (footnote omitted). Similarly, Owners had the right to apply security deposits to the amount of rent that is owed and unpaid by tenants, but the Proclamations render that right illusory.

The purpose of the Fifth Amendment is to require the payment of just compensation when private property is taken for societal needs, so that the burden is shared among society and not imposed on certain individuals. The Proclamations sought to protect tenants in a crisis, but the government's desire to promote that societal goal does not relieve the government from following the Constitution. Requiring Owners to endure the physical occupation of their property without payment of any rent or other reimbursement, deprived them of their property and deprived them of their contractual right to receive rent. The Court should declare that Owners' rights in their property have been taken by the Proclamations.

**II**
## The District Court erred in granting summary judgment on Appellant Owners' Contracts Clause claim.

Owners' contractual rights in their leases has been substantially impaired and the District Court erred in ruling otherwise. The Contracts Clause, Art. 1, § 10, of the United States Constitution, provides: "No State shall . . . pass any . . . Law impairing the Obligation of Contracts." Modern Contracts Clause jurisprudence recognizes a more flexible approach than the text suggests. That jurisprudence arises from *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 445 (1934), which the District Court properly recognized is the "watershed decision" of modern Contracts Clause jurisprudence. 1-ER-17.

### A. *Blaisdell* and *Kavanaugh* are the controlling authorities.

From a big picture perspective, *Blaisdell* and *W.B. Worthen Co. v. Kavanaugh,* 295 U.S. 56 (1935), are the controlling authorities. In both cases, the Supreme Court was reviewing emergency legislation arising from an economic crisis that would allow mortgagors of property an extended period for redemption of the property. *Blaisdell*, 290 U.S. at 416. Normally, if one doesn't pay the mortgage, ownership and the right to occupy is extinguished. Consequently, the mortgagee who was

entitled to possession was required by the new legislation to wait before regaining possession, contrary to the terms of the contract. *Id.*; *Kavanaugh*, 295 U.S. at 59. Not only was the delay in possession in *Blaisdell* and *Kavanaugh* analogous to the eviction moratorium in the present situation—namely, persons entitled to possession must wait before regaining possession—the Supreme Court in *Blaisdell* and *Kavanaugh* specifically relied on cases involving mandatory delays on the eviction of tenants. *See infra* at 55-57. *Blaisdell* and *Kavanaugh* have never been overruled. *Blaisdell* and *Kavanaugh* confirm Owners' claim that the Proclamations violate the Contracts Clause.

As to more recent Contracts Clause jurisprudence, after identifying contractual relationships,[11] cases refer to the analysis as having two steps, and the latter step having two parts, *Sveen v. Melin,* 138 S.Ct. 1815, 1821 (2018). The analysis of the constitutional protection of contracts is as follows: Does the challenged law work a "substantial impairment of a contractual relationship?" If so, has the government

---

[11] The District Court concluded "there is no dispute that Plaintiffs have valid landlord-tenant agreements subject to the Contracts Clause." 1-ER-18.

shown that the interests pursued are legitimate and that "the relief was appropriately tailored" and subject to reasonable conditions?[12] *Id.*

As addressed below, the Proclamations here substantially interfered with the contracts. While the Proclamations did so for legitimate public interests, they did so in a way that was not appropriately tailored nor subject to reasonable conditions. The Proclamations blocked the Owners' ability to recover the rent to which they were entitled under their contracts (thereby substantially interfering with the contracts), and there was no appropriate and reasonable provision wherein they could recover their losses in any other way. Thus, Owners lost the benefits of their contracts.

From the 30,000-foot level, *Blaisdell* itself confirms there is an impairment of contracts here. In *Blaisdell*, the Court upheld emergency legislation which postponed the redemption period when mortgages were foreclosed. *Blaisdell,* 290 U.S. at 439-440. The *Blaisdell* Court summarily assumed the substantial interference question: *of course,*

---

[12] After establishing the predicate that the challenged law works a substantial impairment of the contract, the burden shifts to the government to prove the law was appropriately tailored and subject to reasonable conditions. *United States Trust Co.,* 431 U.S. at 31; *see also Sveen*, 138 S.Ct. at 1822.

dictating a change in the financial arrangements contracted to by two parties is a substantial interference with that contract. Rather, the Court focused on the competing power of the states to regulate in the public interest and the conditions to protect the one whose contractual rights were impaired. *Blaisdell,* 290 U.S. at 446-442.

