NO. 22-35050

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

ENRIQUE JEVONS, as managing member of
Jevons Properties LLC, et al.,

*Plaintiffs-Appellants*,

v.

JAY INSLEE, in his official capacity as the Governor of the
State of Washington, ROBERT FERGUSON, in his official capacity
as the Attorney General of the State of Washington,

*Defendants-Appellees*.

On Appeal from the United States District Court for the
Eastern District of Washington, Case No. 1:20-cv-03182-SAB
The Honorable Stanley A. Bastian
United States District Court Judge

## DEFENDANTS-APPELLEES' ANSWERING BRIEF

ROBERT W. FERGUSON
Attorney General

CRISTINA SEPE, WSBA #53609
BRIAN H. ROWE, WSBA #56817
Assistant Attorneys General
JEFFREY T. EVEN, WSBA #20367
Deputy Solicitor General

800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
Cristina.Sepe@atg.wa.gov
Brian.Rowe@atg.wa.gov
Jeffrey.Even@atg.wa.gov
(206) 464-7744
*Attorneys for Defendants-Appellee*

**TABLE OF CONTENTS**

I.    INTRODUCTION ..............................................................1

II.   JURISDICTIONAL STATEMENT ...................................3

III.  ISSUES PRESENTED .......................................................3

IV.  STATEMENT OF THE CASE ..........................................4

     A.  The COVID-19 Pandemic and Washington State's Response ....4

     B.  The Risk and Costs of Mass Evictions.........................................5

     C.  The State Eviction Moratorium and the Pandemic's Impacts......6

     D.  Federal, State, and Local Rental Assistance Measures
         Providing Relief to Landlords ....................................................10

     E.  Procedural History.....................................................................14

V.    SUMMARY OF ARGUMENT.........................................16

VI.  STANDARD OF REVIEW ..............................................19

VII.  ARGUMENT ....................................................................19

     A.  This Case is Moot Because There is No Longer a Live
         Controversy ...............................................................................19

          1.  Legal standard ....................................................................19

          2.  The Landlords' claims are moot because the challenged
              eviction moratorium ended in 2021 .....................................20

          3.  The voluntary cessation exception to mootness does
              not apply because the Proclamation's expiration and
              the subsequent passage of superseding legislation
              show there is no likelihood of recurrence ............................26

4. The capable of repetition, yet evading review exception does not apply because there is no reasonable expectation the Landlords will be subject to the same action again .......31

B. The Moratorium Did Not Effect an Unconstitutional Physical Taking .........................................................................33

1. The Moratorium did not authorize the "permanent occupation" of Landlords' properties by tenants they invited..................................................................................34

2. Physical takings do not apply to interests in rental agreements ...............................................................42

3. The State did not confiscate security deposits .....................44

C. The Moratorium Comported with the Contracts Clause ............46

1. The Moratorium did not impose a substantial, unforeseeable impairment on rental agreements.........................................47

a. The Moratorium did not undermine the contractual bargain .......................................................47

b. The Moratorium did not impair reasonable expectations ................................................................54

c. The Landlords could safeguard or reinstate their rights 56

2. The Moratorium advanced a significant public purpose in an appropriate and reasonable way.................................57

a. The Moratorium's purpose is significant and legitimate ...................................................................58

b. The Moratorium was reasonable and appropriate .........59

VIII. CONCLUSION..................................................................................65

# TABLE OF AUTHORITIES

## Cases

*36 Apt. Assocs. LLC v. Cuomo*,
  860 F. App'x 215 (2d Cir. 2021) ............................................................. 21, 31

*All. for the Wild Rockies v. Savage*,
  897 F.3d 1025 (9th Cir. 2018) .......................................................... 19

*Allied Structural Steel Co. v. Spannaus*,
  438 U.S. 234 (1978) ...................................................................... 47

*Already, LLC v. Nike, Inc.*,
  568 U.S. 85 (2013) ........................................................................ 19

*Apt. Ass'n of Los Angeles Cnty. v. City of Los Angeles*,
  10 F.4th 905 (9th Cir. 2021),
  *cert. denied*, 142 S. Ct. 1699 (2022) (*AALAC*) ..................................... passim

*Arkansas Game & Fish Comm'n v. United States*,
  568 U.S. 23 (2012) .................................................................. 41, 42

*Armstrong v. United States*,
  364 U.S. 40 (1960) ....................................................................... 45

*Auracle Homes, LLC v. Lamont*,
  478 F. Supp. 3d 199 (D. Conn. 2020) ...................................................... passim

*Baptiste v. Kennealy*,
  490 F. Supp. 3d 353 (D. Mass. 2020) ...................................................... passim

*Bay Point Props., Inc. v. Miss. Transp. Comm'n*,
  937 F.3d 454 (5th Cir. 2019) .......................................................... 21

*Bd. of Trs. of Glazing Health & Welfare Tr. v. Chambers*,
  941 F.3d 1195 (9th Cir. 2019) (en banc) ................................................ 27

*Block v. Hirsh,*
   256 U.S. 135 (1921) .......................................................... 53, 54, 56

*Brach v. Newsom,*
   38 F.4th 6 (9th Cir. 2022) (en banc)..................................... passim

*Bronson v. Kinzie,*
   42 U.S. 311 (1843) ................................................................. 53

*Campesinos Unidos, Inc. v. U.S. Dep't of Labor,*
   803 F.2d 1063 (9th Cir. 1986)...................................................... 33

*Cedar Point Nursery v. Hassid,*
   141 S. Ct. 2063 (2021) ............................................. 25, 39, 40, 41

*Chicago Bd. of Realtors, Inc. v. City of Chicago,*
   819 F.2d 732 (7th Cir. 1987)........................................................ 55

*Church v. Polis,*
   No. 20-1391, 2022 WL 200661 (10th Cir. Jan. 24, 2022) ............................ 29

*Cienega Gardens v. United States,*
   331 F.3d 1319 (Fed. Cir. 2003) ............................................. 43, 44

*City of Los Angeles v. Lyons,*
   461 U.S. 95 (1983) ................................................................ 32

*County of Butler v. Governor of Pennsylvania.,*
   8 F.4th 226 (3d Cir. 2021),
   *cert. denied sub nom.*
   *Butler County, Pennsylvania v. Wolf,*
   142 S. Ct. 772 (2022) ......................................................... 28, 33

*Diffenderfer v. Cent. Baptist Church of Miami,*
   404 U.S. 412 (1972) ................................................................ 26

*Duke Power Co. v. Carolina Env't Study Grp., Inc.,*
   438 U.S. 59 (1978) ................................................................ 25

*E. Enters. v. Apfel*,
    524 U.S. 498 (1998) ...................................................................... 25

*Edgar A. Levy Leasing Co., Inc. v. Siegel*,
    256 U.S. 242 (1922) ............................................................... 53, 54

*El Papel LLC v. Durkan*,
    No. 2:20-cv-01323-RAJ-JRC,
    2021 WL 4272323 (W.D. Wash. Sept. 15, 2021),
    *report and recommendation adopted as modified*,
    No. 20-cv-01323-RAJ,
    2022 WL 2828685 (W.D. Wash. July 20, 2022),
    *appeal docketed*, No. 22-35656 (9th Cir. Aug. 17, 2022)........... 18, 38, 63, 65

*Elmsford Apt. Assocs., LLC v. Cuomo*,
    469 F. Supp. 3d 148 (S.D.N.Y. 2020),
    *appeal dismissed sub nom.*
    *36 Apt. Assocs., LLC v. Cuomo*,
    860 F. App'x 215 (2d Cir. 2021)........................................................... passim

*Energy Rsrvs. Grp., Inc. v. Kan. Power & Light Co.*,
    459 U.S. 400 (1983) ............................................................... passim

*Ex Parte Young*,
    209 U.S. 123 (1908) ...................................................................... 22

*Farhoud v. Brown*,
    No. 3:20-cv-2226-JR, 2022 WL 326092 (D. Or. Feb. 3, 2022).................... 18

*FCC v. Fla. Power Corp.*,
    480 U.S. 245 (1987) ....................................................... 35, 38, 40

*Fikre v. FBI*,
    904 F.3d 1033 (9th Cir. 2018)...................................................... 27

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) ...................................................................... 26

*Gallo v. District of Columbia*,
  No. 1:21-cv-03298 (TNM),
  2022 WL 2208934 (D.D.C. June 21, 2022) ............................... 18, 37, 38, 63

*Gator.com Corp. v. L.L. Bean, Inc.*,
  398 F.3d 1125 (9th Cir. 2005) (en banc) ....................................................... 23

*Gonzales v. Inslee*,
  504 P.3d 890 (Wash. App. 2022) ............................................................ 18, 65

*Hamamoto v. Ige*,
  881 F.3d 719 (9th Cir. 2018) ........................................................................ 32

*Hamby v. Hammond*,
  821 F.3d 1085 (9th Cir. 2016) ...................................................................... 19

*HAPCO v. City of Philadelphia*,
  482 F. Supp. 3d 337 (E.D. Pa. 2020) ..................................................... passim

*Headwaters, Inc. v. Bureau of Land Mgmt., Medford Dist.*,
  893 F.2d 1012 (9th Cir. 1989) ...................................................................... 23

*Heights Apts., LLC v. Walz*,
  30 F.4th 720 (8th Cir. 2022) ....................................................... 19, 20, 40, 41

*Hendler v. United States*,
  952 F.2d 1364 (Fed. Cir. 1991) .................................................................... 42

*Home Bldg. & Loan Ass'n v. Blaisdell*,
  290 U.S. 398 (1934) ............................................................................... passim

*Jevons v. Inslee*,
  561 F. Supp. 3d 1082 (E.D. Wash. Sept. 21, 2021) .............................. passim

*Johnson v. Governor of New Jersey*,
  No. 21-1795, 2022 WL 767035
  (3d Cir. Mar. 14, 2022) .......................................................................... 21, 29

*Kaiser Aetna v. United States*,
    444 U.S. 164 (1979) ...................................................................... 39

*Ladd v. Marchbanks*,
    971 F.3d 574 (6th Cir. 2020) ....................................................... 21

*Lighthouse Fellowship Church v. Northam*,
    20 F.4th 157 (4th Cir. 2021) ................................................. 29, 30

*Loretto v. Teleprompter Manhattan CATV Corp.*,
    458 U.S. 419 (1982) ....................................................... 2, 35, 36, 42

*Los Angeles Cnty. Bar Ass'n v. Eu*,
    979 F.2d 697 (9th Cir. 1992) ....................................................... 22

*Marcus Brown Holding Co., Inc. v. Feldman*,
    256 U.S. 170 (1921) ..................................................................... 53

*Matsuda v. City & County of Honolulu*,
    512 F.3d 1148 (9th Cir. 2008) ..................................................... 47

*McQuillion v. Schwarzenegger*,
    369 F.3d 1091 (9th Cir. 2004) ..................................................... 24

*N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York*,
    140 S. Ct. 1525 (2020) (per curiam) .......................................... 26

*Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104 (1978) .............. 41, 44

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
    141 S. Ct. 63 (2020) (per curiam) ................................... 27, 28, 58

*Rosebrock v. Mathis*,
    745 F.3d 963 (9th Cir. 2014) ....................................................... 27

*Ruckelshaus v. Monsanto Co.*,
    467 U.S. 986 (1984) ..................................................................... 25

*Ruvalcaba v. City of Los Angeles*,
    167 F.3d 514 (9th Cir. 1999) ......................................................... 22

*S. Bay United Pentecostal Church v. Newsom*,
    140 S. Ct. 1613 (2020) ............................................................ 60, 61

*S. Cal. Rental Hous. Ass'n v. County of San Diego*,
    550 F. Supp. 3d 853 (S.D. Cal. 2021) ...................................... 18, 38

*SKS & Assocs., Inc. v. Dart*,
    619 F.3d 674 (7th Cir. 2010) ......................................................... 56

*Slidewaters LLC v. Wash. State Dep't of Lab. & Indus.*,
    4 F.4th 747 (9th Cir. 2021),
    *cert. denied*, 142 S. Ct. 779 (2022) .............................................. 4

*Speech First, Inc. v. Schlissel*,
    939 F.3d 756 (6th Cir. 2019) ......................................................... 27

*Spell v. Edwards*,
    962 F.3d 175 (5th Cir. 2020) ......................................................... 22

