## Docket No. 22-35050

*In the*

# United States Court of Appeals

*For the*

# Ninth Circuit

ENRIQUE JEVONS, as managing member of Jevons Properties, LLC,
FREYA K. BURGSTALLER, as trustee of the Freya K. Burgstaller
Revocable Trust, JAY GLENN and KENDRA GLENN,

*Plaintiffs-Appellants,*

v.

JAY INSLEE, in his official capacity as Governor of the
State of Washington and ROBERT FERGUSON, in his official capacity
of the Attorney General of the State of Washington,

*Defendants-Appellees.*

_____

*Appeal from a Decision of the United States District Court for the Eastern District of Washington,
No. 1:20-cv-03182-SAB · Honorable Stanley Allen Bastian*

## APPELLANTS' REPLY BRIEF

PHILIP A. TALMADGE, ESQ.
AARON P. ORHEIM, ESQ.
TALMADGE/FITZPATRICK
2775 Harbor Avenue SW
Third Floor, Suite C
Seattle, Washington 98126
(206) 574-6661 Telephone
phil@tal-fitzlaw.com
aaron@tal-fitzlaw.com

RICHARD M. STEPHENS, ESQ.
STEPHENS & KLINGE LLP
10900 NE 4th Street, Suite 2300
Bellevue, Washington 98004
(425) 453-6206 Telephone
stephens@GSKlegal.pro

*Attorneys for Appellants Enrique Jevons,
Freya K. Burgstaller, Jay Glenn and Kendra Glenn*

 

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................ ii

I.     INTRODUCTION ........................................................................1

II.    REPLY ON STATEMENT OF THE CASE..................................................2

III.   ARGUMENT IN REPLY ................................................................3

      (1)    The Case Is Not Moot and Declaratory Relief Is Appropriate ............3

      (2)    The Eviction Moratorium Effected a Compensable Taking
           Under the Takings Clause ................................................6

      (3)    The Eviction Moratorium Unconstitutionally Interfered with the
           Owners' Contract Rights in Violation of the Contracts Clause ..........13

IV.   CONCLUSION.............................................................18

CERTIFICATE OF COMPLIANCE....................................................20

CERTIFICATE OF SERVICE ........................................................21

i

# TABLE OF AUTHORITIES

## CASES

*Alabama Ass'n of Realtors v. Dep't of Health & Human Servs.*,
    141 S. Ct. 2485 (2021)........................................................................11, 14, 15

*Arkansas Game & Fish Comm'n v. United States*,
    568 U.S. 23 (2012).............................................................................3, 4, 6, 9

*Armstrong v. United States*,
    364 U.S. 40 (1960) ..................................................................................10

*Block v. Hirsh*,
    256 U.S. 135 (1921)................................................................................14

*Bols v. Newsom*,
    515 F. Supp. 3d 1120 (S.D. Cal. 2021) .......................................................12

*Brown v. Legal Found. of Wash.*,
    538 U.S. 216 (2003).................................................................................9

*Cedar Point Nursery v. Hassid*,
    141 S. Ct. 2063 (2021)......................................................................5, 6, 7, 8, 9

*Cienega Gardens v. United States*,
    331 F.3d 1319 (Fed. Cir. 2003) ..................................................................11

*City Bar, Inc. v. Edwards*,
    __ So. 3d __, 2022 WL 3754747 (La. Ct. App. Aug. 30, 2022)...................12

*Edgar A. Levy Leasing Co., Inc. v. Siegel*,
    256 U.S. 242 (1922).................................................................................14

*Elmsford Apt. Assocs., LLC v. Cuomo*,
    469 F. Supp. 3d 148 (S.D.N.Y. 2020) .........................................................15

*Heights Apartments, LLC v. Walz*,
    30 F.4th 720 (8th Cir. 2022).........................................................8, 14, 15, 17

*Kaiser Aetna v. United States*,
    444 U.S. 164 (1979)..................................................................................7

*Knick v. Township of Scott, Pa.*,
    139 S. Ct. 2162 (2019)...................................................................3

*Loretto v. Teleprompter Manhattan CATV Corp.*,
    458 U.S. 419 (1982)......................................................................9

*Marcus Brown Holding Co., Inc. v. Feldman*,
    256 U.S. 170 (1921)....................................................................14