**B. Forcing owners to tolerate the occupancy of their properties by nonpaying or rule-breaking tenants contrary to their leases constitutes a substantial impairment of contracts.**

The Proclamations cause substantial impairment under applicable precedents of the Supreme Court and this Court. This Court has expressly recognized that *delaying payment* under a contract constitutes a substantial impairment. In *University of Hawaii Prof'l Assembly v. Cayetano*, 183 F.3d 1096, 1104 (9th Cir. 1999), *cited in S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 890 (9th Cir. 2003), this Court held that implementation of an "after-the-fact payroll system" that *delayed paychecks up to three days* for a quarter of the paychecks during the year constitutes "substantial impairment of employment contracts." *Id.* (emphasis added). Indeed, property owners have a constitutional right to recover the time value of money (interest) when payment of a monetary obligation is delayed. *See Schneider v. County of San Diego,*

285 F.3d 784, 789-90 (9th Cir. 2002) (and cases cited therein) (prejudgment interest required for takings claims).

In determining whether a contractual impairment is substantial, courts consider "[(1)] the extent to which the law undermines the contractual bargain, [(2)] interferes with a party's reasonable expectations, and [(3)] prevents the party from safeguarding or reinstating his rights." *Sveen* 138 S.Ct. at 1822. As addressed below, the contractual impairment here is substantial.

### 1. The Proclamations undermine the contractual bargain.

The essence of the contractual bargain at issue is that tenants may live in residential property provided by Owners on the condition that they pay rent regularly, pay fees when their rent payment is late, post a deposit to cover damages and unpaid rent, and that they comply with rules related to protection of the property and/or other tenants or the neighborhood. The Proclamations undermine this contractual bargain by dictating that tenants cannot be evicted for nonpayment of rent and that any nonpayment of rent could not be treated as an enforceable debt if the tenants do not give the property owner information about their financial, health or other circumstances (which they were neither

42

required nor motivated to do). Under these new rules, the contractual bargain is completely upended.

The Supreme Court in *Blaisdell* recognized the importance of the ability to enforce contractual obligations to the contract itself: "Nothing can be more material to the obligation than the means of enforcement." *Blaisdell*, 290 U.S. at 430. Because the means of enforcement—eviction—is the most material obligation of the contract, the deprivation of the right to evict can hardly be characterized as an insubstantial or minor impairment of the contract. *See, e.g., Alabama Ass'n of Realtors*, 141 S.Ct. at 2489 (moratorium preventing landlords "from evicting tenants who breach their leases intrudes on one of the most fundamental elements of property ownership—the right to exclude").

The Eighth Circuit also recently addressed substantial impairment of rental contracts regarding another eviction moratorium in *Heights Apartments, LLC v. Waltz*, 30 F.4th 720 (2022). Noting the fundamental "right to exclude," the Eighth Circuit held that the plaintiff properly pleaded a substantial impairment of a contract when the landlord could not evict. *Id.* at 728-29. The remedy of eviction is the key to another

43

material aspect of the lease contract—receipt of rent as a condition of occupancy.

> It is axiomatic that a landlord's bargain of receiving rent in exchange for a tenant's possession of the property is greatly diminished if the landlord's right to exclude the tenant is minimal or non-existent.

*Id.* at 729.

Timeliness is a key component of the bargain. Leases typically have late fees associated with failure to pay rent on time. *See, e.g., Pham v. Corbett*, 187 Wn.App. 816 (2015). Leases extend for certain time periods. Changing—or, as here, delaying for unlimited time periods—the statutory eviction process drastically alters (after the fact) the costs and benefits that property owners must factor into their contracts with their tenants, and thus, the terms under which those contracts are entered. The obligation to pay rent and comply with reasonable rules of occupancy is essential to the contractual bargain—not merely peripheral or minor provisions of the lease.

### 2. The Proclamations interfere with the reasonable expectation that an owner of property may insist on payment of rent as a condition for occupying the property.

The next step in the analysis is to determine whether there was interference with Owners' expectations.[13] Owners had no basis to expect that the State would confiscate private property for the occupation of others without rent. The United States has recently endured the Great Recession, wars in the Iraq and Afghanistan, and prior epidemics, but forcing private property owners to provide free housing has never been required and could not have been a reasonable expectation despite the severity of the pandemic.

The District Court sidestepped the clear import of these facts and instead concluded that the "pervasive regulation in this field has placed Plaintiffs on notice that they may face further government intervention." 1-ER-21. Of course, there may be future government regulation, but this misses the point; the potential for changes in regulation generally does not eradicate the reasonable expectation that

---

[13] Other courts have referred to this as a look to see whether the government action causing the impairment was "reasonably foreseeable." *Heights Apartments*, 30 F.4th at 729.

a democratic government will not confiscate private property for the occupation of others who have no right to remain without provisions for payment.

This is true for three reasons. First, despite the historical regulation of landlord/tenant relations, the duty of a tenant to pay rent in order to occupy the property is the paramount duty of all tenants. *See, e.g.,* RCW 59.18.130 ("Each tenant shall pay the rental amount at such times and in such amounts as provided for in the rental agreement."); RCW 59.18.080 (payment of rent is a condition to tenant's exercising *any* statutory remedies).