*Spokane Sch. Dist. No. 81 v. Parzybok*,
    633 P.2d 1324 (Wash. 1981) ........................................................ 44

*Super Tire Eng'g Co. v. McCorkle*,
    416 U.S. 115 (1974) ..................................................................... 23

*Sveen v. Melin*,
    138 S. Ct. 1815 (2018) ............................................. 47, 48, 56, 58

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*,
    535 U.S. 302 (2002) ............................................................... 34, 43

*Tandon v. Newsom*,
    141 S. Ct. 1294 (2021) ....................................................... 27, 28, 29

*Trump v. Hawai'i*,
    138 S. Ct. 377 (2017) ................................................................... 26

*United States Trust Co. of New York v. New Jersey*,
  431 U.S. 1 (1977) ........................................................................... 48

*W.B. Worthen Co. v. Kavanaugh*,
  295 U.S. 56 (1935) ................................................................. 49, 50

*Williams v. Utah Dep't of Corr.*,
  928 F.3d 1209 (10th Cir. 2019).................................................. 21

*Workman v. Mingo Cnty. Bd. of Educ.*,
  419 F. App'x 348 (4th Cir. 2011)................................................. 59

*Yee v. City of Escondido*,
  503 U.S. 519 (1992) ............................................................. passim

*Zito v. N.C. Coastal Res. Comm'n*,
  8 F.4th 281 (4th Cir. 2021).......................................................... 21

## Constitutional Provisions

U.S. Const amend. V................................................................ passim

U.S. Const. amend. IX .................................................................. 15

U.S. Const. amend. XIV ............................................................... 15

U.S. Const. art. I, § 10............................................................. passim

U.S. Const. art. III...................................................................... 20

## Statutes

28 U.S.C. § 1291 ........................................................................... 3

28 U.S.C. § 1331 ........................................................................... 3

28 U.S.C. § 1343 ........................................................................... 3

American Rescue Plan Act of 2021,
  Pub. L. No. 117–2, 135 Stat. 4 (2021) ........................................ 11

Coronavirus Aid, Relief, and Economic Security (CARES) Act,
  Pub. L. No. 116-136, 134 Stat. 281 (2020) .................................... 10

Engrossed Substitute H.B. 1368,
  67th Leg., Reg. Sess. (Wash. 2021)
  *enacted as* 2021 Wash. Sess. Laws, ch. 3 .................................... 10

Engrossed Second Substitute S.B. 5160,
  67th Leg., Reg. Sess. (Wash. 2021),
  *enacted as* 2021 Wash. Sess. Laws, ch. 115 ......................................... passim

Engrossed Substitute S.B. 5092,
  67th Leg., Reg. Sess. (Wash. 2021),
  *enacted as* 2021 Wash. Sess. Laws, ch. 334 ................................11

Wash. Rev. Code § 43.06.220 ......................................................... 31

Wash. Rev. Code § 59.12 .................................................................. 55

Wash. Rev. Code § 59.18 .................................................................. 55

Wash. Rev. Code § 59.18.060 .......................................................... 55

Wash. Rev. Code § 59.18.140 .......................................................... 55

Wash. Rev. Code § 59.18.170 .......................................................... 55

Wash. Rev. Code § 59.18.200 .......................................................... 55

Wash. Rev. Code § 59.18.260 .......................................................... 55

Wash. Rev. Code § 59.18.270 .................................................... 45, 55

Wash. Rev. Code § 59.18.280 .......................................................... 55

Wash. Rev. Code § 59.18.365–.410 ................................................ 55

Wash. Rev. Code § 59.18.410 ..........................................................57

<u>Other Authorities</u>

86 Fed. Reg. 21163 (Apr. 22, 2021) .................................................................. 59

Wash. Dep't of Health, *COVID-19 Data Dashboard*,
  https://doh.wa.gov/emergencies/covid-19/data-dashboard
  (last visited Aug. 24, 2022) ............................................................................. 1

Wash. Office of the Governor, *Proclamation 20-05* (Feb. 29, 2020),
  https://www.governor.wa.gov/sites/default/files/proclamations/
  20-05%20Coronavirus%20(final).pdf ............................................................. 4

Wash. Office of the Governor, *Proclamation 20-19* (Mar. 18, 2020),
  https://www.governor.wa.gov/sites/default/files/proclamations/
  20-19%20-%20COVID-19%20Moratorium%20on%20Evictions
  %20(tmp).pdf............................................................................................. passim

Wash. Office of the Governor, *Proclamation 20-19.1* (Apr. 16, 2020),
  https://www.governor.wa.gov/sites/default/files/20-19.1
  %20-%20COVID-19%20Moratorium%20on%20Evictions
  %20Extension%20%28tmp%29.pdf ............................................................. 7, 8

Wash. Office of the Governor, *Proclamation 20-19.6* (Mar. 18, 2021),
  https://www.governor.wa.gov/sites/default/files/
  proclamations/proc_20-19.6.pdf ............................................................. passim

Wash. Office of the Governor, *Proclamation 21-09* (June 29, 2021),
  https://www.governor.wa.gov/sites/default/files/
  proclamations/proc_21-09.pdf .................................................. 13, 14, 15, 20

Wash. Office of the Governor, *Proclamation 21-09.01* (Sept. 24, 2021),
  https://www.governor.wa.gov/sites/default/files/
  proclamations/proc_21-09.1.pdf ................................................................. 14

## I.     INTRODUCTION

The COVID-19 pandemic, the deadliest in over a century, created both a public health crisis and an economic crisis. Over 13,900 Washingtonians have died from COVID-19 and there have been over 1.7 million confirmed and probable cases in the State.[1] The State experienced the worst economic devastation since the Great Depression because of the pandemic.

Governor Inslee issued emergency proclamations to slow COVID-19's spread and mitigate its economic hardships. In particular, the Governor sought to keep people in their homes, recognizing that the pandemic would leave many tenants in financial distress and at risk of eviction, and that eviction would accelerate the spread of the coronavirus. So like the federal government and many other states and municipalities, the Governor issued a moratorium on residential evictions (the Moratorium). The Moratorium ended in 2021, by its own terms and by operation of statute.

The Court should dismiss this appeal as moot. The Moratorium expired over a year ago, and the Washington State Legislature enacted a new eviction

---

[1] Wash. Dep't of Health, *COVID-19 Data Dashboard*, https://doh.wa.gov/emergencies/covid-19/data-dashboard (last visited Aug. 24, 2022).

law in its place—which is not challenged in this case. There is no effective relief this Court can grant. *Brach v. Newsom*, 38 F.4th 6, 11 (9th Cir. 2022) (en banc).

Alternatively, the State asks the Court to affirm the district court's order granting summary judgment to the State for two reasons. First, the Moratorium regulated the landlord-tenant relationship and did not effect a physical taking—that is, "the permanent occupation of [a] landlord's property by a third party." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 440 (1982). This is because property owners voluntarily invited their tenants to occupy their properties; their tenants were not forced upon them by the State. Second, the Moratorium comported with the Contracts Clause because it was a reasonable and appropriate tool to mitigate the progression of COVID-19 in the State and reduce economic hardship. And, as this Court has recognized, there is no constitutionally-derived rule that requires rent be paid during the period of an eviction moratorium. *Apt. Ass'n of Los Angeles Cnty. v. City of Los Angeles*, 10 F.4th 905, 915–16 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 1699 (2022) (*AALAC*). For these reasons, nearly all federal courts have upheld state and local eviction moratoria during the COVID-19 pandemic, including the Moratorium, against the same constitutional challenges. This Court should too.

## II.    JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343. This Court has jurisdiction under 28 U.S.C. § 1291.

## III.    ISSUES PRESENTED

1.    This case involves issues that are unlikely to recur because the Moratorium expired in 2021 and the Legislature enacted new law protecting tenants during the public health emergency. Because this Court's jurisdiction is limited to live cases, and no effective relief can be offered to the Plaintiffs-Appellants, should this appeal be dismissed as moot?

2.    The Moratorium regulated the landlord-tenant relationship by temporarily adjusting the terms under which property owners could evict tenants they invited to occupy their properties. Did the district court correctly hold that the Moratorium did not effect a physical taking?

3.    As recognized by this Court in a similar challenge to an eviction moratorium, there is no fixed rule that eviction moratoria pass constitutional muster only if rent is paid during the period of the moratoria. Did the district court correctly hold that the Moratorium did not unconstitutionally impair contracts?

# IV. STATEMENT OF THE CASE

## A. The COVID-19 Pandemic and Washington State's Response

The outbreak of novel coronavirus SARS-CoV-2 is a global public health disaster that upended life for everyone. The SARS-CoV-2 virus that causes COVID-19 is highly contagious and potentially fatal. SER-55–56. Seniors and persons with medical conditions are most vulnerable to complications and death, and people of color disproportionately contract and experience severe COVID-19 health outcomes. SER-56–58. The virus spreads primarily through close interactions via respiratory droplets. SER-55. There is a lag of several days before the onset of symptoms, and some with COVID-19 experience no symptoms. SER-55–56.

On February 29, 2020, the Governor issued Proclamation 20-05, declaring a state of emergency in Washington State due to COVID-19.[2] *See* Wash. Office of the Governor, *Proclamation 20-05* (Feb. 29, 2020), https://www.governor.wa.gov/sites/default/files/proclamations/20-05%20Coronavirus%20(final).pdf (filed at 2-ER-66–67); *Slidewaters LLC v. Wash. State Dep't of Lab. & Indus.*, 4 F.4th 747, 753 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 779 (2022) (citing

---

[2] The Governor's Proclamations are available at: The Office of the Governor, *Proclamations*, https://www.governor.wa.gov/office-governor/official-actions/proclamations (last visited Aug. 24, 2022).

4

Procl. 20-05). With few proven therapeutics and no vaccine at the outset, a primary strategy to slow COVID-19's spread was to minimize interactions outside one's household. SER-60–63. The State's mitigation measures grew stricter as cases and deaths accelerated. *Id.*

## B. The Risk and Costs of Mass Evictions

From the outset of the pandemic, the Governor's Office understood that the pandemic would significantly reduce economic output and income, making many tenants unable to afford rent. *See* SER-7–8. A homelessness and housing instability crisis predated the pandemic in the State, where nearly one-fifth of tenants were extremely low-income and affordable housing stock has consistently declined. SER-4–5. Against that backdrop, the Governor's Office anticipated that, without countermeasures, the COVID-19 pandemic's economic dislocations would result in mass evictions, exacerbating housing instability and homelessness in Washington. SER-5–6. Mass evictions would imperil both the economy and public health. *Id.* Mass evictions would not only displace people from their residences at the very time that it was critical to stay home, but also force many into congregate settings like shelters and over-occupied homes, further spreading COVID-19. *Id.*; SER-81–84. Residential crowding and increased contact increase the risk of COVID-19 infections. *See* SER-81–84,

SER-86–87. Around the time the State filed its summary judgment motion in May 2021, the Washington State Department of Health had identified 202 COVID-19 outbreaks in homeless services or shelters. SER-84, SER-93. The Governor's Office also recognized that allowing evictions would flood the state court system with unlawful detainer filings, forcing tenants to risk their health to appear in housing courts that are crowded even in normal times. SER-15-16.

**C.      The State Eviction Moratorium and the Pandemic's Impacts**

Given the likelihood and obvious dangers of mass evictions amidst the COVID-19 pandemic, on March 18, 2020, Governor Inslee issued Proclamation 20-19, temporarily prohibiting most residential evictions. *See* Wash. Office of the Governor, *Proclamation 20-19* (Mar. 18, 2020), https://www.governor.wa.gov/sites/default/files/proclamations/20-19%20-%20COVID-19%20Moratorium%20on%20Evictions%20(tmp).pdf (filed at 2-ER-69-71). Correctly predicting COVID-19 to "cause a sustained global economic slowdown," the Governor logically determined that "the inability to pay rent by these members of our workforce increases the likelihood of eviction from their homes," which in turn would "increas[e] the life, health, and safety

risks to a significant percentage of our people from the COVID-19 pandemic[.]" Procl. 20-19 at 1.