*Moore v. Ogilvie*,
    394 U.S. 814 (1969)......................................................................6

*Owens v. Layton*,
    233 P. 645 (Wash. 1925) ...........................................................10

*R. J. Widen Co. v. U.S.*,
    357 F.2d 988 (Ct. Cl. 1966) .........................................................4

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
    141 S. Ct. 63 (2020).........................................................1, 14, 15

*State ex rel. Distilled Spirits Inst., Inc. v. Kinnear*,
    492 P.2d 1012 (Wash. 1972) ........................................................6

*State v. Beaver*,
    358 P.3d 385 (Wash. 2015) ..........................................................5

*Sveen v. Melin*,
    138 S. Ct. 1815 (2018)....................................................13, 15, 17

*United States v. General Motors Corp.*,
    323 U.S. 373 (1945)...............................................................4, 9, 10

*United States v. W.T. Grant Co.*,
    345 U.S. 629 (1953) .....................................................................6

*W.B. Worthen Co. v. Kavanaugh*,
    295 U.S. 56 (1935)......................................................................14

*Yee v. City of Escondido*,
    503 U.S. 519 (1992)......................................................................8

**CONSTITUTIONS**

United States Constitution, Article I § 10.................................................................13

United States Constitution, Fifth Amendment..............................................7, 11, 12

**STATUTES**

28 U.S.C. § 2202....................................................................................................4, 13

## I.    INTRODUCTION

"[E]ven in a pandemic, the Constitution cannot be put away and forgotten."
*Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2020) (*per curiam*).

Time and again, our Supreme Court has reiterated that government interference with private property rights must conform to the protections afforded by our Constitution.  This is just as true during times of peace as it is during times of war, pandemic, or other emergency.  If anything, the Supreme Court has moved the needle further toward protecting the private rights afforded by our Constitution in each decision it has issued since the pandemic began.  It struck down prohibitions on gathering for worship and a broad, federal eviction moratorium issued by the Center for Disease Control ("CDC").  In that latter instance, it noted that it is inequitable to force private landowners to bear the burden of providing public housing through the pandemic and denying them an essential property right, the right to exclude others.  This Court should follow that clear directive.

The State of Washington ("State") ignores these recent authorities and trends in Supreme Court jurisprudence, largely relying on decades-old precedent, dissenting opinions, and district court decisions from the earliest days of the pandemic.  The Court should see through this failure to cite persuasive authority.  Rather, it should uphold the fundamental protections afforded by our Constitution

1

protecting private property rights from appropriation for public purposes without sufficient compensation.

## II.    REPLY ON STATEMENT OF THE CASE

The parties moved on cross motions for summary judgment, agreeing that further factual development was unnecessary to resolve the legal issues present in this case.  Now, the State relies on a host of assumptions about what harm the Owners suffered, while the Owners rely on facts.

The Owners extensively documented the economic harm they suffered as a result of the unconstitutional interference with their contractual rights.  *E.g.*, 2-ER-236–70.  The State glides past this "irreparable harm" arguing that all was well because federal and state COVID relief programs made some money available for rental relief in some cases.  Appellees' br. at 10-14.  But this ignores the reality that landlords like the Owners bore the specific costs of thousands of dollars in unpaid rent that they will never recover, that any rent they did recover was interest free – burdening Washington's residential lessors as the charity lender of last resort in times of pandemic – and that they were left without the right to occupy and enjoy their property or miss out on any number of other benefits of their property.  Moreover, the State glides past the costs incurred by landlords to avail themselves of whatever public monies were made available.  The Owners were burdened with providing public housing rent free, while still being forced to pay property taxes,

utility fees, and other assessments on their properties that they normally rely on rental income to pay.  2-ER-208.

To the extent there is any question about this evidence, the matter should be remanded, not dismissed, for further discovery or other proceedings.  At any rate, reversal is warranted because the district court incorrectly dismissed the case.

## III.   ARGUMENT IN REPLY

### (1)   The Case Is Not Moot and Declaratory Relief Is Appropriate

The State spends considerable time discussing mootness and justiciability through a declaratory relief action because it wants to avoid the merits of this case. Appellees' br. at 19-33.  The State is wrong – the case is not moot and declaratory relief is an appropriate action to resolve this live controversy of whether a compensable taking occurred.