Indeed, as the district court in *Farhoud v. Brown*, 2022 WL 326092 (D. Or. February 3, 2022), explained, "even though state law regulates many aspects of the landlord-tenant relationship, Plaintiffs had no reasonable expectation that their ability to collect rent or otherwise initiate eviction proceedings for nonpayment of rent would be impaired." *Id.* at *8 (ruling on an impairment of contracts clause claim arising from

Oregon eviction moratoria in response to the pandemic).[14] The same is true here and should apply to any private industry—for example, the fact that the food industry is heavily-regulated does not mean that food providers should expect they will be obligated to provide food without payment.

Second, the reason for the change in contractual remedies was unprecedented and unforeseeable. Prior to the pandemic, never had any court—federal or state—held that a government entity, even in an acute and sustained economic emergency such as the Great Depression, may unilaterally excuse occupants of private property from paying a reasonable amount of rent to avoid eviction. As addressed *infra* at 55-57, in cases delaying occupation of property due to emergency economic conditions such as *Blaisdell* and *Kavanaugh*, and the cases on which those cases rely, the owner of the property was still entitled to receive reasonable rent as a condition of continued occupancy by others. The

---

[14] The court concluded that the eviction moratoria did substantially impair the landlord/tenant contracts and specifically noted the similarity to the situation in *Kavanaugh*. *Id.* at *8. But while the district court in *Farhoud* found a substantial impairment, it did not find a constitutional violation because it viewed the Oregon eviction moratorium to be nonetheless reasonable. *Id.* at *9.

Proclamations' open-ended restrictions on eviction are completely unprecedented and were neither foreseeable nor reasonably anticipated.

Several courts have recognized for Contract Clause purposes that the Covid-19 pandemic, and the change in rules applicable to landlord/tenant relations, was unprecedented and not reasonably foreseeable.

> Of course, when landlords entered into leases before the [eviction moratorium] was passed, they did not expect that these specific regulations would be enacted in response to a global pandemic.

*HAPCO*, 482 F. Supp.3d at 351.

> the court finds that a reasonable landlord would not have anticipated a virtually unprecedented event such as the COVID-19 pandemic that would generate a ban on even initiating eviction actions against tenants who do not pay rent and on replacing them with tenants who do pay rent.

*Baptiste,* 490 F. Supp. 3d at 384. Never in the history of this State has a Governor—or a Legislature—required individuals to provide housing contrary to the terms of the leases.

Third, the manner the changes occurred was unprecedented. While legislative changes can and do occur through a legislative process in which Owners can participate, never has a change in the

48

landlord/tenant relationship arrived by the proclamation of one person. This is even more important because the change severely impacted the fundamentals of the contracts—that occupancy is conditional upon the payment of rent. There is no basis for concluding that it was expected or foreseeable that the Governor would disrupt this essential feature of the contractual relationship.

### 3. Owners are unable to safeguard or reinstate their rights.

Although recognizing that the ability to safeguard or reinstate rights is the third part of the analysis under the substantial impairment query, 1-ER-18, the District Court never addresses it. The Supreme Court has recognized that an action filed later against delinquent tenants is an illusory remedy. *Ala. Ass'n of Realtors*, 141 S.Ct. at 2489 (moratorium puts landlords "at risk of *irreparable* harm by depriving them of rent payments with no guarantee of eventual recovery"), *cited in Heights Apartments*, 30 F.4th at 735 n.7 (emphasis added). Similarly, the Second Circuit recognized that recovering arrears in rent is "speculative at best." *Melendez v. City of New York,* 16 F.4th 992, 1033 (2nd Cir. 2021) (regarding commercial leases); *see also Farhoud v. Brown,* 2022 WL 326092 (D. Ore. February 3, 2022), recognizes that the

landlords' ability to ever be paid back rent was "speculative at best." *Id.* at *7. This is especially true regarding the Glenns' former tenants who have moved away. 2-ER-53.

At some unknown time, Owners may be able to regain possession of their property, but they cannot safeguard or reinstate their rights to unpaid rent (or late fees) for the over 18-month period from March 2020 to the end of October 2021. Tenants here are not bound to their contracts. All they must do is refuse to give information about their health or financial circumstances and they will not have to pay the unpaid rent.

While not specifically addressing this step in the process, the District Court concludes that, "Plaintiffs may treat unpaid rent as an enforceable debt during the moratorium after following the above-noted procedures" in a new law, codified in part as RCW 59.18.630. 1-ER-21. That was clearly not true under the Proclamations, but neither is it true under the new law enacted. Recovery of unpaid rent requires involvement under the eviction resolution pilot program (RCW 59.18.630(2), which is unavailable for tenants who have already moved away. 2-ER-50, 53. And the new remedy for unpaid rent is eviction, not

the recovery of rent. RCW 58.19.630. The right to evict a tenant who has already left is meaningless.