As the pandemic continued, the Governor extended Proclamation 20-19, revising and refining the eviction moratorium in the process. *See* Procl. 20-19.1 (issued Apr. 16, 2020), Procl. 20-19.2 (issued June 2, 2020), Procl. 20-19.3 (issued July 24, 2020), Procl. 20-19.4 (issued Oct. 14, 2020), Procl. 20-19.5 (issued Dec. 31, 2020), and Procl. 20-19.6 (issued Mar. 18, 2021). With each amended Proclamation, the Governor extended the duration of the prohibition of most residential evictions and set a new date by which the eviction moratorium would expire. The last amended Proclamation, 20-19.6, expired on its own terms on June 30, 2021. *See* Procl. 20-19.6 at 4. *See* Wash. Office of the Governor, *Proclamation 20-19.6* (Mar. 18, 2021), https://www.governor.wa.gov/sites/default/files/proclamations/proc_20-19.6.pdf (filed at 2-ER-140–148); *see also* SER-47–48.

In crafting amendments to the Moratorium, the Governor's Office sought input from many stakeholders, including residential property owners, managers, and landlords (collectively, property owners). SER-45; SER-13–15. Based on their input, the Governor added several exceptions to protect property owners and induce tenants able to pay rent to do so. In its most recent (and now expired)

form, the Moratorium prohibited property owners from pursuing eviction unless: (1) it was "necessary to respond to a significant and immediate risk to the health, safety, or property of others created by the resident"; (2) the landlord intended to "personally occupy the premises as [a] primary residence" (with timely notice to the tenant); or (3) the landlord intended to "sell the property" (also with timely notice). Procl. 20-19.6 at 5.

Property owners sought a mechanism to collect unpaid rent during the Moratorium. SER-14–15. The Governor amended the Moratorium in April 2022 to provide one. *See* Procl. 20-19.1 at 4. Though it generally prohibited landlords from treating unpaid rent "as an enforceable debt or obligation that is owing or collectable," that prohibition applied only when nonpayment was "a result of the COVID-19 outbreak and occurred on or after February 29, 2020[.]" Procl. 20-19.6 at 6. Thus, the Moratorium permitted action other than eviction to collect unpaid rent that predated or was unrelated to the pandemic. The Moratorium also permitted a landlord to collect *any* unpaid rent if a tenant refused or failed to comply with an offered "re-payment plan that was reasonable based on the individual financial, health, and other circumstances of that resident[.]" *Id.* This provision applied retroactively. The Moratorium did not

forgive any debt of unpaid rent and stressed that tenants "who are not materially affected by COVID-19 should and must continue to pay rent[.]" *Id.* at 2.

During the pandemic, at least 18,000 more Washingtonians have had to rely on cash assistance and 160,000 more on food assistance. SER-6–7. Through December 2020, over 1.6 million Washingtonians filed unemployment claims, and the State's unemployment rate exceeded its Great Recession peak. *Id.*

Due to the economy's fragility, housing instability remained a significant concern. Census survey data reported that, in March 2021 (while the Moratorium was in effect), 10.7% of renters in Washington (160,080 people) were behind on their rent. SER-32. And around 17.8% of renters (265,342 people) reported having little or no confidence in their ability to make rent. SER-33. An analysis by the Aspen Institute found that 649,000 to 789,000 people in Washington (up to 10.3% of the population) would be at risk of eviction without the Moratorium. SER-27–28.

The consequences of mass evictions during the early stages of the pandemic could have been catastrophic. They would have resulted in— according to projections performed by the University of Washington Institute for Health Metrics and Evaluation—up to 59,008 more eviction-attributable

COVID-19 cases, 5,623 more hospitalizations, and 621 more deaths in the State. SER-185.

**D.      Federal, State, and Local Rental Assistance Measures Providing Relief to Landlords**

On March 27, 2020, Congress enacted the Coronavirus Aid, Relief, and Economic Security (CARES) Act, which included $150 billion in direct assistance for state, territorial, and tribal governments. Pub. L. No. 116-136, 134 Stat. 281 (2020). From this fund, in early August 2020, Washington allocated more than $100 million in Eviction Rent Assistance Program (ERAP) grants. SER-11. Administered by local community organizations, ERAP funds provide up to three months of rent assistance to property owners on an eligible tenant's behalf. *Id.* The CARES Act also imposed a 120-day national moratorium on evictions of renters participating in federal housing assistance programs or living in a property with a federally backed mortgage. Pub. L. No. 116–136, 134 Stat. 281, 492–93 (2020).

In February 2021, the Legislature adopted—and the Governor signed into law—a $2.2 billion COVID relief bill. *See* Engrossed Substitute H.B. 1368, 67th Leg., Reg. Sess. (Wash. 2021), *enacted as* 2021 Wash. Sess. Laws, ch. 3. The bill provided the Department of Commerce $325 million to administer an emergency rental and utility assistance program, which provides grants to local

housing providers. *Id.*, § 3(1). The relief package also sent $40 million toward other housing programs, including grants to local housing providers, *id.* § 3(2), mortgage assistance for homeowners facing foreclosure, *id.*, § 3(3), and grants to landlords who have lost "rental income from elective nonpayor tenants during the state's eviction moratorium," *id.*, § 3(7). The State's operating budget appropriated $658 million to the Department of Commerce to administer rental and utility assistance. Engrossed Substitute S.B. 5092, 67th Leg., Reg. Sess. (Wash. 2021), *enacted as* 2021 Wash. Sess. Laws, ch. 334.

In March 2021, Congress enacted the American Rescue Plan Act of 2021. Pub. L. No. 117–2, 135 Stat. 4 (2021). The legislation gives more than $21.5 billion in rental assistance to help millions of families keep up on their rent and remain in their homes and $5 billion to assist people at risk of or experiencing homelessness.

In April 2021, the Washington Legislature adopted—and the Governor signed into law—a bill that provides tenant protections during and after this current public health emergency.[3] Under the statute, the eviction moratorium instituted through Proclamation 20-19.6 ended on June 30, 2021. Engrossed Second Substitute S.B. (E2SSB) 5160, 67th Leg., Reg. Sess. (Wash. 2021),

---

[3] The Governor partially vetoed two sections.

*enacted as* 2021 Wash. Sess. Laws, ch. 115. The law requires that if a tenant has remaining unpaid rent that accrued between March 1, 2020, and the end of the public health emergency, a landlord must offer that tenant a reasonable plan for rent repayment. Thus, a landlord can recover all past-due rent, but those monthly repayments cannot exceed one-third of the monthly rent during the period of non-payment. *Id.*, § 4. But if that tenant "fails to accept the terms of a reasonable repayment plan within 14 days of the landlord's offer," the landlord may pursue an unlawful detainer action, subject to any requirements of the Eviction Resolution Pilot program. *Id.* If a tenant defaults on rent owed under a repayment plan, the landlord may apply for reimbursement from the Landlord Mitigation Program or proceed with an unlawful detainer action, subject to any requirements of the Eviction Resolution Pilot program. *Id.* The court must consider in the unlawful detainer proceeding the tenant's circumstances, including any decreased income or increased expenses due to COVID-19, and the repayment plan terms offered. *Id.* The landlord's failure to offer a reasonable repayment plan is a defense to an unlawful detainer action. *Id.*

The law additionally provides that landlords are eligible to file certain reimbursement claims under the Landlord Mitigation Program up to $15,000 for unpaid rent that accrued between March 1, 2020, and December 30, 2021. *See*

*id.*, § 5. It also requires that the Administrative Office of the Courts contract with Dispute Resolution Centers to establish court-based eviction resolution pilot programs. *Id.*, § 7. It also provides for court-appointed counsel for indigent tenants in unlawful detainer proceedings, subject to the availability of amounts appropriated. *Id.*, § 8.

Because the new programs in E2SSB 5160 took time to implement, Governor Inslee issued Proclamation 21-09 as a temporary bridge to meet the emergency and ensure the protections of E2SSB 5160 were respected until the law was implemented. Wash. Office of the Governor, *Proclamation 21-09* (June 29, 2021), https://www.governor.wa.gov/sites/default/files/proclamations/proc_21-09.pdf. Proclamation 21-09 instructed property owners to comply with E2SSB 5160, even if that meant waiting until the law was operationalized by their county. Procl. 21-09 at 4. Specifically, under Proclamation 21-09, landlords could not evict tenants until "a rental assistance program and an eviction resolution pilot program [(together, ERRAP)] as contemplated by Section 7 of E2SSB 5160" had been implemented and were operational in the county in which the rental property was located, and "a tenant ha[d] been provided with, and ha[d], since the effective date of this order, rejected or failed to respond within 14 days of receipt of such notice to an opportunity to participate in an

13

operational [ERRAP] provided by E2SSB 5160." *Id.* This also meant that if the programs contemplated by E2SSB 5160 were operational while Proclamation 21-09 was in effect, E2SSB 5160's requirements and timelines would control.

Proclamation 21-09's provisions on enforceable debt, future rent owed, reasonable repayment plans, and indigent tenants' right to counsel closely hem to the requirements of E2SSB 5160. *Compare id.* at 5–7, *with* E2SSB 5160 §§ 3 (late fees), 4 (reasonable repayment plans), 7 (ERRAP requirements), 8 (right to counsel). After one extension, Proclamation 21-09, as amended, expired on October 31, 2021. Wash. Office of the Governor, *Proclamation 21-09.01* at 3 (Sept. 24, 2021), https://www.governor.wa.gov/sites/default/files/proclamations/proc_21-09.1.pdf.

### E.    Procedural History

Plaintiffs-Appellants Enrique Jevons, Jevons Properties LLC, Freya Burgstaller, and Jay and Kendra Glenn (collectively, the Landlords) have tenants who owe or owed unpaid rent and wished to evict them. The Landlords filed their lawsuit in October 2020, and amended their complaint in April 2021, mounting a facial challenge to the Moratorium. They sued Governor Jay Inslee and Attorney General Robert Ferguson, seeking declaratory and injunctive relief. They alleged Proclamation 20-19 violated the Takings, Contracts, and

Due Process clauses of the U.S. Constitution. *See Jevons v. Inslee*, 561 F. Supp. 3d 1082, 1092–93 (E.D. Wash. Sept. 21, 2021).

The parties cross-moved for summary judgment, and the district court granted the State Defendants' Cross-Motion for Summary Judgment. The Court held that the Landlords' claims against the Governor were barred by the Eleventh Amendment, *id.* at 1096, and that the Proclamation did not violate the Contracts Clause, Takings Clause, or Due Process Clause of the U.S. Constitution, *id.* at 1097–1112.

Below, the State Defendants maintained that the action was moot because Proclamation 20-19.6 ended on June 30, 2021. The district court disagreed, stating that while Proclamation 20-19.6 had expired, Proclamation 21-09 remained in effect at the time the court rendered its decision. The Landlords never challenged Proclamation 21-09, but the Court reasoned that though "[t]he precise relief sought by Plaintiffs [was] different at [that] juncture . . . the Court could still fashion effective relief with respect to [Proclamation 21-09]." *Id.* at 1095. The Landlords later moved for reconsideration on the court's order granting summary judgment in favor of the State Defendants, which the district court denied.

## V.    SUMMARY OF ARGUMENT

To avoid turning people out of their homes exactly when the COVID-19 pandemic required them to remain there—and to suppress an eviction crisis— Governor Inslee enacted a set of emergency measures that temporarily prevented residential evictions for tenants for COVID-19-related reasons. The Moratorium expressly did not forgive tenants' rental debt or eliminate their obligations. It did not prevent property owners from evicting tenants for safety and health reasons, or to personally occupy property. Nor did it prevent landlords from suing defaulting tenants for rent if tenants refused or defaulted on a reasonable repayment plan. The Moratorium and related legislation were and have been coupled with rent relief measures meant to reimburse landlords for at least some of the burden of unpaid rents.

This Court should dismiss the appeal as moot, because the Moratorium is no longer in effect. During the course of litigation, the Moratorium under Proclamation 20-19 expired on its own terms and the Washington State Legislature enacted a new eviction law, which is not challenged in this case. As a result, the prospective relief the Landlords pursue—declaratory and injunctive relief—is no longer possible. There is no Proclamation that this Court can enjoin the State from enforcing or declare invalid, rendering this case moot. Moreover,

16

neither the voluntary cessation exception nor the capable of repetition yet evading review exception to mootness applies here. The expiration of Proclamation 20-19 and the subsequent passage of legislation demonstrate that an eviction Moratorium is not reasonably expected to recur. This case is moot.