The State claims that the case is moot because it is unlikely to recur.  But that logic would only apply to claims for injunctive relief, which are prospective in nature.  *See Knick v. Township of Scott, Pa.*, 139 S. Ct. 2162, 2175 (2019).  By contrast, in this case, the Owners seek retrospective relief – they ask this Court to declare that the State effected a temporary taking and unconstitutionally interfered with their contractual rights *in the past*.  It makes no difference that the taking is no longer occurring, the Supreme Court has "confirm[ed] that takings temporary in duration can be compensable." *Arkansas Game & Fish Comm'n v. United States*,

3

568 U.S. 23, 32 (2012) (citing cases); *see also*, *e.g.*, *R. J. Widen Co. v. U.S.*, 357 F.2d 988, 996 (Ct. Cl. 1966) ("Temporary takings are recognized in the law of federal eminent domain" and require payment of just compensation during time the government effected a taking temporarily) (past taking occurred for which compensation must be paid when federal engineers temporarily entered plaintiffs land to construct flood control measures) (citing, *e.g.*, *United States v. General Motors Corp.*, 323 U.S. 373, 382 (1945)). It is a live, justiciable controversy for this Court to determine whether a taking occurred when the Owners were denied the right to exclude others from their property without just compensation.

Additionally, the State offers no response to the Owners' argument that the declaratory judgment statute expressly recognizes that a declaratory judgment may not provide all appropriate relief and that further relief – like an award of compensation in this case – may be granted *after* the declaration has been granted. 28 U.S.C. § 2202 ("Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment."). Thus, the State's discussion of sovereign immunity and lawsuits for damages is irrelevant at

this stage.[1] Appellees' br. at 21. The first step is to determine whether a constitutional violation occurred – either a taking or an unconstitutional interference with contracts – and the remedy will be fixed later. That is precisely the mechanism employed by the litigants in *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063 (2021), who first sought declaratory relief that a taking occurred, and further relief was appropriate on remand once the Supreme Court made such a determination.

This Court should not be distracted by the State's diversionary tactics, this case is justiciable and declaratory relief is appropriate for the Court to declare that a compensable taking occurred during the time the eviction moratorium was in place.[2]

---

[1] The State's arguments on immunity and enforcement of a judgment are overblown. Judicial enforcement of a declaratory judgment that the Owners are entitled to just compensation for the State's taking is a non-issue. As in every case cited in this brief and the Owners' opening brief where a court decided that compensation was due, the Takings Clause demands that the State pay such compensation, which it can do.

[2] Even in technically moot cases – which this is not – courts will often "decide an appeal if the question is one of continuing and substantial public interest." *State v. Beaver*, 358 P.3d 385, 390 (Wash. 2015). This is true in actions for declaratory relief:

> Where the question is one of great public interest and has been brought to the court's attention in the action where it is adequately briefed and argued, and where it appears that an opinion of the court would be beneficial to the public and to the other branches of the government, the court may exercise its discretion and render a declaratory judgment to resolve a question of constitutional interpretation.

**(2)** **The Eviction Moratorium Effected a Compensable Taking Under the Takings Clause**

As discussed in the Owners' opening brief, a compensable taking occurred when the State prohibited evictions of tenants who failed to pay rent or violated the rules of the tenancy, effectively mandating a physical occupation of the Owners' properties. Appellants' br. at 27-38.

The State wants to overcomplicate the issue. Citing precedent from decades ago, the State takes great pains to distinguish between physical, regulatory, and other takings, and accuses the Owners of "mish-mash[ing]" the law related to these various labels. Appellees' br. at 42. But the question is much simpler than that. The Supreme Court examined modern jurisprudence on the Takings Clause just last year in *Cedar Point*, noting that the Court's "jurisprudence governing…restrictions [over a property owner's use of his or her property] has developed more recently." 141 S. Ct. at 2071. The Court held that the operative question in any takings case is simply "whether the government has physically taken property for itself or someone else—

---

*State ex rel. Distilled Spirits Inst., Inc. v. Kinnear*, 492 P.2d 1012, 1014 (Wash. 1972). Moreover, cases are not moot where a party voluntarily ceases his or offending conduct but remains "free to return to his old ways," *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953), or in cases that involve wrongs that are "capable of repetition, yet evading review." *Moore v. Ogilvie*, 394 U.S. 814, 816 (1969). Thus, even setting aside the live controversy over the uncompensated takings, declaratory relief is appropriate to clarify landlord rights in this area of substantial public interest. The State could also return to its old ways and reinstitute an eviction moratorium at any time should the pandemic flare back up, meaning this case evaded review.