Additionally, the newly adopted statute that ended the eviction moratorium establishes new rules for repayment plans. For unpaid rent, the landlord may offer a reasonable repayment plan. RCW 59.18.630(2).[15] But reasonableness is still ultimately decided by a court based on a "tenant's circumstances, including decreased income or increased expenses due to COVID-19." *Id.* It remains undisputed that landlords typically do not know the details of tenant's circumstances and they are barred from learning this information through traditional rules of discovery because the Proclamations prohibited the filing of suits. *See, e.g.*, 2-ER-117-18. Even now, the absence of a prior offer of a reasonable repayment plan (when the tenants' details are unknown) is a complete defense to eviction. *See* RCW 59.18.630(4).

Substantial impairment of Owners' contracts has occurred with the Proclamations because the right to enforce them has been eradicated. *See Lynch v. United States,* 292 U.S. 571, 580 (1934). By prohibiting

---

[15] The statute includes other details prohibited in a repayment plan. For instance, plans cannot "require the tenant to apply for governmental benefits." RCW 59.18.630(3)(d).

Owners from treating unpaid rent as a contractual obligation and prohibiting evictions unless one can prove a crime is being committed or the owner decides to sell the property, prevents the safeguarding of rights. Owners have been stripped of all remedies for enforcement of their contractual rights and, unlike other eviction moratoria, were not even allowed to have a court resolve any disputes with tenants while the Proclamations were in effect.

### B. The impairment is not appropriately tailored or conditioned.

As indicated above, the final step in the analysis is to determine whether the means chosen are appropriately tailored, *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 242 (1978), and reasonably conditioned. *United States Trust Co. of New York v. New Jersey,* 431 U.S. 1, 22 (1977). The Proclamations' prohibition on evictions, and absence of any provision for a judicial process or any corresponding public obligation to reimburse landlords, completely lacks the required tailoring and reasonable conditions present in *Blaisdell* and fatally absent in *Kavanaugh*.

As a preliminary matter, and unaddressed by the District Court, when a law substantially impairs a contract, *the Attorney General* bears

the burden of showing that the impairment is both reasonable and necessary. *United States Trust Co.*, 431 U.S. at 31; *see also Sveen,* 138 S.Ct. at 1822. For the following reasons, the Attorney General cannot meet this burden.

> ### 1. Deference on tailoring and conditioning is not appropriate because the means analysis does not require scientific or public health expertise.

As a preliminary matter on this issue, the District Court concluded it must defer to the Governor because, it reasoned, the court has no expertise when it comes to scientific matters generally and public health specifically. 1-ER-23. But determining reasonableness of the impairment here has nothing to do with science or public health. Reasonableness is based on review of analogous precedents such as *Blaisdell* and *Kavanaugh* and the inherent injustice caused by making private parties sacrifice their contracts without any reimbursement from tenants or the State.

> ### 2. Reasonable tailoring or conditioning is absent.

The Proclamations were not tailored or subjected to reasonable conditions. Owners do not question the legitimacy in attempting to limit the consequences and duration of the pandemic. But the Proclamations

are not reasonable in that they put the burden on housing providers of keeping all people in rental housing, including those who can pay rent and have no COVID-19 loss of income, and without any viable means of compensating Owners to make them whole.

### a. The District Court improperly assumed that Owners' claim is based on being required to use assets for the benefit of another.

The District Court inexplicably concludes that: "[s]imply because the moratorium 'requires one person to use his or her assets for the benefit of another' does not raise the eviction moratorium to a level of unconstitutionality under the Contracts Clause." 1-ER-22 (quoting *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 223 (1986)).

First, the District Court flatly misapplied *Connolly*. The quotation was about whether the Takings Clause—not the Contracts Clause—is violated simply by requiring use of assets for another. *Id.* And, immediately following this question, the *Connolly* Court explained that employers could be required to compensate coal miners for disease *caused by their employment. Id.* (emphasis added) (citing *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1 (1976)). Neither *Usery,* nor *Connolly*, involved the Contracts Clause, and certainly there has been

54

no suggestion that Owners here *caused* the pandemic or any loss of income by their tenants.

But even if the principle claimed did apply, the District Court's reasoning is a straw man. Owners are not arguing that the Proclamations are unreasonable only because they involve the use of an asset belonging to Owners for the benefit of the tenants in some hyper-technical manner. Housing regulation has long required landlords to provide assets, like smoke detectors or equipment for basic utilities. But here the Proclamations require them to provide the entirety of their asset and there is no provision for assurance that the withheld rent will ever be paid—by anyone.