In the alternative, this Court should affirm the judgment of the district court, which granted summary judgment to the State on the Landlords' constitutional claims. With respect to the Takings Clause, Proclamation 20-19 temporarily restricted property owners' *use* of their property, preventing them from evicting—in the midst of a deadly pandemic—the tenants whom they had *voluntarily invited*. This kind of regulation on landlord-tenant relationships cannot constitute a physical taking. *See Yee v. City of Escondido*, 503 U.S. 519, 532 (1992). As to the Contracts Clause claim, even assuming the Moratorium substantially impaired contractual relationships (it did not), it still did not run afoul of the Contracts Clause because it was appropriately tailored to respond to the health and financial emergency precipitated by the COVID-19 pandemic. *See AALAC*, 10 F.4th at 913–16. And no case imposes a requirement that rent must be contemporaneously paid for the Moratorium to pass constitutional muster. *Id.* at 915–16.

This Court's affirmance would be consistent with the decisions of virtually all courts deciding the constitutionality of state or local eviction moratoria during the COVID-19 pandemic. *See, e.g.*, *Gonzales v. Inslee*, 504 P.3d 890 (Wash. App. 2022) (upholding the Moratorium against state constitutional and statutory challenge); *El Papel LLC v. Durkan*, No. 2:20-cv-01323-RAJ-JRC, 2021 WL 4272323, at *1 (W.D. Wash. Sept. 15, 2021), *report and recommendation adopted as modified*, No. 20-cv-01323-RAJ, 2022 WL 2828685 (W.D. Wash. July 20, 2022), *appeal docketed*, No. 22-35656 (9th Cir. Aug. 17, 2022) (upholding the Moratorium against federal constitutional challenge); *AALAC*, 10 F.4th 905; *Gallo v. District of Columbia*, No. 1:21-cv-03298 (TNM), 2022 WL 2208934 (D.D.C. June 21, 2022); *Farhoud v. Brown*, No. 3:20-cv-2226-JR, 2022 WL 326092 (D. Or. Feb. 3, 2022); *S. Cal. Rental Hous. Ass'n v. County of San Diego*, 550 F. Supp. 3d 853 (S.D. Cal. 2021); *Elmsford Apt. Assocs., LLC v. Cuomo*, 469 F. Supp. 3d 148 (S.D.N.Y. 2020), *appeal dismissed sub nom. 36 Apt. Assocs., LLC v. Cuomo*, 860 F. App'x 215 (2d Cir. 2021) (summary order); *Baptiste v. Kennealy*, 490 F. Supp. 3d 353 (D. Mass. 2020); *HAPCO v. City of Philadelphia*, 482 F. Supp. 3d 337 (E.D. Pa. 2020); *Auracle Homes, LLC v. Lamont*, 478 F. Supp. 3d 199

(D. Conn. 2020); *but see Heights Apts., LLC v. Walz*, 30 F.4th 720 (8th Cir. 2022).

The Court should dismiss the appeal as moot or affirm the judgment of the district court.

## VI. STANDARD OF REVIEW

This Court reviews de novo a district court's ruling on cross-motions for summary judgment. *Hamby v. Hammond*, 821 F.3d 1085, 1090 (9th Cir. 2016).

## VII. ARGUMENT

## A. This Case is Moot Because There is No Longer a Live Controversy

### 1. Legal standard

"A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982)). "Under Article III of the Constitution, 'a live controversy must persist throughout all stages of the litigation.'" *All. for the Wild Rockies v. Savage*, 897 F.3d 1025, 1031 (9th Cir. 2018) (cleaned up).

**2.     The Landlords' claims are moot because the challenged eviction moratorium ended in 2021**

The eviction moratorium the Landlords challenge expired on its own terms and by the terms of E2SSB 5160. *See* Procl. 20-19.6 (in effect "until 11:59 p.m. on June 30, 2021"); E2SSB 5160, § 4(1) ("The eviction moratorium instituted by the governor of the state of Washington's proclamation 20-19.6 shall end on June 30, 2021").[4] Thus, "[t]his is a classic case in which, due to intervening events, there is no longer a live controversy necessary for Article III jurisdiction. Nor is there any effective relief that can be granted by the court." *Brach*, 38 F.4th at 11.[5] The Court should accordingly dismiss the appeal. *See, e.g.*, *Heights Apts.*, 30 F.4th at 726 (holding property owner's challenge to the voided executive orders (EOs), which placed a moratorium on residential evictions, were "moot to the extent [plaintiff sought] to enjoin the EOs and declare them invalid because there is no longer a live controversy since the EOs have been superseded by statute[ ]"); *36 Apt. Assocs.*, 860 F. App'x. at 217

---

[4] Even considering the unchallenged Proclamation 21-09, which bridged the Moratorium and E2SSB 5160, Proclamation 21-09 expired in October 2021.

[5] This Court previously denied without prejudice the State's motion to dismiss the appeal as moot. *See* May 26, 2022 Order, DktEntry 9. The Court's order issued before the Court's en banc decision in *Brach v. Newsom*, 38 F.4th 6—which held a challenge to an early pandemic restriction was moot and is controlling here.

(dismissing challenge to New York eviction moratorium because, *inter alia*, it expired on its own terms and "the intervening passage of legislation"); *Johnson v. Governor of New Jersey*, No. 21-1795, 2022 WL 767035, at *2 (3d Cir. Mar. 14, 2022) (not precedential) (dismissing as moot challenge to executive order suspending procedures governing use of security deposits applied to rental payments).

This case's mootness is clear because the Landlords seek only injunctive and declaratory relief.[6] Like the plaintiffs in *Brach*, *see* 38 F.4th at 11, the Landlords did not bring a claim for damages. Nor could they; as numerous courts have held, a state's sovereign immunity bars Takings Clause claims for damages in federal court. *See, e.g.*, *Zito v. N.C. Coastal Res. Comm'n*, 8 F.4th 281, 286–87 (4th Cir. 2021); *Ladd v. Marchbanks*, 971 F.3d 574, 579 (6th Cir. 2020); *Bay Point Props., Inc. v. Miss. Transp. Comm'n*, 937 F.3d 454, 456–57 (5th Cir. 2019); *Williams v. Utah Dep't of Corr.*, 928 F.3d 1209, 1214 (10th Cir. 2019).

---

[6] The Landlords appear to concede they could not get injunctive relief on their Takings Clause claim. *See* Opening Br. at 20.

First, the Landlords' request for a permanent injunction against the Governor[7] and the Attorney General to enjoin enforcement of Proclamation 20-19 is moot—there is no longer a Proclamation for the Attorney General to enforce and the Proclamation that the Landlords alleged caused them harm is no longer in effect. To be sure, courts have broad discretion to shape equitable remedies; but here, an injunction would have no effect because the Proclamation the Attorney General could have enforced against the Landlords expired. There is no equitable remedy a court could issue that would provide effective relief. *Ruvalcaba v. City of Los Angeles*, 167 F.3d 514, 521 (9th Cir. 1999) ("[When] there is no longer a possibility that an appellant can obtain relief for his claim, that claim is moot and must be dismissed for lack of jurisdiction."); *see also Spell v. Edwards*, 962 F.3d 175, 179 (5th Cir. 2020) ("a case challenging a statute, executive order, or local ordinance usually becomes moot if the challenged law has expired or been repealed").

---

[7] The State argued below—and the district court agreed—the Landlords' claims for injunctive relief against the Governor were barred by the Eleventh Amendment. *See Jevons*, 561 F. Supp. 3d at 1096. The Governor does not have the requisite enforcement connection, so *Ex Parte Young*, 209 U.S. 123 (1908), does not apply. *See Los Angeles Cnty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992) ("[A] generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision will not subject an official to suit."). The Landlords do not contest that ruling.

Second, no live controversy exists such that a federal court has jurisdiction to issue declaratory relief. "The limitations that Article III imposes upon federal court jurisdiction are not relaxed in the declaratory judgment context." *Gator.com Corp. v. L.L. Bean, Inc.*, 398 F.3d 1125, 1129 (9th Cir. 2005) (en banc). When a request for an injunction becomes moot, there must remain a "substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Super Tire Eng'g Co. v. McCorkle*, 416 U.S. 115, 122 (1974) (quoting *Md. Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).[8]

Here, the controversy between parties has "evaporated or disappeared," making any request for declaratory relief inappropriate. *Headwaters, Inc. v. Bureau of Land Mgmt., Medford Dist.*, 893 F.2d 1012, 1015 (9th Cir. 1989); *see also Super Tire*, 416 U.S. at 124 (declaratory judgment claim remains live if the challenged policy remains fixed and definite, casting a "continuing and brooding presence"). The Moratorium under Proclamation 20-19, as amended, has both expired and been replaced by legislation unchallenged by the Landlords. A

---

[8] This case stands in contrast to *Super Tire*, which dealt with a continuing dispute over an ongoing policy though the specific offense precipitating the suit had become moot. 416 U.S. at 122–24. There simply is no ongoing policy at issue here.

23

declaratory judgment adjudicating the validity of the Proclamation would examine now-hypothetical issues—rather than the current legislative scheme that regulates evictions and the treatment of unpaid rent as enforceable debt— and would constitute an impermissible advisory opinion. *See McQuillion v. Schwarzenegger*, 369 F.3d 1091, 1095 (9th Cir. 2004) (explaining a declaration addressing hypothetical future disputes would offer an advisory opinion). There is simply no controversy, let alone an immediate one, to warrant a declaratory judgment.

That the Legislature has subsequently acted to protect tenants from evictions, *see supra* at pp. 11–13, does not change the conclusion that the Landlords' challenge to the Governor's eviction moratorium under Proclamation 20-19.6—the sole subject of this appeal—is moot. If anything, this strengthens the conclusion that this case is moot. *See infra* at p. 30. If the Landlords are aggrieved by the Legislature's enactments, they could challenge the law directly in a new lawsuit. But they cannot continue their challenge to an expired Proclamation. "Bottom line: there is no longer any state order for the court to declare unconstitutional or to enjoin. It could not be clearer that this case is moot." *Brach*, 38 F.4th at 11.

None of the cases the Landlords rely on, where the Supreme Court considered requests for declaratory relief for alleged takings, are germane to the mootness issue squarely before this Court. *See* Opening Br. at 21–23.[9] Those cases all involved challenges to *operative* laws—not ones that expired or were rescinded. So the Supreme Court had no occasion to consider whether the declaratory relief sought under those challenges were moot. *See Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2070 (2021) (employers sought declaratory and injunctive relief prohibiting a state board from enforcing an access regulation against them); *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 998 (1984) (applicant brought suit seeking injunctive and declaratory relief from operation of certain provisions of a federal law); *Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 71 n.15 (1978) (company sought "declaration of the constitutionality of the disputed governmental action before potentially uncompensable damages [were] sustained"); *E. Enters. v. Apfel*, 524 U.S. 498, 520 (1998) (coal operator sought a declaration that the law violated the Constitution and an injunction against enforcement of the act).

Those cases do not refute the general principle that challenges seeking prospective declaratory or injunctive relief against an expired or terminated

_____

[9] Cites to briefs use internal page numbering.

order are moot. *See Diffenderfer v. Cent. Baptist Church of Miami*, 404 U.S. 412, 414–15 (1972) (case was moot and declaratory relief and injunction "inappropriate" where law was no longer in effect); *Trump v. Hawaiʻi*, 138 S. Ct. 377 (2017) ("Because those provisions of the Executive Order have expired by their own terms, the appeal no longer presents a live case or controversy.") (cleaned up); *N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York*, 140 S. Ct. 1525, 1526 (2020) (per curiam) (claims for declaratory and injunctive relief with respect to prior rule were moot).