by whatever means—or has instead restricted a property owner's ability to use his own property." *Id.* at 2072. The Court rejected an overly technical distinction between physical versus regulatory takings because "label[s] can mislead." *Id.*; *see also*, *Arkansas Game & Fish Comm'n*, 568 U.S. at 31–32 ("no magic formula enables a court to judge, in every case, whether a given government interference with property is a taking…most takings claims turn on situation-specific factual inquiries"). "Government action that physically appropriates property is no less a physical taking because it arises from a regulation." *Cedar Point*, 141 S. Ct. at 2072. "Whenever a regulation results in a physical appropriation of property, a *per se* taking has occurred." *Id.*

In *Cedar Point*, the Court held that "access regulation" that grants persons the right to enter another's property "appropriates a right to invade the growers' property and therefore constitutes a *per se* physical taking." *Id.* The Court noted, as the Owners have argued here, that the right to exclude others, is "one of the most essential sticks in the bundle of rights that are commonly characterized as property." *Id.* (citing *Kaiser Aetna v. United States*, 444 U.S. 164, 176, 179–80 (1979)). Thus, regulation that forces a property owner to suffer physical occupation of property by other persons is a compensable taking under the Fifth Amendment.

Given this recent case, it is unsurprising then that the Eighth Circuit has held that an eviction moratorium promoted by the pandemic constitutes a taking of

property owners' property, requiring compensation. *Heights Apartments, LLC v. Walz*, 30 F.4th 720 (8th Cir. 2022).[3] The court did not need to rely on the decades-old precedent cited by the State in this case, like *Yee v. City of Escondido*, 503 U.S. 519 (1992), which the Eighth Circuit expressly distinguished when considering an eviction moratorium. "The well-pleaded allegations" that moratoriums "forbade the nonrenewal and termination of ongoing leases, even after they had been materially violated" was "sufficient to give rise to a plausible *per se* physical takings claim under *Cedar Point Nursery*." *Id.* at 733. This case is no different.

The State's only retort is to argue that the Eighth Circuit "misread" case law, citing the dissent from the Eighth Circuit's denial of rehearing *en banc* for support. Appellees' br. at 40. But those rehashed arguments were rejected by the majority of the Eighth Circuit who properly considered the issue given recent Supreme Court precedent. They are unpersuasive here in a functionally identical case.

Indeed, it is the State that misreads case law, arguing "the Supreme Court has...ma[de] clear that a physical taking occurs when the government subjects a property owner to a '*permanent* physical occupation' the owner's property."

---

[3] Although this Court's review is *de novo*, and the district court's reasoning is therefore immaterial, the district court did not have the benefit of the Eighth Circuit's decision in *Heights Apartments*. That case was decided nine months after the district court dismissed the owners' claims on nearly identical facts. The district court should have appreciated, as the Eighth Circuit did, the importance of recent Supreme Court precedent like *Cedar Point*.

Appellees' br. at 34 (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982)) (emphasis in appellees' br.). But as discussed above, temporary takings are compensable, as the Supreme Court has reiterated in recent years. *Arkansas Game & Fish Comm'n*, *supra*; *Cedar Point Nursery*, 141 S. Ct. at 2074 ("physical appropriation is a taking whether it is permanent or temporary"); *Brown v. Legal Found. of Wash.*, 538 U.S. 216, 233 (2003) ("compensation is mandated when a leasehold is taken and the government occupies the property for its own purposes, even though that use is temporary.").

It has long been the rule that even in times of crisis, appropriating leased property temporarily for public use is a taking that requires compensation. In *General Motors Corporation*, 323 U.S. at 374–75, the Supreme Court held that "temporary occupancy of a portion of a leased building" to assist with the war effort, was a compensable taking. Again, that case involved the government taking property directly, but the same is true when the government has "taken property for…someone else—by whatever means—or has instead restricted a property owner's ability to use his own property." *Cedar Point*, 141 S. Ct. at 2072 (2021). The State's eviction moratorium did just that, temporarily restricting the Owners' ability to use their property in order to benefit someone else. They could not enforce their legal right to evict tenants for material breaches of their leases, effectively providing subsidized housing through interest free loans and denying Owners the

right to reoccupy their property for material breach. They are owed just compensation for that temporary taking.