> **b. *Blaisdell* teaches that to have satisfied the tailoring and reasonable condition standards, the Proclamations should have included provisions for ensuring Owners received reasonable payment for the occupancy of their properties.**

With the "substantial degree" question readily answered, the *Blaisdell* Court turned to the second step in the analysis: was the law written in an appropriate and reasonable way to achieve its purpose?

After recognizing the power of the state to alter contracts, the Supreme Court in *Blaisdell* places weight on the challenged law's appropriate compensation while the owner is deprived of possession.

> While the mortgagor remains in possession, he must pay the rental value as that value has been determined, upon notice and hearing, by the court. … While the mortgagee-purchaser is debarred from actual possession, he has, so far as *rental value* is concerned, *the equivalent of possession* during the extended period.

*Blaisdell,* 290 U.S. at 425 (emphasis added).

The importance of rental value as "the equivalent of possession" is evident from the cases *Blaisdell* distinguishes. For example, *Bronson v. Kinzie,* 42 U.S. 311 (1843), is another case extending a redemption period arising from an economic emergency—"the panic of 1837." *Blaisdell,* 290 U.S. at 431. The *Blaisdell* Court emphasized the problem with the law addressed in *Bronson*: "the extension of the period of redemption [in *Bronson*] was unconditional, and there was no provision, as in the instant case, to secure to the mortgagee the rental value of the property during the extended period." *Blaisdell,* 290 U.S. at 432.

But even more to the point at issue here, the Supreme Court in *Blaisdell* specifically relies upon the analyses in three eviction—not foreclosure—cases, all of which contribute to the analysis here: *Block v.*

*Hirsh*, 256 U.S. 135 (1921), *Marcus Brown Holding Co. v. Feldman*, 256 U.S. 170 (1921) and *Edgar A. Levy Leasing Co. v. Siegal*, 258 U.S. 242 (1922), *cited in Blaisdell*, 290 U.S. at 440.

*Block* involved a World War I-era federal statute limiting evictions in District of Columbia to those with 30 days advance notice. Housing was an issue because of the significant influx of people to the Nation's Capital at the time. *Block,* 256 U.S. at 157. Overlooked by the District Court here, and critical to the *Block* decision was that the statute "secure[d] to the landlord a reasonable rent." *Id.* As noted in *Blaisdell*, the distinguishing feature in *Block* was that the property owners were deprived of all possessory remedies (eviction), but the eviction prohibition applied only so long as "the tenants or occupants were ready, able, and willing to pay a reasonable rent or price of their use and occupation." *Blaisdell,* 290 U.S. at 440-41.

Similarly, in *Marcus Brown,* the New York law at issue imposed a prohibition on evictions but again, as noted in *Blaisdell*, all tenants had to be "ready, able, and willing to pay a reasonable rent or price for their use and occupation." *Id.* at 440-41. *Edgard A. Levy Leasing* involved the same New York statute with a similar result. *See* 258 U.S. at 243.

As the Court in *Blaisdell* noted about the eviction cases it relied upon, the situation was temporary, *and* landlords were reasonably compensated:

> In these cases of leases, it will be observed that the relief afforded was temporary and conditional; that it was sustained because of the emergency due to scarcity of housing; and that provision was made for *reasonable compensation to the landlord during the period he was prevented from regaining possession.*

*Blaisdell,* 290 U.S. at 441-42 (emphasis added). Unlike the situation in *Block, Marcus Brown* and *Edgar A. Levy Leasing,* the Proclamations did not require the payment of reasonable rent by the tenants nor do they provide an alternative and fair process for being made financially whole by the State itself.

The importance of obtaining rental value while the owner's control over the occupancy of the property is delayed is of critical importance in the Contracts Clause analysis and completely missing in the District Court decision.[16]

---

[16] The Eighth Circuit in *Heights Apartments* relied on the facts that *Blaisdell* involved the exercise of legislative authority, rather than executive authority, had an explicit end date, and guaranteed compensation for the delay. 30 F.4th 720. None of these factors support the Proclamations challenged here.

While *Blaisdell* should be sufficient to readily answer the substantial impairment question, the Court in *Kavanaugh,* 295 U.S. 56*,* adds further weight in finding an unconstitutional impairment of contracts in a case analogous to the present one. In *Kavanaugh*, the state extended a redemption period and thereby delayed the time the property would be available for possession, as was the situation in *Blaisdell*. The *Kavanaugh* decision concluded that, *in the absence of provisions that would reimburse the owner*, the extension of the right to possession unconstitutionally impaired contracts. *Id.* at 63. In so doing, it noted the important condition of the moratorium in *Blaisdell* that was absent in the case at hand:

> "The mortgagor [in *Blaisdell*] during the extended period is not ousted from possession, *but he must pay the rental value of the premises* [as determined by a court]."