**3.  The voluntary cessation exception to mootness does not apply because the Proclamation's expiration and the subsequent passage of superseding legislation show there is no likelihood of recurrence**

The voluntary cessation exception to mootness does not apply because the series of executive and legislative actions that render this case moot show there is no reasonable likelihood the Governor will reissue Proclamation 20-19. Generally, a "defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000). This Court, however, "treat[s] the voluntary cessation of challenged conduct by government officials with more solicitude" than cessation by private parties and

presumes the government acts in good faith. *Bd. of Trs. of Glazing Health & Welfare Tr. v. Chambers*, 941 F.3d 1195, 1198 (9th Cir. 2019) (en banc) (cleaned up). "For this reason, the repeal, amendment, or expiration of challenged legislation is generally enough to render a case moot and appropriate for dismissal." *Id.* In addition, "[t]he rigors of the legislative process bespeak finality." *Fikre v. FBI*, 904 F.3d 1033, 1038 (9th Cir. 2018) (cleaned up); *see also Speech First, Inc. v. Schlissel*, 939 F.3d 756, 768 (6th Cir. 2019) (explaining voluntary cessation through a "legislative-like" process warrants greater solicitude than "ad hoc" government action that is "easily reversible").

To be sure, courts have been careful not to find cases moot when a party "'remain[s] under . . . constant threat' that government officials will use their power to reinstate the challenged restrictions[,]" particularly amid the ever-changing circumstances of the current pandemic. *Tandon v. Newsom*, 141 S. Ct. 1294, 1297 (2021); *see also Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2020) (per curiam); *accord Rosebrock v. Mathis*, 745 F.3d 963, 971 (9th Cir. 2014) ("A case is not easily mooted where the government is otherwise unconstrained should it later desire to reenact the offending provision."). But this case is far different from *Roman Catholic Diocese* and *Tandon*. In *Roman Catholic Diocese*, places of worship were "under

a constant threat" of reclosure. 141 S. Ct. at 68. There, while a church's region moved into a less-restrictive category of a phased re-opening plan, that plan posed no barrier to backsliding to the more-restrictive tier if circumstances changed. *Id.* at 66, 68. And in *Tandon*, California announced plans for future changes shortly after the plaintiffs had filed their application for relief in the Supreme Court, providing no confidence that state officials would not "reinstate [the] heightened restrictions" later. 141S. Ct. at 1297.

Here, two forms of government action show that dismissal on mootness grounds is warranted. First, the Governor allowed Proclamation 20-19.6 to expire. Allowing government action to expire on its own terms alone is a strong indication that the Governor will not reissue the challenged policy. *See, e.g.*, *Brach*, 38 F.4th at 12 (explaining that California had not rescinded its school closure order in response to litigation); *County of Butler v. Governor of Pennsylvania.*, 8 F.4th 226, 230 (3d Cir. 2021), *cert. denied sub nom. Butler County, Pennsylvania v. Wolf*, 142 S. Ct. 772 (2022) ("[T]he voluntary cessation doctrine does not apply here because the [executive] orders expired by their own terms and not as a response to the litigation."); *Johnson*, 2022 WL 767035, at *2 (same); *Lighthouse Fellowship Church v. Northam*, 20 F.4th 157, 163 (4th Cir.

2021) (expired executive orders made case distinguishable from *Roman Catholic Diocese*).

Nor does the Governor's track record since issuing the eviction moratorium suggest that he might "mov[e] the goalposts" and reissue the challenged Proclamation as pandemic-related conditions fluctuate. *Tandon*, 141 S. Ct. at 1297 (cleaned up). Rather, the Governor maintained a generally consistent policy with respect to evictions and the treatment of unpaid rent as enforceable debt since he first issued Proclamation 20-19. *See Hawse v. Page*, 7 F.4th 685, 693 (8th Cir. 2021) (finding no reasonable expectation of recurrence of an order where there was "no track record of 'moving the goalposts'"); *accord Church v. Polis*, No. 20-1391, 2022 WL 200661, at *6 (10th Cir. Jan. 24, 2022) (unpublished). The Governor consistently extended the eviction moratorium until his ultimate decision to let it expire over a year ago once the Legislature took action. This decision further supports the finding that the Governor will not reissue the challenged policy.

It would be unfounded speculation to assert that the Governor will reinstitute Proclamation 20-19, which has not been in place for over a year. The eviction moratorium challenged by the Landlords expired in last year, before the surges in the pandemic attributable to the highly infectious Delta and Omicron

variants. Despite the surging case counts attributable to those variants, the Governor did not reinstitute the Proclamation. In addition, the current circumstances of the pandemic are materially different from those at the outset of the pandemic: "[t]he availability of vaccines and other measures to combat the virus have led to a significant change in the relevant circumstances— including the resumption of pre-COVID-19 activities—as evidenced by the removal of many restrictions." *Lighthouse Fellowship Church*, 20 F.4th at 164; *see also Brach*, 38 F.4th at 14 (holding the voluntary cessation exception to mootness did not apply, in part because "California maintained in-person instruction throughout the surge of the Omicron COVID-19 variant, even while the State's case count soared well past numbers reached early in the pandemic").

The second government action, and stronger still, is the Washington State Legislature's enactment of E2SSB 5160, which regulates the repayment of unpaid but owing rent during public health emergencies and works broader changes to Washington's landlord-tenant laws, particularly as it relates to the pandemic. This law, the culmination of a rigorous legislative process, represents a final state policy with respect to the issues the Proclamations preliminarily addressed. *See Brach*, 38 F.4th at 13 (California's "decision to reopen schools [was] entrenched and not easily abandoned or altered in the future" based on

emergency statute passed by the legislature) (cleaned up); *36 Apt. Assocs.*, 860 F. App'x. at 217 (New York's eviction moratorium was moot because the policy expired on its own terms and "the intervening passage of legislation").

Finally, the Governor continues to retain the statutory authority to "issue an order prohibiting" "[s]uch other activities as he or she reasonably believes should be prohibited to help preserve and maintain life, health, property or the public peace" as long as Washington's state of emergency remains in effect. Wash. Rev. Code § 43.06.220(1)(h). But this authority should not be characterized as a "constant threat" that excludes the possibility of mootness. To take that view would be to preclude any case involving emergency proclamations from becoming moot so long as the state of emergency continues, no matter how the Governor or Legislature has acted. *See Brach*, 38 F.4th at 14 ("[T]he fact 'the Governor has the power to issue executive orders cannot itself be enough to skirt mootness, because then no suit against the government would ever be moot.'") (quoting *Boston Bit Labs, Inc. v. Baker*, 11 F.4th 3, 10 (1st Cir. 2021)).

### 4. The capable of repetition, yet evading review exception does not apply because there is no reasonable expectation the Landlords will be subject to the same action again

The second exception to mootness for disputes that are capable of repetition, yet evading review, does not apply here for the same reason the

voluntary cessation exception does not apply: There is no reasonable expectation the Governor will reissue the challenged Proclamation or similar orders. The capable of repetition, yet evading review exception to mootness allows courts to review cases, "only in exceptional situations, where (1) the challenged action is too short in duration to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Hamamoto v. Ige*, 881 F.3d 719, 722 (9th Cir. 2018) (cleaned up). With respect to the second prong of the analysis, the party raising the exception bears the burden of making a "reasonable showing that [they] will again be subjected to the alleged illegality." *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983).

The duration of the Proclamation was not too short to be challenged. It lasted more than 15 months (not counting Proclamation 21-09) and was the subject of an evidentiary record developed on a non-expedited basis in the district court. But even if the Proclamation were shorter in duration, the exception still would not apply because there is no likelihood that the harms allegedly caused by Proclamation 20-19 will recur. As explained above, the Proclamation's expiration on its own terms and the subsequent passage of E2SSB 5160 eliminate any reasonable expectation that the Governor will reissue

the Proclamation and cause any purported harm. *See Campesinos Unidos, Inc. v. U.S. Dep't of Labor*, 803 F.2d 1063, 1068 (9th Cir. 1986) (holding plaintiffs could not show a likelihood of a recurring harm after the statute allegedly causing harm was repealed); *County of Butler*, 8 F.4th at 231 (exception did not apply because there was no "reasonable expectation that the same complaining parties will be subject to the same orders again").

Here, the Moratorium has long expired, the Legislature has enacted durable legislation, and the trajectory of the pandemic has been altered by the introduction of vaccines and expanded treatment options. Any argument "the pandemic *may* worsen and that the State *may* impose further restrictions is speculative." *Brach*, 38 F.4th at 15.

This case is moot, and no exception to mootness applies. But as discussed below, if the Court concludes this case is not moot (which it should not), the district court's judgment can be affirmed on the merits.

## B. The Moratorium Did Not Effect an Unconstitutional Physical Taking

The Landlords' first argument, that the Moratorium constituted a physical taking, fails because regulation of the landlord-tenant relationship that falls short of a permanent physical occupation is not a physical taking. Nearly every court to consider takings claims against state or local eviction moratoria during the

COVID-19 pandemic has rejected them. The district court's decision is in accord, and this Court should affirm.

**1.    The Moratorium did not authorize the "permanent occupation" of Landlords' properties by tenants they invited**

The Takings Clause provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. There are two general categories of takings: physical takings and regulatory takings. *See Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 321 (2002). The district court correctly decided that the Landlords' claim, that the Moratorium was a physical taking, failed as a matter of law. *See Jevons*, 561 F. Supp. 3d at 1108.

The Landlords contend that the Moratorium forced the Landlords "to endure a physical occupation of their property without compensation." Opening Br. at 17. But the Supreme Court has rejected this position, making clear that a physical taking occurs when the government subjects a property owner to a "*permanent* physical occupation" of the owner's property. *Loretto*, 458 U.S. at 435 (emphasis added). The Court expressly denied that this "physical occupation rule will have dire consequences for the government's power to adjust landlord-tenant relationships." *Id.* at 440; *see also FCC v. Fla. Power Corp.*, 480 U.S. 245, 252 (1987) ("statutes regulating the economic relations of landlords and

tenants are not *per se* takings"). That "broad" power is perfectly compatible with the *Loretto* rule so long as the government does not compel "the permanent occupation of the landlord's property by a third party." 458 U.S. at 440. The Moratorium falls outside that "very narrow" rule, *id.* at 441, as cabined by this seminal case.

If *Loretto* had left any doubts that landlord-tenant regulations fall outside the physical occupation rule, the Court dispelled them in *Yee v. City of Escondido*, 503 U.S. 519 (1992). In *Yee*, mobile home park owners challenged an ordinance that, along with a state law, prevented them from either "set[ting] rents," "decid[ing] who their tenants will be," "evict[ing] a mobile home owner," or "easily convert[ing] the property to other uses." *Id.* at 526–27. This made "the mobile home owner . . . effectively a perpetual tenant of the park," according to the owners. *Id.* at 527. They argued for a *per se* taking under *Loretto*, because "what has been transferred from park owner to mobile home owner is no less than a right of physical occupation of the park owner's land." *Id.* The Supreme Court rejected the park owners' expansive theory of physical takings. *See id.* at 532 (majority), 539 (concurrence). "The government effects a physical taking only where it *requires* the landowner to submit to the physical occupation of his land." *Id.* at 527 (majority). The mobile home laws did "no such thing" because

the park owners "voluntarily rented their land to mobile home owners." *Id.* Given that acquiescence, the laws "merely regulate[d] petitioners' *use* of their land by regulating the relationship between landlord and tenant[,]" and did not constitute a physical taking. *Id.* at 528.

The Moratorium, too, temporarily regulated the landlord-tenant relationship by delaying owners' recourse to eviction. As in *Yee*, because the Landlords "voluntarily open[ed] their property to occupation by others," they "cannot assert a *per se* right to compensation based on their inability to exclude particular individuals." 503 U.S. at 531. The Moratorium regulated the rental relationship without effecting a physical taking.

The Landlords too narrowly paint *Yee* as a rent control case. Opening Br. at 31. *Yee* involved a combination of state and municipal law that also restricted evictions. Namely, the state law "limit[ed] the bases upon which a park owner may terminate a mobile home owner's tenancy[,]" which, together with the municipal ordinance, prevented park owners from evicting owners of mobile homes to secure higher-paying tenants. *Yee*, 503 U.S. at 524; *see Gallo*, 2022 WL 2208934, at *9 ("the plaintiffs in *Yee* also alleged they were unable to evict current tenants"). Here too, the Proclamation temporarily prevented the Landlords from replacing their tenants to obtain more rent. In both situations,

the government regulated the terms on which property owners could terminate the relationships they had voluntarily started with their tenants. That is not a physical taking.