The State also argues that this case is different from cases like *General Mooters Corporation* because the Landlords voluntarily chose to rent their premises out to tenants. Appellants' br. at 35-38. This argument is disingenuous. The Owners voluntarily rent out their residential property, but only with the expectation that they retain the right to exclude tenants who materially breach their lease agreements, most importantly, for nonpayment of rent. Washington law recognizes the fundamental nature of this *business relationship* – "[r]ent is an incident of a tenancy," and any tenants holding over on a property without paying rent are "trespassers." *Owens v. Layton*, 233 P. 645, 645 (Wash. 1925); *see also*, *Armstrong*, *supra* (materialmen chose to furnish materials to a private company to build boats with the expectation of payment, and they were owed just compensation when the Navy conscripted the boats for public service without paying the materialmen).

In effect, the Owners were asked to bear the brunt of a public social policy without full compensation. This runs afoul of one of the primary policy concerns animating takings jurisprudence, namely the notion that the Takings Clause "bar[s] Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960); *see also, Lingle*, 544 U.S. at 537 ("Government

[cannot force] some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." Singling out a small class to bear a societal burden "is the kind of expense-shifting to a few persons that amounts to a taking." *Cienega Gardens v. United States,* 331 F.3d 1319, 1338–39 (Fed. Cir. 2003).

Again, the Supreme Court recently clarified this topic. In striking down the CDC's federal eviction moratorium as an unconstitutional exercise of federal power, the Court explained the inequitable burden such moratoria place on one subset of citizens – residential lessors:

> The moratorium has put the applicants, along with millions of landlords across the country, at risk of irreparable harm by depriving them of rent payments with no guarantee of eventual recovery. Despite the CDC's determination that landlords should bear a significant financial cost of the pandemic, many landlords have modest means. And preventing them from evicting tenants who breach their leases intrudes on one of the most fundamental elements of property ownership—the right to exclude…It is indisputable that the public has a strong interest in combating the spread of the COVID-19 Delta variant. But our system does not permit agencies to act unlawfully even in pursuit of desirable ends.

*Alabama Ass'n of Realtors v. Dep't of Health & Human Servs.*, 141 S. Ct. 2485, 2489–90 (2021). Here, it may be desirable to prevent homelessness due to the COVID-19 pandemic, appropriating private property for that public purpose, without providing just compensation as required by the Fifth Amendment, is "unlawful[]." *Id.* at 2490. It is no wonder that other courts have started to catch up

11

to the clear direction from the Supreme Court that uncompensated takings are actionable. *E.g.*, *Bols v. Newsom*, 515 F. Supp. 3d 1120, 1131 (S.D. Cal. 2021) (landlord's challenge to local eviction moratoria based on Contracts Clause and Fifth Amendment takings claims stated plausible claims for relief); *City Bar, Inc. v. Edwards*, __ So. 3d __, 2022 WL 3754747 at *7 (La. Ct. App. Aug. 30, 2022) (local bar owners stated a claim for an uncompensated taking under the state constitution) (citing federal authorities).

Just weeks ago, a Louisiana appellate court echoed the concerns of the Supreme Court, that while pandemic regulations may be laudable, they must not be unconstitutional, appropriating private property without constitutionally required compensation:

> In a pandemic, all citizens and businesses may be called upon to share the burden of losing their liberties and businesses interests for a period of time for the public good of stopping the spread of a dreaded disease. However, certain individuals or businesses may be called upon to suffer a greater loss for the public good and should, in some cases, be compensated for their greater loss in protecting the health and welfare of the citizens of this State.

*Id.*

Here, too, the Owners were ordered to suffer a great loss for the purpose of "protecting the health and welfare of the citizens of the state." *Id.* Lacking sufficient public housing, funds, or possibly the political desire to provide the same, Washington's leaders commandeered its residential landlords, forcing them to

provide that housing to its citizens. It denied the Owners a basic property right, the right to exclude tenants who materially breached their lease for nonpayment of rent, thereby becoming trespassers. The questions presented here is not whether that was sound or even permissible policy, but whether a taking occurred, such that the Owners must be provided just compensation as the Constitution requires.