*Kavanaugh*, 295 U.S. at 61, 63 (emphasis added) (quoting *Blaisdell,* 290 U.S. at 445)). Like the situation in *Kavanaugh*, such a provision is glaringly absent in the present case.

While *Blaisdell* and *Kavanaugh* are the most analogous to the Proclamations at issue here, other cases dealing with government interference with contractual obligations support a finding that

59

contracts have been unconstitutionally impaired here. This conclusion is evident from this Court's decisions generally and from other courts dealing with other eviction moratoria.

For instance, in *State of Nev. Employees Ass'n, Inc. v. Keating*, 903 F.2d 1223 (9th Cir. 1990), this Court was reviewing a change in pension statutes that eliminated a right to withdraw pensions early without penalty. *Id.* at 227. Noting that this loss "cannot be offset" by other benefits, this Court concluded:

> [M]oney raised by the elimination of the employees' right to withdraw their pension fund contributions could have been raised by several other methods.

*Id.* at 1228. It was lack of tailoring to provide funds, other than by altering contractual relations, which made the statutory changes unconstitutional. *Id.* For the same reason, funds for keeping tenants in their homes (which was the legitimate state interest) could have been raised by several other methods. In fact, both the federal government has appropriated funds and the State Legislature appropriated almost a billion of dollars for rental housing relief (2-ER-156), but the Attorney General opposes a ruling that funds must be applied to remedy those whose contracts were impaired.

The lease contracts are significantly impaired by upending the basic subject of the contract—the contractual right to collect rent in exchange for providing a home.

### c. The district court decisions the District Court relied upon are distinguishable or unpersuasive.

The District Court also concludes its decision on summary judgment against Owners was appropriate because there have been other unsuccessful, constitutional challenges to eviction moratoria. 1-ER-24 (citing *HAPCO,* 482 F. Supp.3d at 355 and *El Papel*, *LLC v. Inslee,* 2021 WL 71678 W. D. Wash. January 28, 2021)[17]

The courts in *HAPCO,* 482 F. Supp.3d at 363 (construing a Philadelphia ordinance) and *El Papel,* 2021 WL 71678, and this Court in *Apartment Association,* 10 F.4th at 908*,* were not resolving the merits, but reviewing the denial of preliminary injunctions. For the reasons below, these cases are not persuasive as to the merits of the Contract Clause claim here.

---

[17] Although not specifically relied upon by the District Court, *Apartment Association of Los Angeles County, Inc. v. City of Los Angeles*, 10 F.4th 905 (9th Cir. 2021), fits the analysis of these other two cases and is also addressed herein.

The eviction moratorium in *HAPCO* applied only until a landlord and tenant went through mediation, presumably where the reality of financial hardship could be revealed. *HAPCO,* 482 F. Supp. 3d at 346. That Philadelphia law also allowed tenants to pay their unpaid rent over a nine-month period to avoid eviction. *Id.* at 347. These are critically distinguishing facts from the Proclamations. The conclusions in *HAPCO* about far more reasonable protection of COVID-19 affected tenants does not support the legality of the Proclamations here.

The District Court also cites *El Papel* for the conclusion that "*Blaisdell* supports the Washington moratorium." 1-ER-24. Neither the District Court in the present action nor the court in *El Papel* recognized *Blaisdell*'s extensive reliance on eviction cases, all of which required payment of fair market rent. *See supra* at 55-57. And, the Court in *El Papel* appears to be dealing solely with the eviction moratorium and not the restriction on treating unpaid rent as an enforceable debt. Unlike eviction moratoria challenged in other cases, this case challenges the Proclamations which make the opportunity to recover unpaid rent subject to an impossible condition—the offering of a repayment plan

tailored to the tenants' unique financial and health circumstances, which is information that Owners cannot know.

While some tenants honor their obligation to pay rent or comply with rules, other do not even if they can. Having no tie to loss of income or health considerations renders the prohibition on eviction not based on reasonable conditions. In contrast, the federal COVID-19 eviction moratorium applied only to lower income tenants and required certification regarding inability to pay rent, without any restriction on charging rent, interest or late fees. *See Alabama Association of Realtors v. Department of Health and Human Services*, 539 F.Supp.3d 29, 34 (D.C. D.C. 2021), *aff'd*, 141 S.Ct. 2485.