In addition, the Landlords' assertion that their tenants have continued to "occupy their property for a longer period than [they] ever agreed to," Opening Br. at 34, is no different than the claim in *Yee*, where the landlords similarly argued they could not evict their tenants. *Yee*, 503 U.S. at 526–27 ("Because under the California Mobilehome Residency Law the park owner cannot evict a mobile home owner or easily convert the property to other uses, the argument goes, the mobile home owner is effectively a perpetual tenant of the park park . . . ."). True, the park owners in *Yee* could pursue eviction for nonpayment of rent. But as long as the park owners wished to rent out their property, they could not evict their rent-controlled tenants. And the fact that a park owner in *Yee* could evict a mobile home owner for other reasons—such as the "owner's desire to change the use of his land[,]" *id.* at 524—likens that case to this one, as the Landlords here were likewise free to evict their tenants for that reason. *Compare id.* at 528 ("a park owner who wishes to change the use of his land may evict his tenants, albeit with 6 or 12 months notice[ ]"), *with* Procl. 20-19.6 at 5 (requiring 60-day notice for sale or re-occupation).

The key here is that the Landlords voluntarily invited their tenants onto their property, subjecting the use of their property to tenancy and regulation of its use. The Landlords did not suffer any trespass and were not forced to accept tenants, but they argue that their tenants' nonpayment of rent resulted in an "unwanted" physical occupation. Opening Br. at 27. *Yee*, however, confirms the maxim earlier established by *Florida Power*: "it is the invitation, not the rent, that makes the difference." *Yee*, 503 U.S. at 532 (quoting *Fla. Power Corp.,* 480 U.S. at 252). Numerous other courts have read *Yee* this way and have rejected similar takings claims. *See, e.g.*, *El Papel*, 2021 WL 4272323, at *16–17; *Gallo*, 2022 WL 2208934, at *8–9; *S. Cal. Rental Hous. Ass'n*, 550 F. Supp. 3d at 865; *Elmsford*, 469 F. Supp. 3d at 163–64; *Baptiste*, 490 F. Supp. at 387–88; *Auracle Homes*, 478 F. Supp. 3d. at 220–21. Here, too, the district court correctly read *Yee*'s emphasis on the importance of the voluntary invitation initiating the landlord-tenant relationship. *Jevons*, 561 F. Supp. 3d at 1105–06.

Because *Yee* is premised on a landlord having already voluntarily invited tenants onto the property, the Landlords do not benefit from decisions dealing with government-imposed, physical easements forcing a landowner to suffer an invasion in the first instance. *See, e.g.*, *Kaiser Aetna v. United States*, 444 U.S. 164, 165–66 (1979) (public navigation easement). This is particularly true of

*Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063 (2021), the recent decision upon which the Landlords principally rely. *See* Opening Br. at 27–28. *Cedar Point* addressed an access regulation forcing certain property owners (agricultural employers) to suffer an intermittent invasion by people they never invited onto their land (union organizers). *Cedar Point*, 141 S. Ct. at 2069. The only new issue in *Cedar Point* was whether the law created any less of a physical easement for per se takings purposes when the right to invade did not span every hour of every day of the year. *Id.* at 2074. *Cedar Point* ruled that an intermittent physical easement effects a per se taking. *Id.* at 2074–76.

*Cedar Point* does not disturb Supreme Court precedent that "statutes regulating the economic relations of landlords and tenants are not *per se* takings." *Fla. Power Corp.*, 480 U.S. at 252; *see also id.* ("This element of required acquiescence is at the heart of the concept of occupation."). Nor did *Cedar Point* overrule or undermine *Yee*; instead, it cited *Yee* favorably for general takings principles. *Cedar Point*, 141 S. Ct. at 2072. *Cedar Point* distinguished laws that regulate how landowners must treat those they have already invited onto their land: "Limitations on how a business generally open to the public may treat individuals on the premises are readily distinguishable from regulations granting a right to invade property closed to the public." *Id.*

at 2077. Based on *Yee*, the same is true for rental property: Limitations on how a landlord may treat tenants they have voluntarily invited onto their properties by renting to them are readily distinguishable from regulations granting a right to invade property closed to the public. *See Yee*, 503 U.S. at 527–28, 531.

Respectfully, the Eighth Circuit (and the Landlords) misread *Yee* in concluding that the landlords in *Yee* "sought to exclude future or incoming tenants rather than existing tenants." *Heights Apts.*, 30 F.4th at 733; *see* Opening Br. at 34 n.10. The plaintiffs in *Yee* also alleged they were unable to evict current tenants: "According to the complaint, 'the rent control law has had the effect of . . . granting to the tenants of mobilehomes *presently in The Park*, as well as the successors in interest of such tenants, the right to physically permanently occupy and use the real property of Plaintiff.'" *Yee*, 503 U.S. at 525 (emphasis added) (cleaned up). The Eighth Circuit accordingly chose to follow *Cedar Point* rather than *Yee* based on this misinterpretation. *See Heights Apts., LLC v. Walz*, 39 F.4th 479, 480 (8th Cir. 2022) (Colloton, J., dissenting from denial of rehearing en banc) (contending that *Yee*, not *Cedar Point*, should have guided the panel's decision and arguing the decision to disregard *Yee* turned on a misunderstanding of the *Yee* plaintiff's claims).

The Landlords mischaracterize *Arkansas Game & Fish Commission v. United States*, 568 U.S. 23 (2012), as holding that "the physical occupation of their property does not depend upon the *duration* of the occupation." Opening Br. at 30. But *Arkansas Game* did not hold that a temporary occupation of property constitutes a categorical taking. It rather held, "simply and only, that government-induced flooding temporary in duration gains no automatic exemption from Takings Clause inspection." *Arkansas Game*, 568 U.S. at 38. Such a "temporary physical invasion[ ]" of property "should be assessed by case-specific factual inquiry" under *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978). *Arkansas Game*, 568 U.S. at 38. In conducting that inquiry, "time is indeed a factor in determining the existence *vel non* of a compensable taking." *Id.*

The Landlords also quote *Hendler v. United States*, 952 F.2d 1364 (Fed. Cir. 1991), for the proposition that an individual has the right to exclude freeriders. Opening Br. at 29. But in *Hendler*, the government sunk concrete wells on landowners' property to monitor groundwater pollution. *See* 952 F.2d at 1367. The wells, and the workers who entered to install and monitor them, permanently occupied plaintiffs' land, giving rise to a *per se* taking under *Loretto*. *Id.* at 1377. The decision rested squarely upon the permanent nature of

the wells and the regular government intrusions to monitor them. *Id.* at 1376. But here, there is no physical invasion by the State onto the Landlords' properties; no *per se* taking has occurred.

The U.S. Supreme Court "has consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails." *Yee*, 503 U.S. at 528–29 (cleaned up). The Moratorium did not relieve tenants of their obligation to pay the rent owed. It merely foreclosed for a period of time a particular remedy—eviction—for nonpayment, with exceptions. That temporary regulation of the landlord-tenant relationship is not a *per se* taking because it does not authorize a permanent physical invasion of the Landlords' property.

2. **Physical takings do not apply to interests in rental agreements**

The Landlords next contend that the Moratorium took their property interests in their rental contract rights. Opening Br. at 34–35. But their argument is an improper mish-mash of physical and regulatory takings. The Landlords do not claim that the Moratorium represents a "complete elimination of value" of their properties, so they have no claim of a regulatory or categorical taking. *See Tahoe-Sierra*, 535 U.S. at 330 (holding "[a]nything less than a 'complete

elimination of value[]' or a 'total loss' . . . would require the kind of analysis applied in *Penn Central*" and rejecting claim of a *per se* regulatory taking).

Thus, the Landlords' reliance on *Cienega Gardens v. United States*, 331 F.3d 1319 (Fed. Cir. 2003), which involved a regulatory takings claim, is misplaced. In *Cienega Gardens*, developers of low-income housing had used federally guaranteed mortgage loans that placed restrictions on the developers' ownership so long as the contract of mortgage insurance remained in effect. *Id.* at 1325. The developers had the right to prepay their mortgages after twenty years, but the government later enacted statutes that prevented the owners from prepaying and exiting their mortgages after twenty years. *Id.* at 1326–27. The court applied the *Penn Central* factors and held that the government's action, in enacting the statutes, constituted a compensable, regulatory taking. *Id.* at 1353. But here, the Moratorium did not take any Landlords' vested property interests in their contract rights.

The Landlords also cite *Spokane School District No. 81 v. Parzybok*, 633 P.2d 1324 (Wash. 1981) for the novel proposition that the Moratorium violates the Takings Clause by infringing their property interests in receiving rental income. Opening Br. at 35. *Parzybok* held that principles of "equity and fairness" allow compensation for a resident leaseholder who, during eminent domain

proceedings, lost an option to buy premises at a specific price. 633 P.2d at 1329. The decision does not remotely stand for the proposition that rental income constitutes a property right protected by the Takings Clause; nor do the Landlords cite any such case. The U.S. Supreme Court "has consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails." *Yee*, 503 U.S. at 528–29 (cleaned up). In any event, the Moratorium did not deprive the Landlords of any rent nor relieve tenants of their obligation to pay the full amount of rent owed. It merely foreclosed for a period of time a particular remedy—eviction—for nonpayment.

### 3. The State did not confiscate security deposits

The Landlords' third argument that the Moratorium takes their interest in security deposits is also meritless. Opening Br. at 35–37. First, the Landlords' theory is untenable because security deposits are property of the tenant—not the landlord. *See* Wash. Rev. Code § 59.18.270 (requiring security deposits be deposited in trust accounts "for the purpose of holding such security deposits for tenants of the landlord" but entitling landlords to interest unless otherwise agreed in writing).

44

Second, the case the Landlords rely on, *Armstrong v. United States*, 364 U.S. 40 (1960), dealt with an actual confiscation by the government. In that case, the Supreme Court held that certain state liens held by federal subcontractors represented compensable property interests for purposes of the Fifth Amendment, and that the United States' extinguishing of these lien interests constituted a taking warranting just compensation. *See Armstrong*, 364 U.S. at 43, 48. Critically, the federal government took title to the underlying property at issue. *Id.* at 43–44. Here, the State did not taken any property interest in security deposits. The Moratorium did not extinguish remedies available to the Landlords seeking to recover unpaid rent owed at the end of a lease nor diminish tenants' rental obligations. Instead, the Moratorium merely prohibited property owners from withholding from tenants any portion of a security deposit in order to collect unpaid rent. *See* Procl. 20-19.6 at 6. This in no way precludes Landlords from retaining the security deposit for the purposes for which it was collected in the first place.

In sum, the temporary regulation of the landlord-tenant relationship was not a *per se* taking because it did not authorize a physical invasion of uninvited third parties onto the Landlords' property.

## C.     The Moratorium Comported with the Contracts Clause

The district court correctly granted summary judgment to the State on the Landlords' claim under the Contracts Clause. *See Jevons*, 561 F. Supp. 3d at 1098-1101. Their remedies for contractual breaches were merely delayed, not eliminated, because of the health emergency. This was appropriate and reasonable to curb the transmission of COVID-19 and stem a wave of evictions that could lead to homelessness.

Article I, section 10 of the U.S. Constitution prohibits states from passing laws "impairing the Obligation of Contracts[.]" U.S. Const. art. I, § 10. The Contracts Clause is construed "narrowly" so that "governments retain the flexibility to exercise their police powers effectively." *Matsuda v. City & County of Honolulu*, 512 F.3d 1148, 1152 (9th Cir. 2008) (cleaned up); *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 241 (1978) ("[T]he [state's] police power[] is an exercise of the sovereign right of the Government to protect the lives, health, morals, comfort and general welfare of the people, and is paramount to any rights under contracts between individuals.")

Courts apply a two-step inquiry under the Contracts Clause. First, courts determine "whether the state law has operated as a substantial impairment of a contractual relationship." *Sveen v. Melin*, 138 S. Ct. 1815, 1821–22 (2018)

(cleaned up). Second, if a substantial impairment exists, courts evaluate "whether the state law is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'" *Id.* (quoting *Energy Rsrvs. Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411–12 (1983)). The Moratorium—a temporary, carefully-crafted emergency measure that has now expired—met both steps.

### 1. The Moratorium did not impose a substantial, unforeseeable impairment on rental agreements

Three factors govern the analysis of whether a law imposes a "substantial impairment" on a contractual relationship: "the extent to which" the law (1) "undermines the contractual bargain," (2) "interferes with a party's reasonable expectations," and (3) "prevents the party from safeguarding or reinstating his rights." *Sveen*, 138 S. Ct. at 1822. Each factor shows the Moratorium did not impair the Landlords' contractual relationships with their tenants.