The answer – as the Supreme Court has suggested and the Eighth Circuit has thoughtfully concluded – is yes. This Court should conclude the same, reverse, and remand the takings clause claims for further relief and proceedings as contemplated by 28 U.S.C. § 2202.

### (3)   The Eviction Moratorium Unconstitutionally Interfered with the Owners' Contract Rights in Violation of the Contracts Clause

As discussed in the Owners' opening brief, the eviction moratorium unconstitutionally interferes with the Owners' contractual rights, in violation of the Contracts Clause. U.S. Const. art. I, § 10, cl. 1. Appellants' br. at 38-68. The parties agree that such a claim is actionable, and they agree on the test, a two-pronged approach where the Court must ask: (1) Does the challenged law work a "substantial impairment of a contractual relationship?" if so, (2) has the government shown that the interests pursued are legitimate and that "the relief was appropriately tailored" and subject to reasonable conditions? *Sveen v. Melin*, 138 S. Ct. 1815, 1821 (2018).

The answer to the first question is clearly yes. As the Supreme Court stated in striking down the unconstitutional CDC moratorium, "preventing [landlords]

from evicting tenants who breach their leases intrudes on one of the most fundamental elements of property ownership—the right to exclude…" *Alabama Ass'n of Realtors*, 141 S. Ct. at 2489. Preventing them from exercising their contractual right to evict a tenant for material breach of their lease exposes landlords to "irreparable harm." *Id.* The Eighth Circuit cited this very reasoning from the Supreme Court in concluding that another state's eviction moratorium "substantially impaired [a landlord's] contractual bargain with its tenants." *Heights Apartments*, 30 F.4th at 729.

Again, ignoring these recent authorities, the State distinguishes cases from the 1920s and 1930s. Appellees' br. at 47–54 (citing, *e.g.*, *Block v. Hirsh*, 256 U.S. 135 (1921); *Marcus Brown Holding Co., Inc. v. Feldman*, 256 U.S. 170 (1921); *Edgar A. Levy Leasing Co., Inc. v. Siegel*, 256 U.S. 242 (1922); *Home Building & Loan Association v. Blaisdell*, 290 U.S. 398 (1934) and *W.B. Worthen Co. v. Kavanaugh*, 295 U.S. 56 (1935)). But even these older cases each recognize the delay for owners to access their property is not a contractual impairment only if value – *namely, rent* – is paid for the delay, contemporaneously or otherwise, a point the State and the district court ignore. Appellants' br. at 56–58. And the State relies heavily on a single district court case from New York issued in the very first months of the pandemic, before the Supreme Court's decisions in *Roman Catholic Diocese of Brooklyn* and *Alabama Association of Realtors* or the Eighth Circuit's in *Heights*

14

*Apartments.* Appellees' br. at 50–52 (citing *Elmsford Apt. Assocs., LLC v. Cuomo*, 469 F. Supp. 3d 148 (S.D.N.Y. 2020)).

True, the Southern District of New York ruled in June 2020 that a moratorium did not fundamentally interfere with a landlord's contractual rights, because *at the time* it appeared to merely delay the right to collect rental payments. But since those salad days of the pandemic, the Supreme Court has articulated the "irreparable harm" landlords suffer because of eviction moratoria like those here. *Alabama Ass'n of Realtors*, 141 S. Ct. at 2489. It is more than just the right to collect rent at a certain time at issue, but, rather the most essential of all property rights, the right to exclude others. *Id.* Whether striking down sweeping restrictions on citizens right to gather for worship, as the Court did in *Roman Catholic Diocese of Brooklyn*, or striking down the federal eviction moratorium as an unconstitutional reach of Executive power in *Alabama Association of Realtors*, the Supreme Court has reiterated that the Constitution does not bend in the face of a pandemic.

Turning to the second prong, the State cannot meet its burden[4] to show that the eviction moratorium was narrowly tailored to avoid running afoul of the Contracts Clause. The eviction moratorium requires the Owners to suffer physical occupation of their properties, against their will, with no provision for assurance that

---

[4] *Sveen*, 138 S. Ct. at 1822 (burden of proof to show sufficiently narrow tailoring rests with the State).