In *Apartment Association*, 10 F.4th 905, this Court concluded that it was unlikely that the plaintiffs could show that the moratorium was not "appropriate and reasonable." *Id.* at 913. The decision is not controlling here for several reasons. First, the Los Angeles moratorium was different from the Proclamations here in meaningful ways. The Los Angeles moratorium did not prohibit landlords from enforcing contracts in court as the Proclamations here do. *Id.* at 910 ("Landlords may continue to seek to evict tenants based on their good-faith belief that

63

the tenants are not protected under the eviction moratorium."). The eviction moratorium only prohibited eviction for non-payment of rent "if the tenant is unable to pay rent due to circumstances related to the COVID-19 pandemic." *Id.* at 909. Here, evictions were prohibited regardless of impact by the pandemic.[18] The Los Angeles moratorium also gave tenants up to 12 months to pay unpaid rent. *Id.* at 910. The Proclamations here did not require payment at all, let alone set a time for tenants to come current with what they owe.

Second, the analysis in *Apartment Association* is distinguishable from this case because the *Apartment Association* plaintiffs argued that *Blaisdell* required "contemporaneous" payment of rent. *Id.* at 915. That is not Owners' argument. Owners contend that *Blaisdell,* and the eviction cases on which *Blaisdell* relies, requires an assurance of recovery of fair market rental value lost during the unwanted occupancy. Owners recognize that some tenants might be unable to pay rent contemporaneously. However, as in *Keating*, 903 F.2d at 1228,

---

[18] While the Los Angeles moratorium did not require tenants to provide evidence that an inability to pay rent stemmed from the pandemic (*id.* at 910), landlords were not prohibited in Los Angeles, as they were in Washington, from filing for evictions wherein a court could make such inquiries.

there are other sources of funds that could avoid a Contracts Clause violation.

The Proclamations at issue here do not require that rent for the period of occupancy ever be paid. It is the ability to evict, before unpaid rent gets insurmountable, that keeps rental housing providers from having to endure long periods of exclusion with no financial return. That was taken away and tenants with unpaid rent can walk away with the new state law merely allowing the owner to evict—a toothless remedy against those who have left. The Proclamations are not reasonable because they take away the opportunity to be paid and do nothing to ensure that Owners are ever paid.

The Washington Proclamations do not provide for "reasonable compensation" to Owners. Indeed, the prohibition on evictions expressly allows tenants to remain in possession without paying any rent during the emergency period regardless of their financial situation. The Proclamations are not reasonable or appropriate to any legitimate end of keeping people in their homes during a crisis. *Blaisdell,* 290 U.S. at 438.

Owners are not sympathetic to tenants who have suffered no loss of income but choose not to pay rent because the Proclamations say they don't have to. The Proclamations allow all tenants, including those who continue to be employed full time because they can work from home or otherwise, to live without ever paying rent because they cannot be evicted until the eviction moratorium is over and can never have their unpaid rent treated as a legal obligation they must pay. The only qualification for being protected from eviction is that one occupies another's property, even squatters. This is not a reasonable response to the pandemic's impact on housing by placing all the burden on the owners of the property.

### d. Requiring property owners to house rule-breaking tenants without rent is not tailored to the emergency.

As addressed above, to survive a Contract Clause claim, substantial impairment of a contract must be "tailored to the emergency that it was designed to meet." *Allied Structural Steel Co.,* 438 U.S. at 242. The Proclamations here evidence no tailoring whatsoever. And the Proclamations are unnecessary and unreasonable because "an evident

and more moderate course would serve [the state's] purposes equally well." *United States Trust of New York*, 431 U.S. at 31.

The Proclamations prohibit evictions regardless of a tenant's employment or ability to pay. The Proclamations are inadequately tailored to account for rule-breaking tenants: a housing provider cannot evict a tenant for violations of a lease condition unrelated to rent, such as rules related to the welfare of other tenants, as is evident here. Appellant Burgstaller tried to evict a tenant who was not paying but was also creating noise problems for other tenants. 2-ER-253-54. She was essentially barred from remedying the problem by the Proclamations.

The Proclamations' ban on rent collection is not tailored to the emergency either. Owners were prohibited from bringing a breach-of-contract action and leaving to the court to administer justice under the circumstances of the parties. Tailoring to specific circumstances was not provided.

In closing on the Contracts Clause claim, the Proclamations certainly imposed a substantial impairment to Owners' leases, resulting in a significant delay in payment, substantially greater than the three-day

delay in *University of Hawaii Prof'l Assembly*, 183 F.3d at 1104.

Additionally, there was none of the tailoring or conditioning considered important in *Blaisdell* and its related cases, namely, assurance of recovering rent. Owners, in addition to the State, need to know whether the Contracts Clause tolerates government action requiring one group of people to shoulder the burden of a public need.

## Conclusion

The District Court erred in granting summary judgment and Owners respectfully urge the Court to reverse that decision.

Respectfully submitted this 24th day of June 2022,

> Richard M. Stephens WSBA #21776
> STEPHENS & KLINGE LLP
> 10900 NE 4th Street, Suite 2300
> Bellevue, WA  98004
> (425)-453-6206

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS IN RULE 29(d) and RULE 32(g)(1)

This brief complies with the type-volume limitation of Fed. R. App. P. 29(d) and 32(a)(7)(B) because this brief contains 13,147 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Word for Microsoft 365 in fourteen point Century Schoolbook font.