### a. The Moratorium did not undermine the contractual bargain

The Moratorium did not undermine the Landlords' contractual bargain because the mere delay in the right to exercise a statutory remedy does not materially alter the lease agreements. In *Home Building & Loan Association v.*

*Blaisdell*, 290 U.S. 398 (1934)—the "leading case in the modern era of Contract Clause interpretation[,]" *United States Trust Co. of New York v. New Jersey*, 431 U.S. 1, 15 (1977)—the Supreme Court upheld a Depression-era mortgage moratorium law extending mortgagors' redemption period *for up to two years*. The Court recognized that contractual obligations may be "impaired by a law which renders them invalid, or releases or extinguishes them[,]" such as a "state insolvent law" that wholly "discharge[s] the debtor from liability" for preexisting debts. *Blaisdell*, 290 U.S. at 431. The mortgage moratorium, however, did not impose such an impairment, for it represented a "temporary restraint of enforcement . . . to protect the vital interests of the community[ ]" from a "great public calamity[.]" *Id.* at 439.

Plaintiffs also rely on *W.B. Worthen Co. v. Kavanaugh*, 295 U.S. 56 (1935), a case decided a year after *Blaisdell*. There the legislative changes at issue (which eased restrictions on defaulting mortgagors) "postpone[d] for a term of many years with undisturbed possession for the debtor and without a dollar for the creditor" and effectively took "from the mortgage the quality of an acceptable investment for a rational investor." *Id.* at 60–61. In *Kavanaugh*, the new redemption period was fixed in length and did not require a certification of

hardship, but *Kavanaugh* did not focus on these factors in isolation. The Court

focused on the cumulative effect of the restrictions:

> Whether one or more of the changes effected by these statutes
> would be reasonable and valid if separated from the others, there is
> no occasion to consider . . . . A different situation is presented when
> extensions are so piled up as to make the remedy a shadow . . . .
> What controls our judgment at such times is the underlying reality
> rather than the form or label. The changes of remedy now
> challenged as invalid are to be viewed in combination, with the
> cumulative significance that each imparts to all. So viewed they are
> seen to be an oppressive and unnecessary destruction of nearly all
> the incidents that give attractiveness and value to collateral security.

*Id.* at 62 (internal citations omitted).

Both *Blaisdell* and *Kavanaugh* look at the reasonableness of the

legislation under the circumstances. One consideration is whether compensation

is ultimately provided to the property owner for the time that the property owner

does not have possession, as in *Blaisdell*, or whether, like in *Kavanaugh*, the

changes to the contractual relationship essentially strip the property owner of

their interest in the property without providing any compensation. The

Moratorium at issue here is more like the law in *Blaisdell* and less like

*Kavanaugh.* It was temporary, as a lessor retained the right to the profits from

the rental (even if those profits are delayed), and the ability to bring an action for

contract damages was not absolutely barred.

The Landlords hyperbolically claim that the Moratorium "stripped [them] of all remedies for enforcement of their contractual rights." Opening Br. at 52. But in reality, the Moratorium barred property owners from treating unpaid rent as an enforceable debt only if (1) the tenant's "non-payment was as a result of the COVID-19 outbreak[,]" (2) the non-payment "occurred on or after February 29, 2020, and during the State of Emergency[,]" and (3) the landlord had not offered the tenant a "reasonable re-payment plan[.]" Procl. 20-19.6 at 6; *id.* (permitting property owners to treat unpaid rent as an enforceable debt if they "demonstrate[ ] . . . to a court that the resident was offered, and refused or failed to comply with" a reasonable repayment plan). This provision prevented "soft" or "informal" evictions—that is, measures short of unlawful detainer actions that lead tenants to "self-evict" to avoid negative credit history, an adverse judgment, or other collateral consequences. *See* SER-14–15. The Landlords' assertion overlooks the fact that "tenants [were] still bound to their contracts," and the Landlords could "obtain a judgment for unpaid rent if the tenants fail to honor their obligations[,]" *Elmsford*, 469 F. Supp. 3d at 172. The Moratorium expressly permitted property owners to treat unpaid rent as an enforceable debt if they showed a court that the resident was offered a reasonable repayment plan and

refused or failed to comply with it. Procl. 20-19.6. In this way and others, the Moratorium preserves the primary benefit of the Landlords' bargain.

As a federal district court explained in upholding New York's eviction moratorium, it "[did] not eliminate the suite of contractual remedies available to the Plaintiffs; it merely postpones the date on which landlords may commence summary proceedings against their tenants." *Elmsford*, 469 F. Supp. 3d at 172; *see also HAPCO*, 482 F. Supp. 3d at 352 (Philadelphia moratorium is "only a minimal alteration of contractual obligations[]" because as in *Blaisdell*, "[it] merely postpone[d] the date on which landlords may commence eviction proceedings and collect full rent") (cleaned up); *Auracle Homes*, 478 F. Supp. 3d at 224 (Connecticut moratorium did "not eliminate Plaintiffs' contractual remedies for evicting nonpaying tenants; Plaintiffs instead have to wait before they may issue notices to quit or initiate summary proceedings.").

The Landlords misconstrue the Moratorium when arguing that the Moratorium prevented them from treating unpaid rent as an enforceable debt and "bringing a breach-of-contract action." Opening Br. at 67. This is wrong. The Moratorium prohibited treating unpaid rent "as an enforceable debt or obligation that is owing or collectable," when nonpayment was "a result of the COVID-19 outbreak and occurred on or after February 29, 2020[.]" Procl. 20-19.6 at 6. The

Moratorium also permitted a landlord to collect *any* unpaid rent if a tenant refused or failed to comply with an offered "re-payment plan that was reasonable based on the individual financial, health, and other circumstances of that resident[.]" *Id.* The Moratorium thus permitted action other than eviction to collect unpaid rent under certain conditions.

The Landlords' contention that the Moratorium substantially impaired their contracts because "the right to enforce them has been eradicated," Opening Br. at 51, is also rebuffed by *Blaisdell*. The *Blaisdell* Court recognized that the Contracts Clause should not "prevent limited and temporary interpositions with respect to the enforcement of contracts if made necessary by a great public calamity such as fire, flood, or earthquake" and "urgent public need demanding such relief is produced by other and economic causes." 290 U.S. at 439–40. *Blaisdell* also distinguished the cases relied on by the Landlords, like *Bronson v. Kinzie*, 42 U.S. 311 (1843), explaining that those cases did not consider states' interests in exercising its police powers to "safeguard the vital interests of its people." 290 U.S. at 434. *Blaisdell* makes clear that socioeconomic changes— like the "constantly increasing density of population, the interrelation of the activities of our people and the complexity of our economic interests"— correspondingly change the boundaries of the state's police power. *Id.* at 442.

The Supreme Court has consistently upheld measures that temporarily pause landowners' right to repossess property during emergencies. Between 1921 and 1922, the Supreme Court decided three cases addressing tenant-protective housing measures enacted to address extreme housing shortages in the wake of World War I. *See Block v. Hirsh*, 256 U.S. 135 (1921); *Marcus Brown Holding Co., Inc. v. Feldman*, 256 U.S. 170 (1921); *Edgar A. Levy Leasing Co., Inc. v. Siegel*, 256 U.S. 242 (1922). The first of these cases, *Block v. Hirsh*, confirmed the broad scope of the state's "police power . . . , under which property rights may be cut down, and to that extent taken, without pay." 256 U.S. at 155. The outer limit of that power is reached only where a measure "is futile or has no reasonable relation to the relief sought." *Id.* at 158. Each of these cases upheld measures that were, in some ways, more aggressive than the Moratorium, but addressed less urgent social conditions. In *Levy*, for example, the Court addressed an emergency New York housing law that allowed a tenant to absolve himself from allegedly "unreasonable" and "unjust" amounts of rent provided for under his lease. 258 U.S. at 247–48. The Court rejected a Contracts Clause challenge to the temporary emergency rent-forgiveness law on the ground that "the existing circumstances clothed the letting of buildings for dwelling purposes with a public interest sufficient to justify restricting property rights in them[.]"

*Id.* Like the rent-forgiveness law in *Levy*, the Moratorium was a temporary measure intended to address an acute emergency. The Moratorium presents an easier case than *Levy* because it also reaffirmed tenants' obligations to pay rent under existing leases while facing down the one-two punch of a global pandemic and economic crisis.

        **b.**    **The Moratorium did not impair reasonable expectations**

The reasonableness of a party's contractual expectations largely depends on "whether the industry the complaining party has entered has been regulated in the past." *Energy Rsrvs. Grp.*, 459 U.S. at 411. "Because past regulation puts industry participants on notice that they may face further government intervention in the future," later regulations are "less likely to violate the contracts clause where [they] cover[ ] the same topic as the prior regulation and share[ ] the same overt legislative intent to the protect the parties protected by the prior regulation." *Elmsford*, 469 F. Supp. 3d at 169–70 (cleaned up).

This factor, too, undercuts the Landlords' Contracts Clause claim. "[T]he landlord-tenant relationship is, if nothing else, heavily regulated." *Chicago Bd. of Realtors, Inc. v. City of Chicago*, 819 F.2d 732, 736 (7th Cir. 1987). The Residential Landlord Tenant Act (RLTA), Wash. Rev. Code § 59.18, regulates many aspects of the landlord-tenant relationship by, for example, establishing a

duty to keep the premises fit for human habitation, Wash. Rev. Code § 59.18.060; requiring notice of rent increases, *id.* § 59.18.140; and regulating late fees, *id.* § 59.18.170, notices of termination, *id.* § 59.18.200, tenant screening, *id.* § 59.18.257, and security deposits, *id.* § 59.18.260–.280. The Forcible Entry and Forcible and Unlawful Detainer Act and RLTA specifically regulate evictions, too. *See id.* § 59.12; *id.* § 59.18.365–.410. Given this backdrop of heavy regulation, the Moratorium is not wholly unexpected government action and thus could not operate as a substantial impairment of the Landlords' contractual rights.

And although this pandemic has no precedent in the modern era, residential leases have been heavily regulated for many years and temporary moratoria on evictions are nothing new. *See, e.g.*, *Block*, 256 U.S. at 153 (upholding law prohibiting eviction of holdover tenants); *SKS & Assocs., Inc. v. Dart*, 619 F.3d 674 (7th Cir. 2010) (eviction moratorium during certain winter conditions). Such "past regulation puts industry participants on notice that they may face further government intervention in the future," *Elmsford*, 469 F. Supp. 3d at 169; *see also HAPCO*, 482 F. Supp. 3d at 352 ("Against this heavily-regulated backdrop, it is doubtful that any impairment . . . has occurred as a result of the [eviction moratorium].") (cleaned up).

Having voluntarily entered the highly regulated landlord-tenant sphere, the Landlords should reasonably have anticipated restrictions on their statutory remedy of eviction. *Id.* at 654. For that reason, too, the Moratorium did not substantially impair any contractual relationships.

### c.     The Landlords could safeguard or reinstate their rights

Finally, the Moratorium allowed the Landlords to protect their contractual rights and thus did not impair them. In *Sveen*, the Court held that a law altering contractual remedies without nullifying them does not "prevent[ ] the party from safeguarding or reinstating [their] rights." 138 S. Ct. at 1822. The Moratorium neither relieved tenants' obligation to pay all rent owed nor eliminated the Landlords' right to enforce that obligation. Rather, it merely requires them "to wait before they may issue notices to quit or initiate summary proceedings." *Auracle Homes*, 478 F. Supp. 3d at 224. Because "the tenants are still bound to their contracts, the contractual bargain is not undermined and landlord rights are safeguarded." *HAPCO*, 482 F. Supp. 3d at 353.

The Landlords repeat the false argument that the Moratorium "prohibit[ed] a [property owner] from treating unpaid rent as a contractual obligation." Opening Br. at 51–52. But, under the Moratorium, property owners could offer a reasonable repayment plan and, if refused or violated, take steps to

recover unpaid rent and any damages resulting from a tenant holding over. Procl. 20-19.6 at 6; *see also* Wash. Rev. Code § 59.18.410. The Moratorium also softened temporary burdens by allowing property owners to evict if it was necessary to respond to a significant and immediate risk to health, safety, or property of others or if they sought to sell or personally occupy the home. Procl. 20-19.6 at 5. The Moratorium preserved landlord protections and imposed no substantial impairment.