15

withheld rent will ever be paid – by anyone.  It aims to reduce homelessness, but it prohibits executions on judgments for past due rent regardless of a tenant's employment or ability to pay.  Nor can the Owners evict tenants for violations unrelated to nonpayment of rent, which draws no relation to the stated goal of preventing homelessness.  The Owners offered a host of measures Washington could have taken to more narrowly focus the relief afforded to tenants facing possible homelessness during the pandemic, through far less intrusive means.  2-ER-209.[5] This is the kind of narrow tailoring the Contracts Clause demands.

Again, the Eighth Circuit's reasoning is persuasive.  There, the court held that broad eviction moratoria that prevented evictions in all cases of material breach, not

---

[5] The Owners' complaint offered several alternatives to conscripting landlords into providing public housing and interest free, indefinite loans to tenants who could not pay rent, including, but not limited to:

> (a) permitting the courts to hear each case on its own merits and fashion relief appropriate to the specific positions of the affected housing providers and tenants, thereby protecting tenants from immediate eviction but also providing protection to housing providers from excessive periods of non-payment; (b) requiring tenants to substantiate the criteria for qualifying for protection under the Proclamations through documentation or other evidence; (c) providing housing providers an opportunity to challenge a tenant's claimed qualification for protection under the Proclamations; (d) providing tenants with the means to pay rent in order to satisfy the State's tenant protection goals, without requiring housing providers owners to bear the burden of significant non-payment of rent; and/or (e) compensating housing providers when a tenant fails to pay rent.

2-ER-209.

just those having to do with nonpayment of rent, was not sufficiently tailored to the goal of reducing COVID-19 transmission. *Heights Apartments*, 30 F.4th at 731–32. This makes perfect sense, as such broad interference with the Owners' contractual rights is impermissible if bears no "appropriate" or "reasonable" relation to the stated public goal. *Id.* (citing, *e.g.*, *Sveen*, 138 S. Ct. at 1822).

The State glosses over this reasoning, and claims that no matter how inappropriately tailored the law was, it furthered the goal of "kep[ing] people in their homes and reduc[ing] COVID-19 transmission." Appellees' br. at 63. It claims that regardless of a tenants' ability to pay rent or otherwise adhere to the material terms of their lease, that goal was valid for both the "rich [and] the poor." *Id.* Preposterous. If the State's true goal was to keep all citizens, rich and poor, from moving between homes during the pandemic, why didn't it institute a freeze on housing sales? Or why did it only restrict landlord's ability to evict tenants without simultaneously restricting tenants' ability to move? The answer is because preventing housing change was not the State's true goal, providing subsidized housing for tenants was. The State could have done so by funding the acquisition of housing by tenants or building its own sufficient public housing but that was presumably too financially or politically costly. Instead, it commandeered residential landlords to bear the brunt of the State's social policy, taking their property and interfering with their existing rights under their contracts without providing compensation. Such unlawful actions

cannot withstand constitutional review, given the recent guidance from the Supreme Court on constitutional law in the time of pandemic.

## IV. CONCLUSION

As federal jurisprudence has evolved in the nearly three years since the COVID-19 pandemic broke out, it has become clear that our Constitutional protections do not take second chair to a government response to a crisis. While States certainly have the power to take action to address a pandemic, they may not appropriate private property to do so without just compensation. Nor may that broadly interfere with quintessential private property rights without sufficient tailoring to protect contract rights. The district court erred in granting summary judgment and Owners respectfully urge the Court to reverse that decision.

DATED this 14th day of October, 2022.

Respectfully submitted,

/s/ Philip A. Talmadge
Philip A. Talmadge, WSBA #6973
Aaron P. Orheim, WSBA #47670
Talmadge/Fitzpatrick
2775 Harbor Avenue SW
Third Floor, Suite C
Seattle, WA 98126
(206) 574-6661

Richard M. Stephens WSBA #21776
Stephens & Klinge LLP
10900 NE 4th Street, Suite 2300
Bellevue, WA 98004
(425)-453-6206

Attorneys for Plaintiffs-Appellants

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** 22-35050

I am the attorney or self-represented party.

**This brief contains 4,439 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[XX] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

Signature: /s/ Philip A. Talmadge      Dated: October 14, 2022

20

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 14, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


 /s/ Kirstin E. Largent