By:   s/   *Richard M. Stephens*

Richard M. Stephens, WSBA # 21776
Attorney for Appellant Appellants
Dated June 24, 2022

# CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Appellant's Opening Brief was served upon counsel for Appellees by electronic filing with the United States Court of Appeals for the Ninth Circuit's CM/ECF system this 24th day of June 2022, at Woodinville, Washington,

By:  s/*Richard M. Stephens*

       Richard M. Stephens, WSBA #21776
       Charles A. Klinge, WSBA # 26093
       Attorneys for Appellants
       Dated June 24, 2022

# Addendum

## Table of Contents

### Constitutional Provisions

Article I, Section of the United States Constitution…………………….2

Fifth Amendment to the United States Constitution…………………..2

Fourteenth Amendment to the United States
Constitution, Section 1………………………………………………..2

### Statutes

Wash. Rev. Code (RCW) 59.18.080……………………………….…….3

RCW 59.18.130…………………………………………………………3

RCW 59.18.630…………………………………………………………3

## Constitutional Provisions

Article I, Section 10 of the United States Constitution:

> No State shall enter into any Treaty, Alliance, or Confederation; grant Letters of Marque and Reprisal; coin Money; emit Bills of Credit; make any Thing but gold and silver Coin a Tender in Payment of Debts; pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts, or grant any Title of Nobility.

Fifth Amendment to the United States Constitution:

> No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

Fourteenth Amendment to the United States Constitution, Section 1:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

**Statutes**

RCW 59.18.080:

> The tenant shall be current in the payment of rent including all utilities which the tenant has agreed in the rental agreement to pay before exercising any of the remedies accorded him or her under the provisions of this chapter: PROVIDED, That this section shall not be construed as limiting the tenant's civil remedies for negligent or intentional damages: PROVIDED FURTHER, That this section shall not be construed as limiting the tenant's right in an unlawful detainer proceeding to raise the defense that there is no rent due and owing.

RCW 59.18.130:

> Each tenant shall pay the rental amount at such times and in such amounts as provided for in the rental agreement or as otherwise provided by law and comply with all obligations imposed upon tenants by applicable provisions of all municipal, county, and state codes, statutes, ordinances, and regulations…

RCW 59.18.630:

> (1) The eviction moratorium instituted by the governor of the state of Washington's proclamation 20-19.6 shall end on June 30, 2021.

> (2) If a tenant has remaining unpaid rent that accrued between March 1, 2020, and six months following the expiration of the eviction moratorium or the end of the public health emergency, whichever is greater, the landlord must offer the tenant a reasonable schedule for repayment of the unpaid rent that does not exceed monthly payments equal to one-third of the monthly rental charges during the period of accrued debt. If a tenant fails to accept the terms of a reasonable repayment plan within 14 days of the landlord's offer, the landlord may proceed with an unlawful detainer action as set forth in RCW 59.12.030(3) but subject to any

73

requirements under the eviction resolution pilot program established under RCW 59.18.660. If the tenant defaults on any rent owed under a repayment plan, the landlord may apply for reimbursement from the landlord mitigation program as authorized under RCW 43.31.605(1)(d) or proceed with an unlawful detainer action as set forth in RCW 59.12.030(3) but subject to any requirements under the eviction resolution pilot program established under RCW 59.18.660. The court must consider the tenant's circumstances, including decreased income or increased expenses due to COVID-19, and the repayment plan terms offered during any unlawful detainer proceeding.

(3) Any repayment plan entered into under this section must:

(a) Not require payment until 30 days after the repayment plan is offered to the tenant;

(b) Cover rent only and not any late fees, attorneys' fees, or any other fees and charges;

(c) Allow for payments from any source of income as defined in RCW 59.18.255(5) or from pledges by nonprofit organizations, churches, religious institutions, or governmental entities; and

(d) Not include provisions or be conditioned on: The tenant's compliance with the rental agreement, payment of attorneys' fees, court costs, or other costs related to litigation if the tenant defaults on the rental agreement; a requirement that the tenant apply for governmental benefits or provide proof of receipt of governmental benefits; or the tenant's waiver of any rights to a notice under RCW 59.12.030 or related provisions before a writ of restitution is issued.

(4) It is a defense to an eviction under RCW 59.12.030(3) that a landlord did not offer a repayment plan in conformity with this section.

(5) To the extent available funds exist for rental assistance from a federal, state, local, private, or nonprofit program, the tenant or landlord may continue to seek rental assistance to reduce and/or eliminate the unpaid rent balance.