### 2. The Moratorium advanced a significant public purpose in an appropriate and reasonable way

Even assuming the Moratorium substantially impaired any contract (which it did not), the Landlords' Contracts Clause claim fails the second step of the inquiry. As a temporary emergency measure designed to prevent economic dislocation and slow the spread of disease, the Moratorium furthered "a significant and legitimate public purpose" in "an appropriate and reasonable way." *Sveen*, 138 S. Ct. at 1822 (cleaned up); *see AALAC*, 10 F.4th at 914 ("each of the provisions of the eviction moratorium that [the appellant] challenges may be viewed as reasonable attempts to address that valid public purpose"). Courts should "defer to legislative judgment as to the necessity and reasonableness of a particular measure" even when such measures interfere with contractual obligations. *Energy Rsrvs. Grp.*, 459 U.S. at 412–13 (cleaned up).

### a.     The Moratorium's purpose is significant and legitimate

The Moratorium's purposes—to "reduce economic hardship" of those "unable to pay rent as a result of the COVID-19 pandemic" and "promote public health and safety by reducing the progression of COVID-19 in Washington State," Procl. 20-19.6—were not just significant and legitimate, but compelling. *See, e.g.*, *Roman Catholic Diocese*, 141 S. Ct. at 67 ("Stemming the spread of COVID–19 is unquestionably a compelling interest . . . ."); *Workman v. Mingo Cnty. Bd. of Educ.*, 419 F. App'x 348, 353 (4th Cir. 2011) (unpublished disposition) ("[T]he state's wish to prevent the spread of communicable diseases clearly constitutes a compelling interest.").

The Moratorium was one of several tools addressing the gravest public health crisis in over a century and the associated economic fallout that triggered soaring unemployment. *See* SER 5–6, 15–16. The Moratorium sought to avert a mass increase in evictions that would trigger a housing instability and homelessness crisis, which would exacerbate the transmission of COVID-19. Experts agree that policies that limited evictions reduced COVID-19 infections and deaths, and that an individual risk of infection was higher for individuals who experience eviction or whose household structures merged because of housing instability. *See* SER-85–87. Within our State, mass evictions could have

caused up to 59,008 more eviction-attributable COVID-19 cases, 5,623 more hospitalizations, and 621 more deaths. SER-185. And the Moratorium's provision limiting the treatment of unpaid rent as an enforceable debt helped prevent soft or informal evictions. *See* SER-14–15; *see also* 86 Fed. Reg. 21163, 21166–67 (Apr. 22, 2021) (noting that "informal evictions may be common" and "have increased during the COVID-19 pandemic").

Designed to avert an economic and public health catastrophe, the purposes of the Moratorium are undisputedly legitimate, a point the Landlords do not dispute. *See* Opening Br. at 40.

### b. The Moratorium was reasonable and appropriate

The only remaining question, then, is whether the Moratorium was "reasonable" and "appropriate" in advancing the State's interests. It was. Where, as here, the State is not itself a "contracting party," the Court must "defer" to the Governor's "judgment as to the necessity and reasonableness of a particular measure[ ]" in answering that question. *Energy Rsrvs. Grp.*, 459 U.S. at 412–13 (cleaned up); *Elmsford*, 469 F. Supp. 3d at 169 ("[T]he law affords States a wide berth to infringe upon private contractual rights when they do so in the public interest . . . ."). This "latitude 'must be especially broad[ ]'" where "officials 'undertake to act in areas fraught with medical and scientific uncertainties,'"

such as responding to the COVID-19 pandemic. *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613–14 (2020) (Roberts, C.J., concurring) (quoting *Marshall v. United States*, 414 U.S. 417, 427 (1974)). So long as "those broad limits are not exceeded, they should not be subject to second-guessing by . . . '[the] judiciary,' which lacks the background, competence, and expertise to assess public health[.]" *Id.* (quoting *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 545 (1985)).

The Moratorium fit paradigmatically within the Supreme Court's standard for a reasonable and appropriate law. Like the mortgage moratorium upheld in *Blaisdell*, the Moratorium was a response to an unprecedented "emergency which threatened the loss of homes." 290 U.S. at 444–45 (cleaned up). The Moratorium was "not for the mere advantage of particular individuals but for the protection of a basic interest of society[,]"—to prevent mass evictions and the spread of COVID-19. *Id.* at 445. Its terms were reasonable: it did not repudiate or reduce tenants' rent obligations, so their "indebtedness is not impaired[.]" *Id.* And the Moratorium was "temporary in operation[]" and "limited to the exigency which called it forth." *Id.* at 447. In sum, "as in *Blaisdell*, where [the Court upheld] temporary measures enacted in response to emergency conditions

to allow people to remain in their homes[,]" the Moratorium advanced important state goals in a reasonable, appropriate way. *HAPCO*, 482 F. Supp. 3d at 355.

The Landlords incorrectly contend that *Blaisdell* and other cases require that moratoria can only be upheld if tenants continue to pay fair rent. *See* Opening Br. at 55–57. In *Blaisdell*, the U.S. Supreme Court upheld a moratorium on foreclosures in part because it "secure[d] to the mortgagee the rental value of the property[.]" 290 U.S. at 432. But the *Blaisdell* Court did not hold that the contemporaneous rent aspect of the Minnesota foreclosure moratorium was essential to its reasonableness. The opinion includes a list of other factors that rendered the order reasonable, including that, like here, many essential contractual obligations remained intact, for example, "the integrity of the mortgage indebtedness [was not impaired" and "the validity of the sale and the right of a mortgagee-purchaser to title or to obtain a deficiency . . . [were] maintained[.]" *Id.* at 445–46. *Blaisdell* specifically rejected the notion that Contracts Clause analysis should proceed with a "literal exactness like a mathematical formula." *Id.* at 428. Instead, "[e]very case must be determined upon its own circumstances." *Id.* at 430.

*Blaisdell* and other cases make clear that there is no precise formula or factor-based test to be applied in every case but that the overarching

consideration must be the reasonableness of the impairment based on the facts of the case. For this reason, courts including this one have rejected the exact argument made by the Landlords here in holding that "there is no apparent ironclad constitutional rule that eviction moratoria pass Contracts Clause scrutiny only if rent is paid during the period of the moratoria. Instead, each of the cases [plaintiff] cites turned on its own facts and circumstances." *AALAC*, 10 F.4th at 915; *id.* ("Nothing in *Blaisdell* suggests that a 'reasonable rent' requirement was dispositive."); *El Papel*, 2021 WL 4272323, at *9–10.

And though the Moratorium did not condition its protection on the continued payment of rent, the State has allocated hundreds of millions of dollars to landlords and tenants to cover unpaid rent during the course of the pandemic— rental assistance funds of which the Landlords themselves have taken advantage of. The Landlords totally ignore this aspect of the State's pandemic response, which significantly mitigates the financial burden of the Moratorium. *See supra* pp. 10–11 (discussing rental assistance measures); *AALAC*, 10 F.4th at 916 ("Further weakening [appellant]'s challenge is the fact that the eviction moratorium is but one aspect of a broader remedial framework applicable to landlords during the pandemic.").

For these reasons, nearly all federal courts have rejected Contracts Clause challenges to state and local eviction moratoria—including this Moratorium. *See, e.g.*, *AALAC*, 10 F.4th at 916–17; *El Papel*, 2021 WL 4272323, at \*9–10; *Gallo*, 2022 WL 2208934, at \*5–7; *Baptiste*, 490 F. Supp. 3d at 381–87; *HAPCO*, 482 F. Supp. 3d at 349–53; *Elmsford*, 469 F. Supp. 3d at 168–72; *Auracle Homes*, 478 F. Supp. 3d at 233–26. Like other moratoria upheld during this public health emergency, the Moratorium helped residents remain in their homes and, especially considering the COVID-19 pandemic during which it has been critical for people to maintain social distance from each other.

The Landlords maintain their argument that the Moratorium is unreasonable because it applied "regardless of a tenant's employment [status] or ability to pay." Opening Br. at 67. But seeking to avoid housing instability, whether of the rich or of the poor, kept people in their homes and reduced COVID-19 transmission. *See* SER-185; *see also AALAC*, 10 F.4th at 914 ("The City fairly ties the moratorium to its stated goal of preventing displacement from homes, which the City reasonably explains can exacerbate the public health-related problems stemming from the COVID-19 pandemic.").

The State specifically considered but decided not to include a hardship requirement because, in many cases, tenants in genuine economic distress due to the pandemic are unable to provide adequate proof of their distress because of their informal employment or non-traditional sources of income. SER-15. As the Governor's Office explained,

> [P]roving distress is not as simple as submitting a copy of a termination letter from an employer. And even if a tenant did not lose their job, they could be facing pandemic-related economic distress anyway, such as the burden of caring for family members who lost their jobs or are unable to provide for themselves.

*Id.* The district court and others have properly credited the State's justifications in holding the Moratorium reasonable. *See Jevons*, 561 F. Supp. 3d at 1101 ("Regardless of the pandemic's impact on any specific individual's financial or health circumstances, one of the moratorium's express intentions is to reduce person-to-person contact to mitigate transmission of COVID-19."); *El Papel*, 2021 WL 4272323, at *11 (discussing the State's efforts to balance interests of tenants and landlords); *Gonzales*, 504 P.3d at 907; *see also Baptiste*, 490 F. Supp. 3d at 386–87 (upholding Massachusetts' moratorium without a requirement for tenants to certify inability to pay rent).

Finally, the Landlords essentially ask the Court to apply strict scrutiny to the Moratorium by drawing distinctions between this Moratorium and what

others courts have upheld. Opening Br. at 61–65. But "[i]t is not the function of the Court to invalidate government action because it was not, in the Court's view, a perfect match to the [g]overnment's objective." *El Papel*, 2021 WL 4272323, at *11. Instead, the Court should defer to the Governor's judgment that a temporary moratorium on evictions is a reasonable and appropriate way to keep renters in their homes and slow the spread of COVID-19, and thus permissible under the Contracts Clause. *See id.* ("It is not required . . . to determine the 'least restrictive means' of achieving that goal."); *Baptiste*, 490 F. Supp. 3d at 386 n.10 ("In any event, the court must determine whether there was a rational basis for the Moratorium when it was enacted, not whether it was necessary because there was no less burdensome way to address the impact of evictions during the pandemic."). The State's action was appropriately tailored to the unprecedented crisis it was designed to meet. *See Energy Rsrvs. Grp.*, 459 U.S. at 412–13.

## VIII. CONCLUSION

The Court should dismiss this appeal as moot or, in the alternative, affirm the judgment of the district court.

RESPECTFULLY SUBMITTED this 24th day of August 2022.

ROBERT W. FERGUSON
Attorney General

*/s/ Cristina Sepe*
CRISTINA SEPE, WSBA #53609
BRIAN H. ROWE, WSBA #56817
Assistant Attorneys General
JEFFREY T. EVEN, WSBA #20367
Deputy Solicitor General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
Cristina.Sepe@atg.wa.gov
Brian.Rowe@atg.wa.gov
Jeffrey.Even@atg.wa.gov
*Attorneys for Defendants-Appellees*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)**  | 22-35050

The undersigned attorney or self-represented party states the following:

○  I am unaware of any related cases currently pending in this court.

○  I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

⦿  I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

Case No. 22-35656, El Papel, LLC, et al. v. City of Seattle, et al.
This case also challenges the Governor's eviction moratorium under Proclamation 20-19, as amended, under the Takings and Contracts Clauses of the U.S. Constitution. In addition to the state moratorium, Plaintiffs also challenge the City of Seattle's moratorium.

**Signature** | s/ Cristina Sepe   **Date** | Aug 24, 2022

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 17**                                                        *New 12/01/2018*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 22-35050

I am the attorney or self-represented party.

**This brief contains** | 13,963 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

　　○ it is a joint brief submitted by separately represented parties;

　　○ a party or parties are filing a single brief in response to multiple briefs; or

　　○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [            ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Cristina Sepe | **Date** | Aug 24, 2022

*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** | *Rev. 12/01/2018*